Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:  (801) 363-4300
E-mail:  mboley@ck.law
          jtrousdale@ck.law

*Attorneys for* debtor-in-possession
LOGISTICS GIVING RESOURCES, LLC

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>**LOGISTICS GIVING RESOURCES, LLC,**<br><br>Debtor. | Bankruptcy No. 22-20143<br><br>Chapter 11<br><br>(Under Subchapter V) |

**DEBTOR'S PLAN UNDER SUBCHAPTER V OF CHAPTER 11**

Dated:  May 25, 2022

LOGISTICS GIVING RESOURCES, LLC, debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case under subchapter V (the "Case"), hereby proposes the following plan of reorganization (the "Plan") under sections 1189, 1190 and 1191 of title 11 of the United States Code.

# TABLE OF CONTENTS

**ARTICLE 1 DISCLOSURE STATEMENT PURSUANT TO SECTION 1190(1) OF THE CODE** ...................1

**ARTICLE 2 DEFINITIONS AND RULES OF INTERPRETATION** ...............................................................7

| | | |
|---|---|---|
| 2.1 | "Administrative Expense Claim" | 7 |
| 2.2 | "Allowed" | 8 |
| 2.3 | "Applicable Rate" | 8 |
| 2.4 | "Avoidance Actions" | 9 |
| 2.5 | "Bankruptcy Code" and "Code" | 9 |
| 2.6 | "Bankruptcy Court" and "Court" | 9 |
| 2.7 | "Bankruptcy Rules" and "Rules" | 9 |
| 2.8 | "Bar Date" | 9 |
| 2.9 | "Blue Bridge" | 9 |
| 2.10 | The "Blue Bridge Net Amount" | 9 |
| 2.11 | The "Blue Bridge Principal Amount" | 9 |
| 2.12 | "Breakout" | 10 |
| 2.13 | The "Breakout Net Amount" | 10 |
| 2.14 | The "Breakout Principal Amount" | 10 |
| 2.15 | "Brickstone" | 10 |
| 2.16 | The "Brickstone Net Amount" | 10 |
| 2.17 | The "Brickstone Principal Amount" | 11 |
| 2.18 | "Business Day" | 11 |
| 2.19 | "Cash" | 11 |
| 2.20 | "Causes of Action" | 11 |
| 2.21 | "Claim" | 11 |
| 2.22 | The "Claim Rate" | 11 |
| 2.23 | "Class" | 12 |
| 2.24 | "Collateral" | 12 |
| 2.25 | "Confirmation Date" | 12 |
| 2.26 | "Confirmation Order" | 12 |
| 2.27 | "Contingent or Unliquidated Claim" | 12 |
| 2.28 | "Debtor" | 12 |
| 2.29 | "Disallowed" | 12 |
| 2.30 | "Disclosure Statement" | 12 |
| 2.31 | "Disposable Income" | 12 |
| 2.32 | "Disputed Claim" | 12 |
| 2.33 | "Disputed Claim Amount" | 13 |
| 2.34 | "Disputed Lien" | 13 |
| 2.35 | "Distribution Agent" | 13 |
| 2.36 | "Distribution Date" | 13 |
| 2.37 | "Distribution Fund" | 13 |
| 2.38 | "Diverse Capital" | 13 |
| 2.39 | The "Diverse Capital Net Amount" | 13 |
| 2.40 | The "Diverse Capital Principal Amount" | 14 |
| 2.41 | "Drivers" | 14 |
| 2.42 | "Effective Date" | 14 |
| 2.43 | "Equity Interest" | 14 |
| 2.44 | "ERC" or the "ERCs" | 14 |
| 2.45 | The "ERC Fund" | 14 |
| 2.46 | "Estate" | 14 |
| 2.47 | "Everest" | 14 |
| 2.48 | The "Everest Net Amount" | 14 |
| 2.49 | The "Everest Principal Amount" | 15 |

2.50    "Everyday Funding" ............................................................................................ 15
2.51    The "Everyday Funding Net Amount" ............................................................. 15
2.52    The "Everyday Funding Principal Amount" ................................................... 16
2.53    "Final Distribution Date" ................................................................................. 16
2.54    "Final Order" ..................................................................................................... 16
2.55    "Fundbox" .......................................................................................................... 16
2.56    The "Fundbox Net Amount" is: ....................................................................... 16
2.57    The "Fundbox Principal Amount" ................................................................... 17
2.58    The "Future Receivables Financiers" ............................................................. 17
2.59    "General Unsecured Claim" ............................................................................ 17
2.60    "Harvest" ............................................................................................................ 17
2.61    "Hires" ................................................................................................................ 17
2.62    "Initial Distribution Date" .............................................................................. 17
2.63    "Interim Distribution Date" ........................................................................... 17
2.64    "IRS" ................................................................................................................... 17
2.65    "Lien" .................................................................................................................. 17
2.66    "Lifetime Funding" ........................................................................................... 17
2.67    The "Lifetime Funding Net Amount" .............................................................. 17
2.68    The "Lifetime Funding Principal Amount" .................................................... 18
2.69    "Owner" .............................................................................................................. 18
2.70    "Person" .............................................................................................................. 18
2.71    "Petition Date" .................................................................................................. 18
2.72    "Pinhook" ........................................................................................................... 18
2.73    The "Pinhook Net Amount" .............................................................................. 18
2.74    The "Pinhook Principal Amount" .................................................................... 19
2.75    "Plan" .................................................................................................................. 19
2.76    "Plan Administrator" ........................................................................................ 19
2.77    The "Plan Filing Date" ...................................................................................... 19
2.78    The "Plan Lien Rate" ......................................................................................... 19
2.79    "Plan Period" ..................................................................................................... 19
2.80    The "PPP Loan" ................................................................................................. 19
2.81    The "PPP Loan Documents" ............................................................................. 19
2.82    "Prime Rate" ...................................................................................................... 19
2.83    "Priority Claims" ............................................................................................... 19
2.84    "Priority Tax Claims" ....................................................................................... 20
2.85    "Pro Rata" .......................................................................................................... 20
2.86    "Professionals" .................................................................................................. 20
2.87    "Quarter" ............................................................................................................ 20
2.88    "Quarterly" ........................................................................................................ 20
2.89    "Reorganized Debtor" ....................................................................................... 20
2.90    "ROC" ................................................................................................................. 20
2.91    The "ROC Net Amount" ..................................................................................... 20
2.92    The "ROC Principal Amount" .......................................................................... 21
2.93    "Schedules" ........................................................................................................ 21
2.94    "Secured Claim" ................................................................................................ 21
2.95    "Special Voting Interest" .................................................................................. 21
2.96    "Subchapter V Trustee" and "Trustee" .......................................................... 21
2.97    "Subordinated Claim" ...................................................................................... 21
2.98    "Subsidiary Entities" ........................................................................................ 21
2.99    "Total Distributions" ........................................................................................ 21
2.100   "UCC" ................................................................................................................. 21
2.101   "Unclassified Priority Claims" ........................................................................ 22
2.102   "Unique Funding" ............................................................................................. 22
2.103   The "Unique Funding Net Amount" ................................................................ 22
2.104   The "Unique Funding Principal Amount" ...................................................... 22

2.105    The "Unreturned 549 Amounts" .............................................................................22
2.106    The "Wage Order" ................................................................................................23
2.107    "WCF" ...................................................................................................................23
2.108    Capitalized Terms. ...............................................................................................23
2.109    Other Terms. .........................................................................................................23
2.110    References Generally. ...........................................................................................23
2.111    References to Documents, Headings or Exhibits. ...............................................23
2.112    General Rules of Construction. ............................................................................23
2.113    Computation of Time. ..........................................................................................23

**ARTICLE 3 TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS  AND OTHER UNCLASSIFIED PRIORITY CLAIMS** ..........................................................................24

3.1    Non-Classification. ...............................................................................................24
3.2    Administrative Expense Claims. ..........................................................................24
3.3    Unclassified Priority Claims. ...............................................................................25

**ARTICLE 4 CLASSIFICATION OF CLAIMS** ..............................................................25

4.1    Claims Provided for in the Plan. ..........................................................................25
4.2    Limitation on Inclusion in a Class. ......................................................................25
4.3    Unclassified Claims. .............................................................................................25
4.4    Classified Claims and Interests. ...........................................................................26

**ARTICLE 5 TREATMENT OF CLAIMS AND EQUITY INTERESTS** .....................27

5.1    Class 1 – Priority Claims. .....................................................................................27
5.2    Class 2 – General Unsecured Claims. ..................................................................27
5.3    Class 3 – Breakout Capital's Claims. ...................................................................28
5.4    Class 4 – Everest's Claims. ..................................................................................31
5.5    Class 5 – Everyday Funding's Claims. .................................................................34
5.6    Class 6 – Blue Bridge's Claims. ..........................................................................35
5.7    Class 7 – Pinhook's Claims. .................................................................................38
5.8    Class 8 – Diverse Capital's Claims. .....................................................................42
5.9    Class 9 – ROC's Claims. ......................................................................................45
5.10    Class 10 – Brickstone's Claims. ..........................................................................48
5.11    Class 11 – Lifetime Funding's Claims. ................................................................52
5.12    Class 12 – Fundbox's Claims. ..............................................................................55
5.13    Class 13 – Unique Funding's Claims. ..................................................................59
5.14    Class 14 – Harvest's Claim. .................................................................................62
5.15    Class 15 – Equity Interests in the Debtor. ...........................................................62
5.16    Class 16 – Miscellaneous Secured Claims. .........................................................63
5.17    Class 17 – Subordinated Claims. .........................................................................63
5.18    Satisfaction of Claims and Release. .....................................................................63
5.19    No Assumed Liability. ..........................................................................................64
5.20    Disputed Claims. ..................................................................................................64
5.21    No Penalties. .........................................................................................................64
5.22    All Defaults Cured and Waived; All Notes and Obligations Decelerated and Reinstated. ..........64
5.23    Settlement and Compromise. ...............................................................................64

**ARTICLE 6 MEANS FOR EXECUTION OF THE PLAN** ..........................................64

6.1    Vesting of Property. ..............................................................................................64
6.2    Avoidance Actions and Other Claims. .................................................................65
6.3    Bankruptcy Case Administration. ........................................................................65
6.4    Continuation of Business Operations. ..................................................................66
6.5    Distributions on Account of Claims and Interests. ..............................................68
6.6    Priorities in Distribution from the Distribution Account. ....................................69
6.7    Plan Administrator ...............................................................................................70

6.8      Consolidation of the Debtor and Subsidiary Entities ................................................75
6.9      Employment of Professionals. ....................................................................................76
6.10    Use of the ERC Fund. ................................................................................................76

**ARTICLE 7 IMPLEMENTATION OF THE PLAN** ................................................................77

7.1      Method of Distributions under the Plan. ...................................................................77
7.2      Objections to Disputed Claims. .................................................................................77
7.3      Estimation of Claims. ................................................................................................78
7.4      Determination of Tax Liability. .................................................................................78
7.5      No Distributions to the Holders of Disallowed Claims. ...........................................78
7.6      Late-Filed Claims Forever Barred. ............................................................................78
7.7      Reversion of Unclaimed Checks. ..............................................................................78
7.8      Cash Payments and Time Bar. ...................................................................................78
7.9      Retention and Preservation of Claim Objections and Causes of Action. ..................78
7.10    No Release or Waiver. ...............................................................................................79

**ARTICLE 8 VOTING ON THE PLAN** ...................................................................................79

8.1      Voting of Claims. .......................................................................................................79
8.2      Nonconsensual Confirmation. ...................................................................................79

**ARTICLE 9 EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...........................80

9.1      Assumption of Executory Contracts and Leases. ......................................................80
9.2      Rejection of Executory Contracts. .............................................................................80
9.3      Rejection Damages Claims. .......................................................................................81
9.4      Cure Amounts for Assumed Contracts. .....................................................................81
9.5      Post-Petition Agreements Unaffected By Plan ..........................................................81

**ARTICLE 10 CONDITIONS PRECEDENT TO EFFECTIVE DATE** ................................81

10.1    Conditions Precedent to Effectiveness. .....................................................................81
10.2    Failure of Conditions Precedent. ...............................................................................82
10.3    Waiver of Conditions. ................................................................................................82

**ARTICLE 11 RETENTION OF JURISDICTION; CASE CLOSURE;  RELEASE AND TERMINATION OF SERVICE OF SUBCHAPTER V TRUSTEE** .............................................82

11.1    Retention of Jurisdiction. ..........................................................................................82
11.2    Closure of the Case. ...................................................................................................84
11.3    Release of Subchapter V Trustee; Termination of Trustee Service. ..........................85

**ARTICLE 12 MODIFICATION OF THE PLAN** .................................................................85

12.1    Revocation or Withdrawal of the Plan. .....................................................................85

**ARTICLE 13 STAYS, INJUNCTIONS AND RELEASES** ..................................................86

13.1    Continuation of Injunctions or Stays until Effective Date. .......................................86
13.2    Injunction Relating to the Plan. .................................................................................86
13.3    Broad Injunction. .......................................................................................................87
13.4    Exculpation. ...............................................................................................................87
13.5    Release of Claims. .....................................................................................................87
13.6    Setoffs. .......................................................................................................................87

**ARTICLE 14 DEFAULT AND REMEDIES** ........................................................................88

14.1    Default of Plan; Notice Required. ..............................................................................88
14.2    Opportunity to Cure. ..................................................................................................88
14.3    Remedies in the Event of Default. .............................................................................88

**ARTICLE 15 MISCELLANEOUS** .......................................................................................88

15.1    Severability. .................................................................................................................88
15.2    Binding Effect. ............................................................................................................89
15.3    Further Assurances. ....................................................................................................89
15.4    Notices.........................................................................................................................89
15.5    Governing Law.............................................................................................................90
15.6    Filing of Additional Documents. ................................................................................90

# ARTICLE 1
## DISCLOSURE STATEMENT PURSUANT TO SECTION 1190(1) OF THE CODE
### SECTION A.  A SUMMARY OF THE PLAN

The following is a brief description and summary of this Plan.

1.      Under this Plan, the Debtor anticipates paying holders of Allowed Claims (except, perhaps, Class 17 Subordinated Claims) at least 100% of their Allowed Claims. Without limitation, the Plan proposes to pay the holders of Allowed Class 2 "General Unsecured Claims" 100% of their Allowed Claims. The Debtor also anticipates resolving its Claims against the "Future Receivables Financiers" through the Plan, or, to the extent such parties vote against or object to the Plan, reserving and pursuing its objections and Causes of Action against those parties.

2.      Allowed Claims will be paid in the order of priority established by the Bankruptcy Code from Total Distributions, which arise from a combination of Disposable Income received from the Debtor's continued business operations, including anticipated ERCs to be paid to the Debtor and, if applicable, proceeds arising from the Debtor's prosecution of Avoidance Actions and other Causes of Action.

3.      From its projected Disposable Income, the Debtor anticipates that Administrative Expenses will be paid first, including the fees and expenses of the Subchapter V Trustee and of the Debtor's Professionals.  Priority Claims will be paid next, to the extent that they have not already been paid.  Then General Unsecured Claims will be paid pro rata from any projected Disposable Income available for distribution, in an amount that is at least as much as such Claims would receive if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code.  If all Claims are paid in full, any remaining Disposable Income or other cash proceeds will be distributed to the Debtor's Equity Interest holders.

4.      With respect to the Future Receivables Financiers, the Debtor anticipates paying each such creditor with an Allowed Claim that accepts the Plan either: (i) a negotiated amount at the rate and term agreed upon between the Debtor and such creditor, as set forth in a separate stipulation; or (ii) a settlement amount, as calculated under the Plan, with interest at the rates of interest set forth herein. The payments to the Future Receivables Financiers under the Plan shall be in full satisfaction of the debt underlying their Claims. The Future Receivables Financiers shall have no further claim to ownership of any future (or existing) accounts receivable, future receivables, future receipts, or other third-party payment rights owed to the Debtor.

5.      If a Future Receivable Financier votes against or objects to the Plan, then the Debtor anticipates objecting to such creditor's Claim, if any, and bringing Avoidance Actions and other Causes of Action against such creditor.

6.      Provided that all other applicable requirements of subchapter V of chapter 11 the Bankruptcy Code are met, the Plan may be confirmed even if every class of impaired Claims does not accept the Plan. See Bankruptcy Code § 1191(b). However, the Debtor hopes to achieve consensual confirmation under section 1191(a) of the Code.

7.      The Debtor submits that a consensual plan is preferable for at least the following reasons: (a) it will reduce Administrative Expenses, including the fees of the Subchapter V Trustee and the Debtor's Professionals, which should result in an increase in the amounts paid to holders of Allowed Claims; and (b) it should reduce the amount of time required to achieve confirmation of the Plan, thus expediting the date on which distributions under the Plan will commence.

**SECTION B.  A BRIEF HISTORY OF THE DEBTOR'S BUSINESS OPERATIONS**

The following is a brief history of the Debtor's business operations, and the reasons that the Debtor filed this Case.

### *The Debtor and its Subsidiaries*

1.      The Debtor is a staffing agency that matches employers with qualified job seekers who are looking for long-term or temporary employment. The Debtor has two subsidiaries which operate as divisions of the Debtor (the "Subsidiaries"):  LG Drivers LLC, a Utah limited liability company ("Drivers"); and LG Hires, LLC, a Utah limited liability company ("Hires"). At all relevant times, Drivers and Hires have operated as business divisions of the Debtor – all as part of a single unit, i.e., one common business enterprise.  The separate legal existence of Drivers and Hires was/is necessary solely for regulatory compliance.

2.      From their formation through January 13, 2022, the Debtor, Drivers and Hires all were owned 100% by Troy Hyde ("Hyde"), who also acted as the manager and chief executive officer for the companies.  On January 14, 2022, prior to the filing of this Case, Hyde contributed and assigned his 100% membership interests in Drivers and Hires to the Debtor.

3.      Drivers has a legal existence separate from the Debtor solely for the purpose of ACA compliance.[1]  Maintaining the separate legal existence of Drivers potentially saves the Debtor substantial amounts in either/both health insurance premiums and/or regulatory fines. As of the Petition Date, Drivers employed all of the Debtor's administrative employees, *i.e.*, all of the persons that interact with the Debtor's clients, and that hire and oversee the Debtor's "staffing" employees.  Drivers' sole business and its only function was to manage and operate the Debtor.  To use an analogy, if the Debtor was a body, Drivers was the head, including brain, eyes, ears and mouth.  Without Drivers, the Debtor could not think, see, hear, speak or act. Drivers generates no revenues.  Historically, the Debtor has funded Drivers' payroll expenses by paying it an "administration fee".  If the Debtor does not continue to fund Drivers' payroll, the Debtor will be unable to operate, because all of the Debtor's operations are performed and overseen by individuals employed and paid by Drivers.  And if the Debtor were to employ all of Drivers' employees directly, the Debtor potentially would incur substantial amounts in either/both increased/additional health insurance premiums and/or regulatory fines.

4.      As of the Petition Date, Hires had a legal existence separate from the Debtor solely for the purpose of compliance with Pennsylvania law. All the Debtor's business in

---

[1] ACA-compliance refers to a major medical health insurance policy that conforms to the regulations set forth in the Affordable Care Act (Obamacare). ACA-compliant individual and small-group policies must include coverage for the ten essential health benefits with no annual or lifetime coverage maximums.

Pennsylvania was conducted by/under Hires. While Hires employed different staffing employees – all working in the State of Pennsylvania – its business and operations were otherwise indistinguishable from the Debtor. Its business operations are overseen and conducted by the same people – all employed by Drivers and funded by the Debtor – and it serves substantially the same clients. Maintaining the separate legal existence of Hires may be necessary for the Debtor to continue to operate in Pennsylvania. The Debtor is still establishing (growing) its (i.e., Hires') business in the State of Pennsylvania. Accordingly, Hires – if viewed as a standalone entity – historically has not been profitable. And its operating losses, as well as its startup capital, have been funded by the Debtor.

5.      Because Hires and Drivers function as subdivisions of the Debtor, rather than truly separate entities, the Debtor will consolidate Hires and Drivers into the Debtor for the purpose of the Plan. The proposed plan consolidation hereunder will eliminate inter-company debts and receivables, extend the injunctions called for under the Plan for the benefit of Hires and Drivers, and cause the assets and liabilities of the Debtor, Hires, and Drivers to be combined for purposes of distributions to creditors.

### *The Business of the Debtor*

1.      As of the Petition Date, the Debtor earned most of its income through its business as a staffing agency. As of the Petition Date, the Debtor (including Hires and Drivers) employed over six hundred (600) employees and served over one hundred (100) clients. The Debtor earned gross revenues exceeding fourteen million dollars ($14,000,000) annually. Since the Petition Date, the Debtor's has streamlined its offerings by closing its location in Kansas City, Missouri, and has seen additional growth in its location in Pennsylvania.

2.      By and through its payroll processor and professional employment organization ("PEO"), Quality Payroll Services, Inc. ("Quality Payroll"), the Debtor has applied for Employee Retention Credits ("ERCs" or individually, an "ERC") and has filed amended tax returns, which are anticipated to result in payment to the Debtor in an aggregate amount exceeding nine million dollars ($9MM). The Debtor has filed all forms and amended returns necessary to apply for the ERCs. As of the date of the filing of this Plan, the Debtor has received approximately $2,245,813 in ERCs since the Petition Date.

3.      Based upon the skill, knowledge and experience that the Debtor has garnered applying for its own ERCs, the Debtor also has undertaken to assist other employers to apply for their own ERCs, with compensation to be paid to the Debtor in the form of a percentage commission of ERCs actually received and paid out. The Debtor has assisted other employers in filing for substantial amounts of ERCs, though any potential commission payments to the Debtor as a result of its efforts are subject to conditions precedent and subsequent that are outside of the Debtor's control, and accordingly, such potential payments are inchoate, contingent, and unrealized.

### *Reasons for Filing the Case*

1.      In the latter half of calendar year 2021, the Debtor found itself in a cash crunch. The Debtor failed to adjust its expenses to make up for its cash flow problems, which were

exacerbated by owner distributions and "start-up" expenses relating to opening new offices and locations in Pennsylvania and Kansas.  The Debtor borrowed to cover the shortfalls from private lenders charging huge fees and interest term, including several "Future Receivables Financiers."

2.      In short, the Debtor made the mistake of borrowing extremely expensive debt from the Future Receivables Financiers and made the additional mistake of failing to adjust its ongoing expenses and owner withdrawals.

3.      One of the Debtor's Future Receivables Financiers is Pinhook Capital LLC ("Pinhook").  On or about December 15, 2021, the Debtor "sold" Pinhook $224,850 of future receivables for $150,000 (the "Pinhook Loan"), although only $125,000 was actually advanced. The advance received from Pinhook was used to pay off another Future Receivables Financier that had made a similar "loan".

4.      Under the terms of the Pinhook Loan, Pinhook was entitled to debit $4,497.00 per day from the Debtor's account until it collected a total of $224,850.  Beginning on December 17 and continuing on each business day through January 4, 2022, Pinhook debited $4,497.00 per day – collecting a total of $53,964.00.  The Debtor failed to make the $4,497 payment due January 6, 2022.

5.      The next day, January 7, 2022, Pinhook filed suit in the Supreme Court of the State of New York, County of Nassau and obtained, on an ex parte basis and without notice to the Debtor, a Temporary Restraining Order which provides, in relevant part, that the Debtor's bank, Wells Fargo, shall "restrain all funds in and [t]hereafter deposited into any Wells Fargo account titled to [the Debtor] …." (the "Ex Parte TRO").

6.      The Ex Parte TRO was served upon Wells Fargo Bank on or about Monday, January 10, 2022, and the bank froze all of the Debtor's accounts, including the account from which the Debtor paid its employees.  The Debtor's employees that were paid via check on Friday, January 7, 2022, were unable to obtain payment on their wage checks, because the Wells Fargo account on which the checks were drawn was frozen. Further, without the ability to access and pay out the funds held in Wells Fargo bank, the Debtor was unable to pay any of its employees their wages payable on January 14, 2022 – or on future paydays.

7.      Accordingly, the Debtor filed the instant Case for multiple reasons, including: (a) to obtain the protection of the automatic stay on an "emergency basis"; (b) to prevent the Debtor's assets from being eroded by its most aggressive creditors – most or all of which are "Future Receivables Financiers";  (c) to obtain the benefit of the reorganizational process to streamline operations, eliminate unprofitable divisions, "clean up" its books and records, and generally reassess and restructure its way of doing business; (d) to obtain the benefit of bankruptcy procedures and priorities for the potential payment of legitimate claims and distributions to creditors; and (f) to obtain the benefit of the claims review and objection process, including an inexpensive and expeditious process and procedure for investigating the validity of claims and, if appropriate, resolving disputes through the claims objection process.

*Potential Chapter 5 Claims Against Future Receivables Financiers; Claim Objections*

1.       Within six months prior to the Petition Date, the Debtor obtained cash advances from several Future Receivables Financiers.

2.       Based upon the Debtor's investigation, which is ongoing, each of the transactions that the Debtor entered into with the Future Receivables Financiers may be void or voidable as a "fraudulent transfer."

3.       Without limitation, under section 548 of the Bankruptcy Code (and under the Utah Uniform Voidable Transaction Act, which is applicable pursuant to section 544 of the Bankruptcy Code), the Debtor "may avoid any transfer … of an interest of the debtor in property, or *any obligation ... incurred by the debtor*, that was made or incurred on or within 2 years before the [Petition Date], if the debtor voluntarily or involuntarily … received less than a reasonably equivalent value  in exchange for such transfer *or obligation* …." (Italics added).

4.       Further, based upon the Debtor's investigation, which is ongoing, the Debtor was either insolvent as of the date it entered into transactions with the Future Receivables Financiers, or was rendered insolvent as a consequence.

5.       Each of the Future Receivables Financiers collected or received from the Debtor substantial sums with 90 days prior to the Petition Date.  Accordingly, the Debtor may have the right to recover all payments each of the Future Receivables Financiers received within the 90-day period pursuant to under section 547 of the Bankruptcy Code.

6.       Some (but not all) of the Future Receivables Financiers may have taken actions which violated the automatic stay, including (a) after the Petition Date making demands upon the Debtor's account debtors to pay the Debtor's accounts receivable to the Future Receivables Financier rather than the Debtor, (b) collecting, or seeking to collect, from the Debtor's account debtors after the Petition, (c) debiting the Debtor's bank accounts after the Petition Date, and (d) failing and refusing to comply with the Debtor's demands for turnover.

7.       Under section 362(a) of the Bankruptcy Code and applicable case law, the Future Receivables Financiers may be liable to the Debtor for its actual damages and also, to the extent the violations of the automatic stay were willful and/or malicious, for punitive or exemplary damages.

8.       Under section 542 of the Bankruptcy Code, the Future Receivables Financiers and other persons, including Capital Credit, Inc., may be liable to the Debtor and compelled to turnover cash or other property collected – both before and after the Petition Date.

9.       Under section 549 of the Bankruptcy Code, several of the Future Receivable Financiers collected, obtained or received property of the Debtor after the Petition Date. Without limitation, even after receiving notice of the Debtor's Case and the Automatic Stay, Brickstone continued to make ACH withdrawals from the Debtor's bank account, plainly violating the Automatic Stay. Accordingly, the Debtor has the right to recover all payments and property of the Debtor each of the Future Receivables Financiers received after the Petition Date pursuant to

section 549 of the Bankruptcy Code, as well as under Sections 362(a) and 542 of the Bankruptcy Code.

10.     Except only to the extent stated otherwise in this Plan (including all Stipulations incorporated into this Plan), the Debtor objects to the claims of each of the Future Receivables Financers, without limitation, on each of the above-described grounds, pursuant to section 502(d), pursuant to section 502(b)(1) and applicable non-bankruptcy law, pursuant to section 502(b)(9) and on grounds of unconscionability, mistake, fraud, duress, and applicable usury statutes. The Debtor further reserves the right to seek recharacterization and/or subordination of the Claims of the Future Receivables Financers.

## SECTION C.  A LIQUIDATION ANALYSIS

_The following is a liquidation analysis, including a discussion of the so-called "best interests of creditors test" under section 1129(a)(7) of the Bankruptcy Code._

1.     One of the requirements of confirming a plan under section 1191 of the Bankruptcy Code is that the plan must satisfy the requirements of 1129(a)(7) of the Code, which is sometimes referred to as the "best interest of creditors test".  Specifically, each impaired class must either (A) accept the Plan, or (B) receive or retain property of a value, as of the Effective Date of the Plan, "that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date."  The Debtor submits that the Plan meets this test.

2.     Attached as **Exhibit B** is a Liquidation Analysis.  It is an estimate of the total liquidation proceeds that may be available for distribution if the Debtor's assets are liquidated by a chapter 7 trustee.

3.     The Debtor's most significant asset is its ability continue in business. As both a staffing agency and as it assists other companies in applying for ERCS, the Debtor is, at base, a services company. Without the provision of services, the Debtor cannot earn income. Accordingly, it is critical that the Debtor remain in business.

4.     The Debtor's second-most significant assets are the cash refunds arising from the ERCs that have been paid to it since the Petition Date. The refunds that were paid to the Debtor are now being held in the "debtor-in-possession" accounts established by the Debtor. As of the date of this Plan, the aggregate total of the refunds paid to the Debtor is $2,245,813. The Debtor has utilized some of the refunds to pay its ongoing business expenses, leaving a balance of $1,526,065.88 being held in a segregated debtor-in-possession account as of the date of this Plan.

5.     Finally, the Debtor has four additional significant potential assets: (i) Avoidance Actions against the Future Receivables Financers; (ii) Avoidance Actions against Troy Hyde, based on net distributions to Troy Hyde of approximately $474,642.57 in the year before the Petition Date; (iii) potential additional tax refunds arising from the Debtor's own ERCs; and (iv) commissions that may arise in the future from ERCs processed for other companies. Any Avoidance Actions may be subject to certain defenses, including (for Troy Hyde in particular) that the Debtor may not have been insolvent at the time of all transfers that occurred during the

one-year period prior to the Petition Date. Because these potential assets are uncertain, their value is discounted under the Liquidation Analysis.

6.      In summary, potential recovery by creditors in chapter 11 is, at a minimum, no worse than such creditors would receive in a chapter 7 liquidation.  Although the ERC Fund is not included in the Debtor's projected Disposable Income, it is accounted for in the Liquidation Analysis. Put simply, holders of Allowed General Unsecured Claims against the Debtor will receive at least as much under the Plan as they would in a chapter 7 liquidation. Further, it is highly probable that creditor recoveries would be far less in chapter 7 than they would be through the Plan.

**SECTION D.  PROJECTIONS REGARDING THE ABILITY OF THE DEBTOR TO MAKE PAYMENTS UNDER THE PROPOSED PLAN**

_A discussion of the Debtor's projections regarding the ability to make payments under the Plan follow._

1.      Another requirement of confirming a plan under section 1191 of the Bankruptcy Code is that the plan must satisfy the requirements of 1129(a)(11) of the Code, which is sometimes referred to as "feasibility".  Specifically, the Debtor must show that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

2.      The Debtor's projected Disposable Income is shown on **Exhibit A**, attached hereto.  The projections anticipate that the Debtor will be able to fund its projected Disposable Income through its ongoing business operations and pay holders of Allowed Claims in full. To the extent that the Debtor's actual income falls short of its projected Disposable Income, the Debtor will utilize its remaining ERC Fund to fulfill its obligations to creditors under the Plan. In utilizing its ERC Fund as a "backup" for its payments to creditors under the Plan, the Debtor submits that the Plan is not likely to be followed by the liquidation or need for future reorganization of the Debtor.

**ARTICLE 2**
**DEFINITIONS AND RULES OF INTERPRETATION**

**SECTION A.  DEFINED TERMS**

_For purposes of this Plan, the following terms shall have the meanings specified in this Article 2.  A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code._

**2.1     "Administrative Expense Claim"** shall mean a Claim that is Allowed under section 503(b) of the Bankruptcy Code and that is entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without limitation,

2.1.1    fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court,

2.1.2   fees and expenses of the Subchapter V Trustee Allowed pursuant to an Order of the Bankruptcy Court, and

2.1.3   all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

**2.2** **"Allowed"** shall mean, with reference to any Claim:

2.2.1   a Claim that has been listed by the Debtor in its Schedules and (i) is not listed as disputed, contingent or unliquidated, (ii) is not a Claim as to which a proof of claim has been filed, and (iii) is not a Claim as to which the Debtor has filed an objection;2

2.2.2   a Claim as to which a timely3 proof of claim has been filed by the Bar Date in a sum certain and (A) is not a Contingent or Unliquidated Claim, and (B) either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

2.2.3   a Claim arising from the recovery of property under section 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code; or

2.2.4   any Claim expressly allowed4 under this Plan or pursuant to the Confirmation Order; or

2.2.5   any Claim expressly allowed pursuant to a Final Order of the Bankruptcy Court.

Except as otherwise specified in the Plan or any Final Order of the Bankruptcy Court, and except for any Claim that is Secured by property of a value in excess of the principal amount of such claims, the amount of an Allowed Claim shall not include any attorneys' fees, costs, penalties, or interest on such Claim occurring or incurred from and after the Petition Date.

**2.3** **"Applicable Rate"** means an annual rate of interest equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the federal Reserve System, for the calendar week immediately preceding the Confirmation Date.

---

2       The Debtor reserves its right to object to Claims that it has listed in its Schedules notwithstanding that the Schedules may not identify the Claim as disputed, contingent or unliquidated.  The Debtor further reserves the right to amend its Schedules to delete any reference to listed Claims, to adjust the amount of the listed Claim and/or to identify any listed Claim as disputed, contingent or unliquidated.

3       A proof of claim is timely filed only if (a) it is filed on or before the applicable Bar Date, or (b) if filed after the applicable Bar Date, on or before the Effective Date the Court has entered an order permitting the holder of the Claim to file a late-filed proof of claim.

4       The fact that a Claim may be specifically referenced and/or its treatment specified under this Plan does not mean that it is "expressly allowed."  Rather, all Claims referenced or discussed in this Plan are subject to potential objection unless the Plan states expressly that the Claim is or shall be allowed, and the amount of the allowed claim is specified.

**2.4** **"Avoidance Actions"** shall mean Causes of Action arising or held by the Estate under sections 502, 510, 541, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

**2.5** **"Bankruptcy Code" and "Code"** shall mean title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.**"Bankruptcy Court" and "Court"** b shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28 U.S.C. § 151.

**2.7** **"Bankruptcy Rules" and "Rules"** shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

**2.8** **"Bar Date"** shall mean: (i) March 25, 2022, with respect to a Claim against the Estate other than a Claim of a Governmental Unit; (ii) July 13, 2022, with respect to a Claim of a Governmental Unit against the Estate; (iii) if applicable, any special deadline for certain creditors to file proofs of claim as specified by the Court; or (iv) if this Plan and/or an order of the Court establishes a different bar date for a specific claim or category of claims (e.g., rejection damages claims), the date established by the Plan or order of the Court.

**2.9** **"Blue Bridge"** shall mean Blue Bridge Capital, LLC.

**2.10** **The "Blue Bridge Net Amount"** is:

2.10.1 the Blue Bridge Principal Amount;

2.10.2 *less* (minus or reduced by) all amounts paid to Blue Bridge by the Debtor on or before the Petition Date;

2.10.3 *less* (minus or reduced by) all amounts that Blue Bridge collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.10.4 *less* (minus or reduced by) all amounts that Blue Bridge collected or received from the Debtor's account debtors on or before the Petition Date; and

2.10.5 *less* (minus or reduced by) all amounts that Blue Bridge collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Blue Bridge Net Amount is $79,038.41, calculated as follows: (1) $136,500.00 (the Blue Bridge Principal Amount; *less* (minus) (2) $57,461.59 (the aggregate of all payments and other amounts collected or received by Blue Bridge through the Petition Date). The Debtor reserves the right to clarify or correct the Blue Bridge Net Amount if/when additional or better information is received.

**2.11** **The "Blue Bridge Principal Amount"** is the aggregate cash payment(s) that Blue Bridge actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Blue Bridge Principal Amount does not include amounts that Blue Bridge purports or asserts to have "advanced" but which actually (a) were

retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the Blue Bridge Principal Amount is $136,500.00.  The Debtor reserves the right to clarify or correct the Blue Bridge Principal Amount if/when additional or better information is received.

**2.12**    **"Breakout"** shall mean Breakout Capital LLC.

**2.13**    **The "Breakout Net Amount"** is:

2.13.1  the Breakout Principal Amount;

2.13.2  *less* (minus or reduced by) all amounts paid to Breakout by the Debtor on or before the Petition Date;

2.13.3  *less* (minus or reduced by) all amounts that Breakout collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.13.4  *less* (minus or reduced by) all amounts that Breakout collected or received from the Debtor's account debtors on or before the Petition Date; and

2.13.5  *less* (minus or reduced by) all amounts that Breakout collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

**2.14**    **The "Breakout Principal Amount"** is the aggregate cash payment(s) that Breakout actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Breakout Principal Amount does not include amounts that Breakout purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan. According to the best information available to the Debtor as of the Plan Filing Date, the Breakout Principal Amount is $1,131,903.72.  The Debtor reserves the right to clarify or correct the Breakout Principal Amount if/when additional or better information is received.

**2.15**    **"Brickstone"** shall mean Brickstone Group LLC.

**2.16**    **The "Brickstone Net Amount"** is:

2.16.1  the Brickstone Principal Amount;

2.16.2  *less* (minus or reduced by) all amounts paid to Brickstone by the Debtor on or before the Petition Date;

2.16.3  *less* (minus or reduced by) all amounts that Brickstone collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.16.4  *less* (minus or reduced by) all amounts that Brickstone collected or received from the Debtor's account debtors on or before the Petition Date; and

2.16.5  *less* (minus or reduced by) all amounts that Brickstone collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Brickstone Net Amount is $60,005.00, calculated as follows:  (1) $67,500.00 (the Brickstone Principal Amount; *less* (minus) (2) $7,495.00 (the aggregate of all payments and other amounts collected or received by Brickstone through the Petition Date).  The Debtor reserves the right to clarify or correct the Brickstone Net Amount if/when additional or better information is received.

**2.17**    **The "Brickstone Principal Amount"** is the aggregate cash payment(s) that Brickstone actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Brickstone Principal Amount does not include amounts that Brickstone purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the Brickstone Principal Amount is $67,500.00.  The Debtor reserves the right to clarify or correct the Brickstone Principal Amount if/when additional or better information is received.

**2.18**    **"Business Day"**  shall mean any day other than a Saturday, Sunday or legal holiday recognized in the State of Utah.

**2.19**    **"Cash"** shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

**2.20**    **"Causes of Action"** shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

**2.21**    **"Claim"** shall mean a claim against a Person or its property as defined in section 101(5) of the Bankruptcy Code, including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**2.22**    **The "Claim Rate"** is an annual rate of interest applicable to any particular claim equal to, as applicable

2.22.1  the non-default rate of interest specified in the documents creating and governing the Claim, or

2.22.2  if no rate of interest is specified, the annual rate of interest that may be imputed or calculated based upon the principal amount loaned or advanced, the payments

(individually and in the aggregate) required to be paid by the Debtor, and the period of time over which such payments are to be paid.

**2.23** **"Class"** shall mean those classes designated in Article IV of this Plan.

**2.24** **"Collateral"** shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

**2.25** **"Confirmation Date"** shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

**2.26** **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

**2.27** **"Contingent or Unliquidated Claim"** shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which: (a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

**2.28** **"Debtor"** shall mean Logistics Giving Resources, LLC. References to the Debtor shall mean and refer to the Reorganized Debtor at any point in time after the Effective Date.

**2.29** **"Disallowed"** shall mean and refer to any Claim that does not fall within the definition of "Allowed."

**2.30** **"Disclosure Statement"** shall mean information required by section 1190(1) of the Code and which is included in this Plan under Article 1, above.

**2.31** **"Disposable Income"** shall mean the average quarterly "disposable income" of the Debtor as defined in and calculated pursuant to the requirements of section 1191(d)(2) of the Bankruptcy Code, which is and shall be for the purpose of this Plan and the duration of the Plan Period, the amount shown on the attached "**Exhibit A**".

**2.32** **"Disputed Claim"** shall mean:

2.32.1  if no proof of claim relating to a Claim has been filed, a Claim that is listed in the Schedules as unliquidated, disputed or contingent; or

2.32.2  a Claim as to which an objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order;

2.32.3  unless it is "Allowed" under Article 5 of the Plan because the holder of the Claim has accepted the Plan, the Claim of each Future Receivable Financier—which are subject to objection and avoidance as described in section 1.23 through 1.29, above; or

2.32.4  a Claim that otherwise is "Allowed," but which is a Contingent or Unliquidated Claim.

**2.33** **"Disputed Claim Amount"** shall mean the amount set forth in the proof of claim relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Disputed Claim in accordance with section 502(c) of the Bankruptcy Code.

**2.34** **"Disputed Lien"** shall mean a Lien which is the subject of a pending Avoidance Action or any other type of judicial challenge to the validity, priority or enforceability of the Lien, whether prosecuted by the Debtor or another party-in-interest and whether filed in the Bankruptcy Court or another court of competent jurisdiction.  Independent of and in addition to the foregoing, if the Claim secured by a Lien is a Disputed Claim, the Lien shall be considered a "Disputed Lien" unless and until the Claim is Allowed.

**2.35** **"Distribution Agent"** shall have the meaning specified in section 6.5.1 of this Plan.  In short, the Reorganized Debtor shall be, and serve as, the Distribution Agent unless the Bankruptcy Court orders that the Subchapter V Trustee shall serve as the Distribution Agent.

**2.36** **"Distribution Date"** shall mean fourteen (14) days after the last day of each full Quarter following the Effective Date, up to and including the Final Distribution Date, or if the fourteenth day following the last day of any Quarter is not a Business Day, the first Business Day immediately thereafter.

**2.37** **"Distribution Fund"** shall mean the aggregate total of the Debtor's projected Disposable Income, determined as of the date of this Plan, for the period of time that is three years after the Effective Date.

**2.38** **"Diverse Capital"** shall mean Diverse Capital, LLC.

**2.39** The **"Diverse Capital Net Amount"** is:

2.39.1  the Diverse Capital Principal Amount;

2.39.2  *less* (minus or reduced by) all amounts paid to Diverse Capital by the Debtor on or before the Petition Date;

2.39.3  *less* (minus or reduced by) all amounts that Diverse Capital collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.39.4  *less* (minus or reduced by) all amounts that Diverse Capital collected or received from the Debtor's account debtors on or before the Petition Date; and

2.39.5  *less* (minus or reduced by) all amounts that Diverse Capital collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Diverse Capital Net Amount is $115,137.00, calculated as follows:  (1) $132,000.00 (the Diverse Capital Principal Amount; *less* (minus) (2) $16,863.00 (the aggregate of all payments and other amounts collected or received by Diverse Capital through the Petition Date).  The Debtor reserves the

right to clarify or correct the Diverse Capital Net Amount if/when additional or better information is received.

**2.40**    The **"Diverse Capital Principal Amount"** is the aggregate cash payment(s) that Diverse Capital actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Diverse Capital Principal Amount does not include amounts that Diverse Capital purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the Diverse Capital Principal Amount is $132,000.00.  The Debtor reserves the right to clarify or correct the Diverse Capital Principal Amount if/when additional or better information is received.

**2.41**    **"Drivers"** shall mean LG Drivers, LLC, the wholly owned subsidiary of the Debtor.

**2.42**    **"Effective Date"** shall mean the later of (a) the first Business Day on which the Confirmation Order is no longer subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e) or otherwise, and (b) unless such thirty day period is waived by the Debtor as permitted under section 10.1 of the Plan, the first Business Day that is at least thirty calendar days after the Confirmation Date; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in section 10.1 of the Plan have not been satisfied or waived, then the Effective Date shall be the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

**2.43**    **"Equity Interest"** shall mean any member interest in the Debtor, and all options, warrants and rights, contractual or otherwise, to acquire any such member interests, as such interests exist immediately prior to the Effective Date.

**2.44**    **"ERC" or the "ERCs"** shall mean an Employee Retention Credit, or Employee Retention Credits, respectively, and all refunds that may be, or may become, payable to the Debtor based on its own Employee Retention Credits.

**2.45**    The **"ERC Fund"** shall mean the aggregate remaining total of the ERCs received by the Debtor prior to the Initial Distribution Date. For the avoidance of doubt, and consistent with Bankruptcy Code § 1191(c)(2)(A), the ERC Fund is not included in the Debtor's projected Disposable Income.

**2.46**    **"Estate"** shall mean the estate created in the Bankruptcy Case pursuant to sections 1186 and 541 of the Bankruptcy Code.

**2.47**    **"Everest"** shall mean EBF Holdings, LLC d/b/a Everest Business Funding.

**2.48**    The **"Everest Net Amount"** is:

2.48.1  the Everest Principal Amount;

2.48.2  *less* (minus or reduced by) all amounts paid to Everest by the Debtor on or before the Petition Date;

2.48.3  *less* (minus or reduced by) all amounts that Everest collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.48.4  *less* (minus or reduced by) all amounts that Everest collected or received from the Debtor's account debtors on or before the Petition Date; and

2.48.5  *less* (minus or reduced by) all amounts that Everest collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Everest Net Amount is $79,429.81, calculated as follows:  (1) $147,355.00 (the Everest Principal Amount; *less* (minus) (2) $67,925.19 (the aggregate of all payments and other amounts collected or received by Everest through the Petition Date).  The Debtor reserves the right to clarify or correct the Everest Net Amount if/when additional or better information is received.

**2.49**    **The "Everest Principal Amount"** is the aggregate cash payment(s) that Everest actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Everest Principal Amount does not include amounts that Everest purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan. According to the best information available to the Debtor as of the Plan Filing Date, the Everest Principal Amount is $147,355.00. The Debtor reserves the right to clarify or correct the Everest Principal Amount if/when additional or better information is received.

**2.50**    **"Everyday Funding"** shall mean Everyday Funding Group LLC.

**2.51**    **The "Everyday Funding Net Amount"** is:

2.51.1  the Everyday Funding Principal Amount;

2.51.2  *less* (minus or reduced by) all amounts paid to Everyday Funding by the Debtor on or before the Petition Date;

2.51.3  *less* (minus or reduced by) all amounts that Everyday Funding collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.51.4  *less* (minus or reduced by) all amounts that Everyday Funding collected or received from the Debtor's account debtors on or before the Petition Date; and

2.51.5  *less* (minus or reduced by) all amounts that Everyday Funding collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Everyday Funding Net Amount is either zero or negative -$82,059.07, calculated as follows: (1) $110,000.00 (the Everyday Funding Principal Amount; *less* (minus) (2) $192,059.07 (the aggregate of all payments and other amounts collected or received by Everyday Funding through

the Petition Date).  The Debtor reserves the right to clarify or correct the Everyday Funding Net Amount if/when additional or better information is received.

**2.52**   **The "Everyday Funding Principal Amount"** is the aggregate cash payment(s) that Everyday Funding actually (i) advanced and delivered directly to the Debtor on or about [date], or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Everyday Funding Principal Amount does not include amounts that Everyday Funding purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the Everyday Funding Principal Amount is $110,000. The Debtor reserves the right to clarify or correct the Everyday Funding Principal Amount if/when additional or better information is received.

**2.53**   **"Final Distribution Date"** shall mean the earlier of (A) the Distribution Date immediately prior to, or substantially contemporaneous with, the filing of notice of substantial consummation pursuant to section 1183(c)(2) of the Bankruptcy Code, or (B) the twelfth Quarterly Distribution Date; provided, however, that the Final Distribution Date will be the date of the last payment/distribution pursuant to section 3.3.2 of this Plan, if later.

**2.54**   **"Final Order"** shall mean an order, decree, or judgment that is not subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e), a stay applicable by order of the Bankruptcy Court or by order of another Court with jurisdiction to stay an order entered in this Case, or otherwise.  If an order is not subject to a stay, the possibility that it may be modified, amended or reversed upon appeal, pursuant to a motion under Federal Rules of Civil Procedure 59 or 60, or otherwise shall not cause such order not to be a Final Order.

**2.55**   **"Fundbox"** shall mean Fundbox, Inc. and/or First Electronic Bank.

**2.56**   **The "Fundbox Net Amount" is:**

2.56.1  the Fundbox Principal Amount;

2.56.2  *less* (minus or reduced by) all amounts paid to Fundbox by the Debtor on or before the Petition Date;

2.56.3  *less* (minus or reduced by) all amounts that Fundbox collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.56.4  *less* (minus or reduced by) all amounts that Fundbox collected or received from the Debtor's account debtors on or before the Petition Date; and

2.56.5  *less* (minus or reduced by) all amounts that Fundbox collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Fundbox Net Amount is $34,826.71, calculated as follows:  (1) $79,647.00 (the Fundbox Principal Amount; *less* (minus) (2) $44,820.29 (the aggregate of all payments and other amounts collected

or received by Fundbox through the Petition Date).  The Debtor reserves the right to clarify or correct the Fundbox Net Amount if/when additional or better information is received.

**2.57**    **The "Fundbox Principal Amount"** is the aggregate cash payment(s) that Fundbox actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Fundbox Principal Amount does not include amounts that Fundbox purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan. According to the best information available to the Debtor as of the Plan Filing Date, the Fundbox Principal Amount is $79,647.00. The Debtor reserves the right to clarify or correct the Fundbox Principal Amount if/when additional or better information is received.

**2.58**    **The "Future Receivables Financiers"** include, collectively: Fundbox; Breakout; Blue Bridge; Everest; Everyday Funding; Lifetime Funding; Unique Funding Solutions; ROC; Diverse Capital; Brickstone; and Pinhook.

**2.59**    **"General Unsecured Claim"** shall mean a Claim that is not a Secured Claim and that is not entitled to priority of payment under section 507 of the Bankruptcy Code.

**2.60**    **"Harvest"** shall mean Harvest Small Business Finance, LLC or, if applicable, the current holder of the payment rights under the PPP Loan Documents.

**2.61**    **"Hires"** shall mean LG Hires, LLC, the wholly-owned subsidiary of the Debtor.

**2.62**    **"Initial Distribution Date"** shall mean and refer to the Distribution Date first occurring after the Effective Date.

**2.63**    **"Interim Distribution Date"** shall mean each Distribution Date other than the Final Distribution Date.

**2.64**    **"IRS"** shall mean the United States Department of Treasury – Internal Revenue Service.

**2.65**    **"Lien"** shall have the meaning set forth in section 101(37) of the Bankruptcy Code; *except that* a Lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

**2.66**    **"Lifetime Funding"** shall mean Lifetime Funding, LLC.

**2.67**    **The "Lifetime Funding Net Amount"** is:

2.67.1  the Lifetime Funding Principal Amount;

2.67.2  *less* (minus or reduced by) all amounts paid to Lifetime Funding by the Debtor on or before the Petition Date;

2.67.3  *less* (minus or reduced by) all amounts that Lifetime Funding collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.67.4  *less* (minus or reduced by) all amounts that Lifetime Funding collected or received from the Debtor's account debtors on or before the Petition Date; and

2.67.5  *less* (minus or reduced by) all amounts that Lifetime Funding collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Lifetime Funding Net Amount is $63,914.50, calculated as follows:  (1) $134,367.50 (the Lifetime Funding Principal Amount; *less* (minus) (2) $70,453.00 (the aggregate of all payments and other amounts collected or received by Lifetime Funding through the Petition Date).  The Debtor reserves the right to clarify or correct the Lifetime Funding Net Amount if/when additional or better information is received.

**2.68**   **The "Lifetime Funding Principal Amount"** is the aggregate cash payment(s) that Lifetime Funding actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Lifetime Funding Principal Amount does not include amounts that Lifetime Funding purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the Lifetime Funding Principal Amount is $134,367.50.  The Debtor reserves the right to clarify or correct the Lifetime Funding Principal Amount if/when additional or better information is received.

**2.69**   **"Owner"** means and refers to the holder of an Equity Interest.

**2.70**   **"Person"** shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, Governmental Unit or political subdivision thereof.

**2.71**   **"Petition Date"** shall mean January 14, 2022.

**2.72**   **"Pinhook"** shall mean Pinhook Capital, LLC.

**2.73**   **The "Pinhook Net Amount"** is:

2.73.1  the Pinhook Principal Amount;

2.73.2  *less* (minus or reduced by) all amounts paid to Pinhook by the Debtor on or before the Petition Date;

2.73.3  *less* (minus or reduced by) all amounts that Pinhook collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.73.4  *less* (minus or reduced by) all amounts that Pinhook collected or received from the Debtor's account debtors on or before the Petition Date; and

2.73.5  *less* (minus or reduced by) all amounts that Pinhook collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Pinhook Net Amount is $71,036.00, calculated as follows:  (1) $125,000.00 (the Pinhook Principal Amount; *less* (minus) (2) $53,964.00 (the aggregate of all payments and other amounts collected or received by Pinhook through the Petition Date).  The Debtor reserves the right to clarify or correct the Pinhook Net Amount if/when additional or better information is received.

**2.74**    **The "Pinhook Principal Amount"** is the aggregate cash payment(s) that Pinhook actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Pinhook Principal Amount does not include amounts that Pinhook purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan. According to the best information available to the Debtor as of the Plan Filing Date, the Pinhook Principal Amount is $125,000.00.  The Debtor reserves the right to clarify or correct the Pinhook Principal Amount if/when additional or better information is received.

**2.75**    **"Plan"** shall mean this Plan of Reorganization, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

**2.76**    **"Plan Administrator"** shall mean and refer to the Initial Plan Administrator or successor Plan Administrator appointed under section 6.7 of this Plan.

**2.77**    **The "Plan Filing Date"** is the date on which this Plan was filed with the Court, *i.e.*, April 14, 2022.

**2.78**    **The "Plan Lien Rate"** means an annual rate of interest equal to the lesser of (a) the 1 Year Libor Rate as published in the Wall Street Journal as of the Plan Filing Date, or (b) the non-default interest rate expressly provided for under the loan agreement or contract between the Debtor and the applicable holder of the Claim or Lien.

**2.79**    **"Plan Period"** shall mean the period of time commencing on the Effective Date and ending on the Final Distribution Date.  If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the applicable date with respect to that particular Claim or creditor.

**2.80**    **The "PPP Loan"** shall mean that certain loan in the amount of $1,851,500.00 issued to the Debtor on February 26, 2021 by Harvest.

**2.81**    **The "PPP Loan Documents"** shall mean all documents related to the PPP Loan signed by the Debtor.

**2.82**    **"Prime Rate"** shall mean the per annum rate of interest published from time to time in the Wall Street Journal, under the section entitled "Money Rates," which is denoted as the United States "Prime Rate."

**2.83**    **"Priority Claims"** shall mean any and all Claims (or portions thereof), if any, entitled to priority under section 507(a) of the Bankruptcy Code other than Administrative Expense Claims.  If a Claim otherwise entitled to priority is a Secured Claim, it shall not be deemed to be, or treated as, a Priority Claim.

**2.84** **"Priority Tax Claims"** shall mean any Claim of a Governmental Unit entitled to priority under section 507(a)(8) of the Bankruptcy Code, and that is not a Secured Claim.

**2.85** **"Pro Rata"** shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims in such Class.

**2.86** **"Professionals"** shall mean (i) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. For the avoidance of doubt, Professionals also include those Persons employed by the Plan Administrator, the Subchapter V Trustee, and/or the Reorganized Debtor after the Effective Date.

**2.87** **"Quarter"** means and refers to the calendar quarters ending, respectively, on March 31, June 30, September 30 and December 31.

**2.88** **"Quarterly"** means on the basis of a Quarter.

**2.89** **"Reorganized Debtor"** shall mean the Debtor, as reorganized after the Effective Date pursuant to the terms of this Plan.

**2.90** **"ROC"** shall mean ROC Funding Group, LLC.

**2.91** **The "ROC Net Amount"** is:

> 2.91.1  the ROC Principal Amount;

> 2.91.2  *less* (minus or reduced by) all amounts paid to ROC by the Debtor on or before the Petition Date;

> 2.91.3  *less* (minus or reduced by) all amounts that ROC collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

> 2.91.4  *less* (minus or reduced by) all amounts that ROC collected or received from the Debtor's account debtors on or before the Petition Date; and

> 2.91.5  *less* (minus or reduced by) all amounts that ROC collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the ROC Net Amount is $65,270.00, calculated as follows:  (1) $146,830.00 (the ROC Principal Amount; *less* (minus) (2) $81,560.00 (the aggregate of all payments and other amounts collected or received by ROC through the Petition Date).  The Debtor reserves the right to clarify or correct the ROC Net Amount if/when additional or better information is received.

**2.92** **The "ROC Principal Amount"** is the aggregate cash payment(s) that ROC actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The ROC Principal Amount does not include amounts that ROC purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the ROC Principal Amount is $146,830.00.  The Debtor reserves the right to clarify or correct the ROC Principal Amount if/when additional or better information is received.

**2.93** **"Schedules"** shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

**2.94** **"Secured Claim"** shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is a claim of setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

**2.95** **"Special Voting Interest"** shall mean a special "voting class" membership interest in the Debtor, which shall grant the Plan Administrator the power and authority: (i) to vote to determine whether Troy Hyde's contingent membership interest in the Debtor should vest upon the completion of the Debtor's payment in full of the Distribution Fund Amount; (ii) to vote on any proposed merger, dissolution, liquidation, or other significant organizational change of the Debtor; and (iii) in the event that Troy Hyde fails to satisfy the conditions set forth in Section 6.4.2 of the Plan, to allocate, assign, sell, or otherwise distribute Troy Hyde's Equity Interests in the best interests of the Debtor and its creditors.

**2.96** **"Subchapter V Trustee" and "Trustee"** mean and refer to the trustee appointed in this Case pursuant to section 1183 of the Bankruptcy Code.  D. Ray Strong was appointed as Subchapter V Trustee in this Case and is serving in said capacity as of the date of the filing of this Plan

**2.97** **"Subordinated Claim"** shall mean any unsecured Claim that is subordinated in right of payment to Class 2 Unsecured Claims by reason of either (a) voluntary agreement or consent by the holder of the Claim, or (b) a Final Order of the Court.

**2.98** **"Subsidiary Entities"** shall mean Hires and Drivers, collectively.

**2.99** **"Total Distributions"** shall mean the aggregate sum of the Debtor's projected Disposable Income, determined as of the date of this Plan, for the period beginning on the Initial Distribution Date and ending on the twelfth Quarterly Distribution Date, *provided, however*, that in no event shall the Total Distributions be less than the lesser of: (i) the principal balance all of Allowed Claims in Classes 1 and 2 of this Plan; or (ii) the balance of the ERC Fund as of the Effective Date of the Plan.

**2.100** **"UCC"** means and refers to the Uniform Commercial Code as applicable to the Debtor.  Upon information and belief, the UCC applicable to the Debtor is Utah Code Ann. § 70A-1-101, et seq.

**2.101**   **<u>"Unclassified Priority Claims"</u>** are Priority Claims (other than Administrative Expense Claims) defined in section 3.3 of this Plan, including claims within the scope of sections 507(a)(2), 507(a)(3) and/or 507(a)(8) of the Bankruptcy Code.

**2.102**   **<u>"Unique Funding"</u>** shall mean Unique Funding Solutions LLC.

**2.103**   The "**<u>Unique Funding Net Amount</u>**" is:

2.103.1 the Unique Funding Principal Amount;

2.103.2 *less* (minus or reduced by) all amounts paid to Unique Funding by the Debtor on or before the Petition Date;

2.103.3 *less* (minus or reduced by) all amounts that Unique Funding collected or received from the Debtor's accounts on or before the Petition Date, including via ACH;

2.103.4 *less* (minus or reduced by) all amounts that Unique Funding collected or received from the Debtor's account debtors on or before the Petition Date; and

2.103.5 *less* (minus or reduced by) all amounts that Unique Funding collected or received on or before the Petition Date from or on account of any property of the Debtor and/or any interest of the Debtor in property.

According to the best information available to the Debtor as of the Plan Filing Date, the Unique Funding Net Amount is $54,797.00, calculated as follows:  (1) $202,352.00 (the Unique Funding Principal Amount; *less* (minus) (2) $147,555.00 (the aggregate of all payments and other amounts collected or received by Unique Funding through the Petition Date).  The Debtor reserves the right to clarify or correct the Unique Funding Net Amount if/when additional or better information is received.

**2.104**   **The "<u>Unique Funding Principal Amount</u>"** is the aggregate cash payment(s) that Unique Funding actually (i) advanced and delivered directly to the Debtor, or (ii) paid to third parties to satisfy antecedent debts of the Debtor. The Unique Funding Principal Amount does not include amounts that Unique Funding purports or asserts to have "advanced" but which actually (a) were retained or paid to itself or its insiders as fees, prepaid interest, loan charges, etc., or (b) paid to non-debtors as commissions, finders fees, or other amounts relating to the origination or funding of the loan.  According to the best information available to the Debtor as of the Plan Filing Date, the Unique Funding Principal Amount is $202,352.00.  The Debtor reserves the right to clarify or correct the Unique Funding Principal Amount if/when additional or better information is received.

**2.105**   **The "<u>Unreturned 549 Amounts</u>"** means and refers, as to any creditor or claim-holder, (a) the aggregate of all amounts that such creditor (or privies of such creditor) collected after the Petition Date from the Debtor, from any account debtor of the Debtor, from property of the Debtor and/or on account of any interest of the Debtor in Property or other person, *less* (b) such amounts as the creditor (or its privies) voluntarily returned and repaid to the Debtor on or before the Confirmation Date.

**2.106** **The "Wage Order"** shall mean the *Order Authorizing Payment of Pre-Petition Wages, Benefits and Certain Other Employee-Related Obligations* entered by the Bankruptcy Court on January 19, 2022, at Docket No. 23 in the Bankruptcy Case.

**2.107** **"WCF"** means WCF Mutual Insurance Co. and WCF National Insurance Co., collectively.

## SECTION B.  RULES OF CONSTRUCTION

**2.108** **Capitalized Terms.** Unless otherwise provided, any capitalized terms used in the Plan shall have the meaning set forth in Article 2.

**2.109** **Other Terms.** All terms not defined in this Article 2 or otherwise defined in the Plan, but that are defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed by the Bankruptcy Code or the Bankruptcy Rules. For convenience, terms defined in the Bankruptcy Code may be capitalized in the Plan, and the Plan sometimes may include a cross-reference to the Bankruptcy Code. Neither the failure to capitalize any such term, nor the failure to include a Bankruptcy Code cross-reference, however, shall modify the meaning or use of such term as defined in the Bankruptcy Code.

**2.110** **References Generally.** All references to an "article" or "articles" are to articles in the Plan, including all sections, subsections, and numbered paragraphs under the referenced article. References to a "section" or "sections" are to the section of this Plan or, if applicable, a section of the Bankruptcy Code. All references to a "section," "paragraph," "sections" or "paragraphs" designated by numbers are to the individual numbered sections or numbered paragraphs in the Plan or Code, as applicable, including all subsections and subparagraphs. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, sub-section or clause contained in the Plan.

**2.111** **References to Documents, Headings or Exhibits.** Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions. Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented. Unless otherwise specified in a particular reference, all references in the Plan to articles, sections, subsections and exhibits are references to articles, sections, subsections and exhibits of or to the Plan.

**2.112** **General Rules of Construction.** The headings at the beginning of each paragraph or section this Plan are solely for convenience and may not be used or construed in any manner to interpret, define, change, modify, amend, alter or restrict the substance of the Plan. Unless the context requires otherwise, singular nouns and pronouns used in this Plan shall be deemed to include the plural, and pronouns of one gender or the neuter shall be deemed to include the equivalent pronouns of the other gender or the neuter. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the terms of this Plan.

**2.113** **Computation of Time.** In computing any period of time prescribed or allowed in the Plan, Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 3
## TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS
## AND OTHER UNCLASSIFIED PRIORITY CLAIMS

**3.1** **Non-Classification.** As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Unclassified Priority Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims instead are treated separately in accordance with the terms in this Article 2.

**3.2** **Administrative Expense Claims.**

3.2.1   Bar Date. All applications for allowance of Administrative Expense Claims other than (a) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and (b) fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930, shall be filed not later than thirty (30) days after the Effective Date. All Administrative Expense Claims not filed within thirty days after the Effective Date shall be barred. The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations. The Reorganized Debtor shall provide notice to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date. The Bankruptcy Court shall determine all Administrative Expense Claims.

3.2.2   General. Except as otherwise agreed to by the Debtor and the holder of an Allowed Administrative Expense Claim, and subject to section 3.2.4. below, each such holder shall be paid in full in Cash on the later of (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms, or (ii) the Effective Date. If the Debtor disputes any portion of an Administrative Expense Claim, the Debtor shall pay such Claim within 30 days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim. If the Debtor is unable to pay any Allowed Administrative Expense Claim by the time set forth in the preceding two sentences, then such Allowed Administrative Expense Claim(s) shall be paid from Total Distributions in the order of priority set forth in Section 6.6 of this Plan.

3.2.3   U.S. Trustee's Fees – None Due. Because this is a case under Subchapter V of Chapter 11, the Debtor is not required to pay fees to the United States Trustee pursuant to 28 U.S.C. § 1930.

3.2.4   Trustee's Fees and Expenses; Professional Compensation and Expense Reimbursement Claims.

3.2.4.1   The Subchapter V Trustee and each Professional shall file a final application for the allowance of fees, compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date. Any award granted by the Bankruptcy Court shall be paid (i) within fifteen days of the entry of the order of the Bankruptcy Court approving such award, unless a stay is obtained, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtor. If the Debtor is unable to pay any Allowed Administrative Expense Claim by the time set forth in the preceding sentence, then such Allowed

Administrative Expense Claim(s) shall be paid from Total Distributions in the order of priority set forth in Section 6.6 of this Plan.

    3.2.4.2    All fees and expenses of the Subchapter V Trustee, the Plan Administrator or Professionals for services rendered after the Effective Date in connection with the Bankruptcy Case and the Plan shall be paid by the Debtor from Total Distributions in the order of priority set forth in Section 6.6 of this Plan upon receipt of reasonably detailed invoices therefor in such amounts and on such terms as such Subchapter V Trustee, the Plan Administrator or Professional, on the one hand, and the Debtor, on the other hand, may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**3.3**    **Unclassified Priority Claims.**

    3.3.1   <u>Payment and Treatment</u>.  Allowed Priority Tax Claims shall be paid in Cash after the Effective Date over the Plan <u>Period</u>, in compliance with section 1129(a)(9)(C) of the Bankruptcy Code.

    3.3.2   <u>Annual Installment Payments</u>.  The holders of Allowed Priority Tax Claims shall receive a total value, as of the Effective Date, equal to the Allowed amount of such Claims, plus interest from and after the Effective Date at the Applicable Rate.  Unless they have agreed to different treatment, the Priority Tax Claims shall be paid in full on or before the end of the fifth anniversary of the Petition Date in five annual installments equal to one-fifth of the total amount of the Allowed Claim.  In any event, the holders of Priority Tax Claims shall be paid regular annual installment payments as follows: the first payment on the later of (a) forty-five days after the Effective Date or (b) the one year anniversary of the Petition Date; the second payment on the second anniversary of the Petition Date; the third payment on the third anniversary of the Petition Date; the fourth payment on the fourth anniversary of the Petition Date; and the fifth and final payment on the fifth anniversary of the Petition Date.

# ARTICLE 4
# CLASSIFICATION OF CLAIMS

**4.1**    **Claims Provided for in the Plan.**  This Plan treats all Claims against the Debtor, against the Debtor's Property and against the Estate.  Only Allowed Claims receive any distribution under this Plan.  All other Claims are disallowed by the Plan and will not receive any distributions under the Plan.

**4.2**    **Limitation on Inclusion in a Class.**  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that class.  A Claim is in a particular Class only to the extent that the portion of the Claim is an Allowed Claim in that class.

**4.3**    **Unclassified Claims.**  In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims are not classified under this Article 3, but are treated in the Plan in accordance with the requirements of 11 U.S.C. § 1129.  Likewise, in accordance with § 1123(a)(1) of the Bankruptcy Code, gap claims within the scope of section 507(a)(3) of the Bankruptcy Code and tax claims within the scope of section 507(a)(8) of the Bankruptcy Code are not classified except to the extent such claim otherwise should be classified, *e.g.*, in the event such claims are not unsecured Priority Claims, but are Secured Claims.

**4.4** **Classified Claims and Interests.** Claims, other than Administrative Expense Claims and Unclassified Priority Claims, shall be classified for all purposes, including voting on, confirmation of, and distribution pursuant to the Plan, as follows:

4.4.1  Class 1 – Priority Claims.  Class 1 shall consist of all Allowed Priority Claims against the Debtor other than (a) Unclassified Priority Claims (including Priority Tax Claims), and (b) Priority Claims that are Secured Claims.

4.4.2  Class 2 – General Unsecured Claims.  Class 2 shall consist of all Allowed General Unsecured Claims against the Debtor.

4.4.3  Class 3 – Breakout Capital's Claims.  Class 3 shall consist of all of Breakout Capital's Claims.

4.4.4  Class 4 – Everest's Claims. Class 4 shall consist of all of Everest's Claims.

4.4.5  Class 5 – Everyday Funding's Claims.  Class 5 shall consist of all of Everyday Funding's Claims.

4.4.6  Class 6 – Blue Bridge's Claims.  Class 6 shall consist of all of Blue Bridge's Claims.

4.4.7  Class 7 – Pinhook's Claims.  Class 7 shall consist of all of Pinhook's Claims.

4.4.8  Class 8 – Diverse Capital's Claims.  Class 8 shall consist of all of Diverse Capital's Claims.

4.4.9  Class 9 – ROC's Claims.  Class 9 shall consist of all of ROC's Claims.

4.4.10  Class 10 – Brickstone's Claims.  Class 10 shall consist of all of Brickstone's Claims.

4.4.11  Class 11 – Lifetime Funding's Claims.  Class 11 shall consist of all of Lifetime Funding's Claims.

4.4.12  Class 12 – Fundbox's Claims.  Class 12 shall consist of all of Fundbox's Claims.

4.4.13  Class 13 – Unique Funding's Claims.  Class 13 shall consist of all of Unique Funding's Claims.

4.4.14  Class 14 – Harvest's Claim. Class 14 shall consist of the Harvest's Claim arising from the PPP Loan.

4.4.15  Class 15 – Equity Interests in the Debtor.  Class 15 shall consist of all Equity Interests in the Debtor.

4.4.16  Class 16 – Miscellaneous Secured Claims.  Class 16 shall consist of all Allowed Claims that are secured by property of the Debtor that are not otherwise classified under this Plan.

4.4.17  Class 17 – Subordinated Claims.  Class 17 shall consist of all Allowed Unsecured Claims that are voluntarily or otherwise subordinated to Allowed Class 2 Claims.

## ARTICLE 5
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

5.1  Class 1 – Priority Claims.

5.1.1  Impairment and Voting.  Class 1 is impaired under the Plan.  Each holder of an Allowed Class 1 Claim shall be entitled to vote to accept or reject the Plan.

5.1.2  Payment.  Subject to section 5.1.4 of this Plan, the holders of Allowed Class 1 Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution.

5.1.3  Distributions.  Subject section 5.1.4 of this Plan and the limitations and priorities described in section 6.6, the holders of Allowed Class 1 Claims shall be paid, pro rata, (a) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available on such dates, and (b) on the Final Distribution Date.

5.1.4  Priority Wage Claims Already Paid.  To the extent that an Allowed Class 1 Claim was paid pursuant to the Wage Order, such Claim shall be deemed paid in full, and shall not be entitled to the payments or distributions set forth in sections 5.1.3 or 5.1.4.

5.2  Class 2 – General Unsecured Claims.

5.2.1  Impairment and Voting.  Class 2 is impaired under the Plan.  Each holder of an Allowed Class 2 Claim shall be entitled to vote to accept or reject the Plan.

5.2.2  Payment.  The holders of Allowed Class 2 Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution.

5.2.3  Distributions.  Subject to the limitations and priorities described in section 6.6, the holders of Allowed Class 2 Claims shall be paid, pro rata, (a) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available on such dates, and (b) on the Final Distribution Date.  The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution.  Specifically, the holders of Allowed Class 2 Claims will not receive distributions until the holders of claims with higher priority (listed under sections 6.6.1 through 6.6.11 of the Plan) have been paid or reserved in full.

**5.3**  **Class 3 – Breakout Capital's Claims.**

5.3.1  <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

5.3.2  <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) votes in favor of the Plan <u>and</u> does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.3.2.1  *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  On or about May 12, 2022, the Debtor and Breakout entered into a stipulation providing for the treatment of the Class 3 Claim (the "<u>Breakout Stipulation</u>").  Provided that Breakout accepts the Plan and does not object to the Plan, the Class 3 Claim shall be treated consistent with the terms set forth in the Breakout Stipulation.

5.3.2.1.1  In such event, subject to the following paragraph, the terms and conditions of the Breakout Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.3 of the Plan and the Breakout Stipulation, the terms of the Breakout Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Breakout Stipulation, the Breakout Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.3.2.1.2  In the event, however, that Breakout votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Breakout Stipulation), then the Debtor shall have the rights and remedies specified in the Breakout Stipulation together with the right to modify the Plan to provide treatment of the Class 3 Claim consistent with the treatment specified below in section 4.3.3.

5.3.2.2  *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Breakout have entered into a Breakout Stipulation, the payment and treatment of the Class 3 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.3.2.2.1  *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Breakout Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 3 Claim (and/or its agents and/or privies).

5.3.2.2.2  *Interest on the Allowed Class 3 Claim*:  No interest shall accrue on the Allowed Class 3 Claim for the first year after the Effective Date.

Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 3 Claim at the Plan Lien Rate.

5.3.2.2.3    *Payment of Allowed Class 3 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 3 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 3 Claim at any time.

5.3.2.2.4    *Waiver and Release of Avoidance Actions:* On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Breakout Net Amount.

5.3.2.2.5    *Retention of Lien up to Amount of Allowed Class 3 Claim:*  Except as otherwise provided in this Section 5.3, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 3 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 3 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.3.2.2.6    *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class 3 Claim is in an amount less than the filed or scheduled amount of the Class 3 Claim (the "Class 3 Delta"), effective upon payment in full of the Allowed Class 3 Claim, the holder of the Class 3 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 3 Delta, (b) the contract and/or documents governing the Class 3 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 3 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.3.3    Treatment if Holder Votes Against or Objects to the Plan.  If the holder of the Class 3 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.3.3.1    *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 3 Claims. If the holder of a Class 3 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.3.3.2    *Claim Not Allowed*:  The Class 3 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.3.3.3    *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 3 Secured Claim shall be treated and paid as provided below, and the balance of the Class 3 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.3.3.3.1    *Potential Bifurcation of Claim.*  To the extent the Class 3 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 3 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

5.3.3.3.2    *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 3 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

5.3.3.3.3    *Interest:* Interest shall accrue on the portion of the Class 3 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

5.3.3.3.4    *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 3 Claim in equal monthly installments calculated on a five-year amortization.

5.3.3.3.5    *Retention of Lien up to Amount of Allowed Class 3 Claim:*  Except as otherwise provided in this Section 5.3, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 3 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 3 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.3.4    <u>Complete Satisfaction of Debt</u>*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 3 <u>Claims</u>. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

5.3.5    <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Except only to the extent waived and/or released under the Breakout Stipulation, all of the Debtor's rights <u>under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 3 Claim.

**5.4    <u>Class 4 – Everest's Claims.</u>**

5.4.1    <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class <u>shall</u> be entitled to vote to accept or reject the Plan.

5.4.2    <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) votes <u>in</u> favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.4.2.1    *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  On or about May 24, 2022, the Debtor and Everest entered into a stipulation providing for the treatment of the Class 4 Claim (the "<u>Everest Stipulation</u>"). Provided that Everest accepts the Plan and does not object to the Plan, the Class 4 Claim shall be treated consistent with the terms set forth in the Everest Stipulation.

5.4.2.1.1    In such event, subject to the following paragraph, the terms and conditions of the Everest Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.4 of the Plan and the Everest Stipulation, the terms of the Everest Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Everest Stipulation, the Everest Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.4.2.1.2    In the event, however, that Everest votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Everest Stipulation), then the Debtor shall have the rights and remedies specified in the Everest Stipulation together

with the right to modify the Plan to provide treatment of the Class 4 Claim consistent with the treatment specified below in section 5.4.3.

5.4.2.2    *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Everest have entered into an Everest Stipulation, the payment and treatment of the Class 4 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.4.2.2.1    *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Everest Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 4 Claim (and/or its agents and/or privies).

5.4.2.2.2    *Interest on the Allowed Class 4 Claim*: No interest shall accrue on the Allowed Class 4 Claim for the first year after the Effective Date. Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 4 Claim at the Plan Lien Rate.

5.4.2.2.3    *Payment of Allowed Class 4 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 4 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 4 Claim at any time.

5.4.2.2.4    *Waiver and Release of Avoidance Actions:*  On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Everest Net Amount.

5.4.2.2.5    *Retention of Lien up to Amount of Allowed Class 4 Claim:*  Except as otherwise provided in this Section 5.4, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 4 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 4 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.4.2.2.6    *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class

4 Claim is in an amount less than the filed or scheduled amount of the Class 4 Claim (the "<u>Class 4 Delta</u>"), effective upon payment in full of the Allowed Class 4 Claim, the holder of the Class 4 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 4 Delta, (b) the contract and/or documents governing the Class 4 Claim (the "<u>Contract</u>"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 4 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

      5.4.3   <u>Treatment if Holder Votes Against or Objects to the Plan</u>.   If the holder of the Class 4 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the <u>following</u> treatment:

      5.4.3.1   *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 4 Claims. If the holder of a Class 4 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

      5.4.3.2   *Claim Not Allowed*:  The Class 4 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

      5.4.3.3   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 4 Secured Claim shall be treated and paid as provided below, and the balance of the Class 4 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

      5.4.3.3.1   *Potential Bifurcation of Claim.*  To the extent the Class 4 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 4 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

      5.4.3.3.2   *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 4 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

      5.4.3.3.3   *Interest:* Interest shall accrue on the portion of the Class 4 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

        5.4.3.3.4     *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 4 Claim in equal monthly installments calculated on a five-year amortization.

        5.4.3.3.5     *Retention of Lien up to Amount of Allowed Class 4 Claim:*  Except as otherwise provided in this Section 5.4, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 4 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 4 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

        5.4.4   <u>Complete Satisfaction of Debt</u>*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 4 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

        5.4.5   <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Except only to the extent waived and/or released under the Everest Stipulation, all of the Debtor's rights <u>under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 4 Claim.

   **5.5**     **<u>Class 5 – Everyday Funding's Claims.</u>**

        5.5.1   <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class <u>shall</u> be entitled to vote to accept or reject the Plan.

        5.5.2   <u>Claim Already Paid in Full; Reservation of Rights</u>.  Everyday Funding's Claim, if any, was paid in full prior to the Petition Date. The Debtor reserves all Claims and Causes of Action, including but not limited to Avoidance Actions, against Everyday Funding.

        5.5.3   <u>Complete Satisfaction of Debt</u>.  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class, including the payment in full of the Claim prior to the Petition date, shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other

rights held by or afforded to such holder related to or arising from its Class 5 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers and/or other third-party payors.

        5.5.4   <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Property acquired by the Debtor or its Estate after the commencement of the Case is not subject to any lien or interest of the holder of the Class 5 Claim.  Without limitation, any accounts, accounts receivable, payment intangibles or other right to payment which first existed on or after the Petition Date is owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 5 Claim.

      **5.6**     **Class 6 – Blue Bridge's Claims.**

        5.6.1   <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

        5.6.2   <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

          5.6.2.1   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  On or about May 17, 2022, the Debtor and Blue Bridge entered into a stipulation providing for the treatment of the Class 6 Claim (the "<u>Blue Bridge Stipulation</u>"). Provided that Blue Bridge accepts the Plan and does not object to the Plan, the Class 6 Claim shall be treated consistent with the terms set forth in the Blue Bridge Stipulation.

            5.6.2.1.1   In such event, subject to the following paragraph, the terms and conditions of the Blue Bridge Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.6 of the Plan and the Blue Bridge Stipulation, the terms of the Blue Bridge Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Blue Bridge Stipulation, the Blue Bridge Stipulation shall be deemed approved by the entry of the Confirmation Order.

            5.6.2.1.2   In the event, however, that Blue Bridge votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Blue Bridge Stipulation), then the Debtor shall have the rights and remedies specified in the Blue Bridge Stipulation together with the right to modify the Plan to provide treatment of the Class 6 Claim consistent with the treatment specified below in section 5.6.3.

5.6.2.2    *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Blue Bridge have entered into a Blue Bridge Stipulation, the payment and treatment of the Class 6 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.6.2.2.1    *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Blue Bridge Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 6 Claim (and/or its agents and/or privies).

5.6.2.2.2    *Interest on the Allowed Class 6 Claim*: No interest shall accrue on the Allowed Class 6 Claim for the first year after the Effective Date. Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 6 Claim at the Plan Lien Rate.

5.6.2.2.3    *Payment of Allowed Class 6 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 6 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 6 Claim at any time.

5.6.2.2.4    *Waiver and Release of Avoidance Actions:* On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Blue Bridge Net Amount.

5.6.2.2.5    *Retention of Lien up to Amount of Allowed Class 6 Claim:*  Except as otherwise provided in this Section 5.6, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 6 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 6 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.6.2.2.6    *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class 6 Claim is in an amount less than the filed or scheduled amount of the Class 6 Claim (the "Class 6 Delta"), effective upon payment in full of the Allowed Class 6 Claim, the holder of the Class 6 Claim shall assign to the Debtor for

the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 6 Delta, (b) the contract and/or documents governing the Class 6 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 6 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

    5.6.3   *Treatment if Holder Votes Against or Objects to the Plan*.   If the holder of the Class 6 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

    5.6.3.1   *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 6 Claims. If the holder of a Class 6 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

    5.6.3.2   *Claim Not Allowed*:  The Class 6 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

    5.6.3.3   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 6 Secured Claim shall be treated and paid as provided below, and the balance of the Class 6 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

    5.6.3.3.1   *Potential Bifurcation of Claim.*  To the extent the Class 6 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 6 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

    5.6.3.3.2   *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 6 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

    5.6.3.3.3   *Interest:* Interest shall accrue on the portion of the Class 6 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

    5.6.3.3.4   *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date

the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 6 Claim in equal monthly installments calculated on a five-year amortization.

        5.6.3.3.5     *Retention of Lien up to Amount of Allowed Class 6 Claim:*  Except as otherwise provided in this Section 5.6, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 6 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 6 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

        5.6.4   <u>Complete Satisfaction of Debt</u>*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 6 <u>Claims</u>. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

        5.6.5   <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  <u>Except</u> only to the extent waived and/or released under the Blue Bridge Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the **Class 6** Claim.

**5.7**    <u>**Class 7 – Pinhook's Claims.**</u>

        5.7.1   <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

        5.7.2   <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

        5.7.3   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the <u>extent</u> the Debtor and Pinhook have entered into a stipulation providing for the treatment of the Class 7 Claim (the "<u>Pinhook Stipulation</u>") then, provided that Pinhook accepts the Plan and does not object to the Plan, the Class 7 Claim shall be treated consistent with the terms set forth in the Pinhook Stipulation.

5.7.3.1.1      In such event, subject to the following paragraph, the terms and conditions of the Pinhook Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.7 of the Plan and the Pinhook Stipulation, the terms of the Pinhook Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Pinhook Stipulation, the Pinhook Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.7.3.1.2      In the event, however, that Pinhook votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Pinhook Stipulation), then the Debtor shall have the rights and remedies specified in the Pinhook Stipulation together with the right to modify the Plan to provide treatment of the Class 7 Claim consistent with the treatment specified below in section 5.7.3.

5.7.3.2      *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Pinhook have entered into a Pinhook Stipulation, the payment and treatment of the Class 7 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.7.3.2.1      *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Pinhook Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 7 Claim (and/or its agents and/or privies).

5.7.3.2.2      *Interest on the Allowed Class 7 Claim*: No interest shall accrue on the Allowed Class 7 Claim for the first year after the Effective Date. Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 7 Claim at the Plan Lien Rate.

5.7.3.2.3      *Payment of Allowed Class 7 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 7 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 7 Claim at any time.

5.7.3.2.4      *Waiver and Release of Avoidance Actions:* On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Pinhook Net Amount.

5.7.3.2.5   *Retention of Lien up to Amount of Allowed Class 7 Claim:*  Except as otherwise provided in this Section 5.7, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 7 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 7 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.7.3.2.6   *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class 7 Claim is in an amount less than the filed or scheduled amount of the Class 7 Claim (the "Class 7 Delta"), effective upon payment in full of the Allowed Class 7 Claim, the holder of the Class 7 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 7 Delta, (b) the contract and/or documents governing the Class 7 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 7 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.7.4   Treatment if Holder Votes Against or Objects to the Plan.   If the holder of the Class 7 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.7.4.1   *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 7 Claims. If the holder of a Class 7 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.7.4.2   *Claim Not Allowed*:  The Class 7 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.7.4.3   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 7 Secured Claim shall be treated and paid as provided below, and the balance of the Class 7 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.7.4.3.1   *Potential Bifurcation of Claim.*  To the extent the Class 7 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens

that were senior to the Lien securing the Class 7 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

5.7.4.3.2     *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 7 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

5.7.4.3.3     *Interest:* Interest shall accrue on the portion of the Class 7 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

5.7.4.3.4     *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 7 Claim in equal monthly installments calculated on a five-year amortization.

5.7.4.3.5     *Retention of Lien up to Amount of Allowed Class 7 Claim:*  Except as otherwise provided in this Section 5.7, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 7 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 7 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.7.5     Complete Satisfaction of Debt*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 7 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

5.7.6     Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Except only to the extent waived and/or released under the Pinhook Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 7 Claim.

**5.8**    **Class 8 – Diverse Capital's Claims.**

5.8.1    <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

5.8.2    <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) <u>votes</u> in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.8.2.1    *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  On or about May 13, 2022, the Debtor and Diverse Capital entered into a stipulation providing for the treatment of the Class 8 Claim (the "<u>Diverse Capital Stipulation</u>").  Provided that Diverse Capital accepts the Plan and does not object to the Plan, the Class 8 Claim shall be treated consistent with the terms set forth in the Diverse Capital Stipulation.

5.8.2.1.1    In such event, subject to the following paragraph, the terms and conditions of the Diverse Capital Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.8 of the Plan and the Diverse Capital Stipulation, the terms of the Diverse Capital Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Diverse Capital Stipulation, the Diverse Capital Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.8.2.1.2    In the event, however, that Diverse Capital votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Diverse Capital Stipulation), then the Debtor shall have the rights and remedies specified in the Diverse Capital Stipulation together with the right to modify the Plan to provide treatment of the Class 8 Claim consistent with the treatment specified below in section 5.8.3.

5.8.2.2    *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Diverse Capital have entered into a Diverse Capital Stipulation, the payment and treatment of the Class 8 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.8.2.2.1    *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Diverse Capital Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 8 Claim (and/or its agents and/or privies).

       5.8.2.2.2   *Interest on the Allowed Class 8 Claim*: No interest shall accrue on the Allowed Class 8 Claim for the first year after the Effective Date. Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 8 Claim at the Plan Lien Rate.

       5.8.2.2.3   *Payment of Allowed Class 8 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 8 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 8 Claim at any time.

       5.8.2.2.4   *Waiver and Release of Avoidance Actions:* On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Diverse Capital Net Amount.

       5.8.2.2.5   *Retention of Lien up to Amount of Allowed Class 8 Claim:*  Except as otherwise provided in this Section 5.8, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 8 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 8 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

       5.8.2.2.6   *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class 8 Claim is in an amount less than the filed or scheduled amount of the Class 8 Claim (the "Class 8 Delta"), effective upon payment in full of the Allowed Class 8 Claim, the holder of the Class 8 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 8 Delta, (b) the contract and/or documents governing the Class 8 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 8 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

    5.8.3   Treatment if Holder Votes Against or Objects to the Plan.  If the holder of the Class 8 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.8.3.1    *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 8 Claims. If the holder of a Class 8 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.8.3.2    *Claim Not Allowed*:  The Class 8 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.8.3.3    *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 8 Secured Claim shall be treated and paid as provided below, and the balance of the Class 8 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.8.3.3.1    *Potential Bifurcation of Claim.*  To the extent the Class 8 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 8 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

5.8.3.3.2    *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 8 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

5.8.3.3.3    *Interest:* Interest shall accrue on the portion of the Class 8 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

5.8.3.3.4    *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 8 Claim in equal monthly installments calculated on a five-year amortization.

5.8.3.3.5    *Retention of Lien up to Amount of Allowed Class 8 Claim:*  Except as otherwise provided in this Section 5.8, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 8 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 8 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.8.4   <u>Complete Satisfaction of Debt</u>:  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 8 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or <u>other</u> payment rights from the Debtor's customers, account debtors and/or other third-party payors.

5.8.5   <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Except only to the extent waived and/or released under the Diverse Capital Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the <u>Bankruptcy</u> Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 8 Claim.

**5.9      Class 9 – ROC's Claims.**

5.9.1   <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

5.9.2   <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) <u>votes</u> in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.9.2.1   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor and ROC have entered into a stipulation providing for the treatment of the Class 9 Claim (the "<u>ROC Stipulation</u>") then, provided that ROC accepts the Plan and does not object to the Plan, the Class 9 Claim shall be treated consistent with the terms set forth in the ROC Stipulation.

5.9.2.1.1   In such event, subject to the following paragraph, the terms and conditions of the ROC Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.9 of the Plan and the ROC Stipulation, the terms of the ROC Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the ROC Stipulation, the ROC Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.9.2.1.2   In the event, however, that ROC votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the ROC Stipulation), then the Debtor shall have the rights and remedies specified in the ROC Stipulation together with the right to

modify the Plan to provide treatment of the Class 9 Claim consistent with the treatment specified below in section 5.9.3.

5.9.2.2  *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and ROC have entered into a ROC Stipulation, the payment and treatment of the Class 9 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.9.2.2.1  *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the ROC Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 9 Claim (and/or its agents and/or privies).

5.9.2.2.2  *Interest on the Allowed Class 9 Claim*: No interest shall accrue on the Allowed Class 9 Claim for the first year after the Effective Date. Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 9 Claim at the Plan Lien Rate.

5.9.2.2.3  *Payment of Allowed Class 9 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 9 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 9 Claim at any time.

5.9.2.2.4  *Waiver and Release of Avoidance Actions:* On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the ROC Net Amount.

5.9.2.2.5  *Retention of Lien up to Amount of Allowed Class 9 Claim:*  Except as otherwise provided in this Section 5.9, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 9 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 9 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.9.2.2.6  *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class

9 Claim is in an amount less than the filed or scheduled amount of the Class 9 Claim (the "Class 9 Delta"), effective upon payment in full of the Allowed Class 9 Claim, the holder of the Class 9 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 9 Delta, (b) the contract and/or documents governing the Class 9 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 9 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.9.3   <u>Treatment if Holder Votes Against or Objects to the Plan</u>.   If the holder of the Class 9 Claim either (i) votes <u>against</u> the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.9.3.1   *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 9 Claims. If the holder of a Class 9 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.9.3.2   *Claim Not Allowed*: The Class 9 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.9.3.3   *Treatment of Secured Claim*: To the extent it is Allowed and Secured, the Class 9 Secured Claim shall be treated and paid as provided below, and the balance of the Class 9 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.9.3.3.1   *Potential Bifurcation of Claim.* To the extent the Class 9 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 9 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

5.9.3.3.2   *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 9 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

5.9.3.3.3   *Interest:* Interest shall accrue on the portion of the Class 9 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

5.9.3.3.4     *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 9 Claim in equal monthly installments calculated on a five-year amortization.

5.9.3.3.5     *Retention of Lien up to Amount of Allowed Class 9 Claim:*  Except as otherwise provided in this Section 5.9, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 9 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 9 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.9.4   Complete Satisfaction of Debt*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 9 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

5.9.5   Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Except only to the extent waived and/or released under the ROC Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 9 Claim.

**5.10   Class 10 – Brickstone's Claims.**

5.10.1   Impairment and Voting.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

5.10.2   Treatment if Holder Votes in Favor of the Plan.  If the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.10.2.1   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor and Brickstone have entered into a stipulation providing for the treatment of the Class 10 Claim (the "Brickstone

Stipulation") then, provided that Brickstone accepts the Plan and does not object to the Plan, the Class 10 Claim shall be treated consistent with the terms set forth in the Brickstone Stipulation.

5.10.2.1.1   In such event, subject to the following paragraph, the terms and conditions of the Brickstone Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.10 of the Plan and the Brickstone Stipulation, the terms of the Brickstone Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Brickstone Stipulation, the Brickstone Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.10.2.1.2   In the event, however, that Brickstone votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Brickstone Stipulation), then the Debtor shall have the rights and remedies specified in the Brickstone Stipulation together with the right to modify the Plan to provide treatment of the Class 10 Claim consistent with the treatment specified below in section 5.10.3.

5.10.2.2   *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Brickstone have entered into a Brickstone Stipulation, the payment and treatment of the Class 10 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.10.2.2.1   *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Brickstone Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 10 Claim (and/or its agents and/or privies).

5.10.2.2.2   *Interest on the Allowed Class 10 Claim*: No interest shall accrue on the Allowed Class 10 Claim for the first year after the Effective Date.  Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 10 Claim at the Plan Lien Rate.

5.10.2.2.3   *Payment of Allowed Class 10 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 10 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 10 Claim at any time.

5.10.2.2.4   *Waiver and Release of Avoidance Actions:*  On the Effective Date, the Debtor shall waive and release any Avoidance Actions it

holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Brickstone Net Amount. The Debtor shall retain the right to seek return and disgorgement of the Unreturned 549 Amounts under any and all available Statutes or other Causes of Action, including the right to recover actual damages (including disgorgement of the entire Unreturned 549 Amounts), punitive damages, sanctions for willful contempt and an award of attorneys' fees.

5.10.2.2.5 *Retention of Lien up to Amount of Allowed Class 10 Claim:* Except as otherwise provided in this Section 5.10, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 10 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 10 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released. Notwithstanding the foregoing, to the extent any Unreturned 549 Amounts exist as of the Confirmation Date, the Debtor may seek to void, avoid, or subordinate any Lien securing the Class 10 Claim on any basis, including as a sanction for willfully violating the automatic stay.

5.10.2.2.6 *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:* To the extent that the Allowed Class 10 Claim is in an amount less than the filed or scheduled amount of the Class 10 Claim (the "Class 10 Delta"), effective upon payment in full of the Allowed Class 10 Claim, the holder of the Class 10 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 10 Delta, (b) the contract and/or documents governing the Class 10 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 10 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.10.3 <u>Treatment if Holder Votes Against or Objects to the Plan</u>. If the holder of the Class 10 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following <u>treatment</u>:

5.10.3.1 *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 10 Claims. If the holder of a Class 10 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.10.3.2   *Claim Not Allowed*:  The Class 10 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.10.3.3   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 10 Secured Claim shall be treated and paid as provided below, and the balance of the Class 10 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

      5.10.3.3.1   *Potential Bifurcation of Claim.*  To the extent the Class 10 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 10 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

      5.10.3.3.2   *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 10 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

      5.10.3.3.3   *Interest:* Interest shall accrue on the portion of the Class 10 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

      5.10.3.3.4   *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 10 Claim in equal monthly installments calculated on a five-year amortization.

      5.10.3.3.5   *Retention of Lien up to Amount of Allowed Class 10 Claim:*  Except as otherwise provided in this Section 5.10, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 10 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 10 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.10.4  <u>Complete Satisfaction of Debt</u>*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 10 Claims. For the avoidance of doubt, the holder of Claims in this Class

shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

      5.10.5  <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Except only to the extent waived and/or released under the Brickstone Stipulation, all of the Debtor's rights <u>under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved</u>.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 10 Claim.

    **5.11**    <u>**Class 11 – Lifetime Funding's Claims.**</u>

      5.11.1  <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be <u>entitled</u> to vote to accept or reject the Plan.

      5.11.2  <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) votes in favor <u>of</u> the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

        5.11.2.1  *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor and Lifetime Funding have entered into a stipulation providing for the treatment of the Class 11 Claim (the "<u>Lifetime Funding Stipulation</u>") then, provided that Lifetime Funding accepts the Plan and does not object to the Plan, the Class 11 Claim shall be treated consistent with the terms set forth in the Lifetime Funding Stipulation.

          5.11.2.1.1   In such event, subject to the following paragraph, the terms and conditions of the Lifetime Funding Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.11 of the Plan and the Lifetime Funding Stipulation, the terms of the Lifetime Funding Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Lifetime Funding Stipulation, the Lifetime Funding Stipulation shall be deemed approved by the entry of the Confirmation Order.

          5.11.2.1.2   In the event, however, that Lifetime Funding votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Lifetime Funding Stipulation), then the Debtor shall have the rights and remedies specified in the Lifetime Funding Stipulation together with the right to modify the Plan to provide treatment of the Class 11 Claim consistent with the treatment specified below in section 5.11.3.

5.11.2.2 *Treatment of Claim in the Absence of a Future Stipulation.* Unless the Debtor and Lifetime Funding have entered into a Lifetime Funding Stipulation, the payment and treatment of the Class 11 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.11.2.2.1 *Allowance of Claim*: The Claim shall be Allowed in an amount equal to (a) the Lifetime Funding Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 11 Claim (and/or its agents and/or privies).

5.11.2.2.2 *Interest on the Allowed Class 11 Claim*: No interest shall accrue on the Allowed Class 11 Claim for the first year after the Effective Date. Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 11 Claim at the Plan Lien Rate.

5.11.2.2.3 *Payment of Allowed Class 11 Claim*: Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 11 Claim in thirty-six equal monthly installments. The Debtor may prepay the Allowed Class 11 Claim at any time.

5.11.2.2.4 *Waiver and Release of Avoidance Actions:* On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Lifetime Funding Net Amount.

5.11.2.2.5 *Retention of Lien up to Amount of Allowed Class 11 Claim:* Except as otherwise provided in this Section 5.11, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 11 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 11 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.11.2.2.6 *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:* To the extent that the Allowed Class 11 Claim is in an amount less than the filed or scheduled amount of the Class 11 Claim (the "Class 11 Delta"), effective upon payment in full of the

Allowed Class 11 Claim, the holder of the Class 11 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 11 Delta, (b) the contract and/or documents governing the Class 11 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 11 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.11.3  Treatment if Holder Votes Against or Objects to the Plan.   If the holder of the Class 11 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.11.3.1  *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 11 Claims. If the holder of a Class 11 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.11.3.2  *Claim Not Allowed*:  The Class 11 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.11.3.3  *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 11 Secured Claim shall be treated and paid as provided below, and the balance of the Class 11 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.11.3.3.1  *Potential Bifurcation of Claim.*  To the extent the Class 11 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 11 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

5.11.3.3.2  *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 11 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

5.11.3.3.3  *Interest:* Interest shall accrue on the portion of the Class 11 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

5.11.3.3.4  *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date

the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 11 Claim in equal monthly installments calculated on a five-year amortization.

5.11.3.3.5    *Retention of Lien up to Amount of Allowed Class 11 Claim:*  Except as otherwise provided in this Section 5.11, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 11 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 11 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.11.4  Complete Satisfaction of Debt*:*  Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 11 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

5.11.5  Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Except only to the extent waived and/or released under the Lifetime Funding Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 11 Claim.

**5.12  Class 12 – Fundbox's Claims.**

5.12.1  Impairment and Voting.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to vote to accept or reject the Plan.

5.12.2  Treatment if Holder Votes in Favor of the Plan.  If the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.12.2.1    *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor and Fundbox have entered into a stipulation providing for the treatment of the Class 12 Claim (the "Fundbox Stipulation") then, provided that Fundbox accepts the Plan and does not object to the

Plan, the Class 12 Claim shall be treated consistent with the terms set forth in the Fundbox Stipulation.

      5.12.2.1.1   In such event, subject to the following paragraph, the terms and conditions of the Fundbox Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.12 of the Plan and the Fundbox Stipulation, the terms of the Fundbox Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Fundbox Stipulation, the Fundbox Stipulation shall be deemed approved by the entry of the Confirmation Order.

      5.12.2.1.2   In the event, however, that Fundbox votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Fundbox Stipulation), then the Debtor shall have the rights and remedies specified in the Fundbox Stipulation together with the right to modify the Plan to provide treatment of the Class 12 Claim consistent with the treatment specified below in section 5.12.3.

    5.12.2.2   *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Fundbox have entered into a Fundbox Stipulation, the payment and treatment of the Class 12 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

      5.12.2.2.1   *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Fundbox Net Amount *less* (minus) (b) five times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 12 Claim (and/or its agents and/or privies).

      5.12.2.2.2   *Interest on the Allowed Class 12 Claim*: No interest shall accrue on the Allowed Class 12 Claim for the first year after the Effective Date.  Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 12 Claim at the Plan Lien Rate.

      5.12.2.2.3   *Payment of Allowed Class 12 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 12 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 12 Claim at any time.

      5.12.2.2.4   *Waiver and Release of Avoidance Actions:*  On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549

and/or 550 to the extent the Unreturned 549 Amounts exceed the Fundbox Net Amount.

5.12.2.2.5 *Retention of Lien up to Amount of Allowed Class 12 Claim:* Except as otherwise provided in this Section 5.12, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 12 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 12 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.12.2.2.6 *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:* To the extent that the Allowed Class 12 Claim is in an amount less than the filed or scheduled amount of the Class 12 Claim (the "Class 12 Delta"), effective upon payment in full of the Allowed Class 12 Claim, the holder of the Class 12 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 12 Delta, (b) the contract and/or documents governing the Class 12 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 12 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.12.3   Treatment if Holder Votes Against or Objects to the Plan.   If the holder of the Class 12 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.12.3.1   *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 12 Claims. If the holder of a Class 12 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.12.3.2   *Claim Not Allowed*:  The Class 12 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.12.3.3   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 12 Secured Claim shall be treated and paid as provided below, and the balance of the Class 12 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.12.3.3.1       *Potential Bifurcation of Claim.*  To the extent the
Class 12 Claim as of the Petition Date exceeds the forced liquidation value of
the Collateral as of the Petition Date (taking into account any and all Liens
that were senior to the Lien securing the Class 12 Claim as of the Petition
Date), the Claim shall be treated as a Secured Claim only to the extent of such
value.

5.12.3.3.2       *Reservation of All Objections to Claim and Lien.*
The Reorganized Debtor (and other parties' in interest regarding the claim and
amount) shall have the right to object to the Class 12 Claim or ostensible Lien
on any grounds, including amount, validity, perfection, priority and in all
other respects.

5.12.3.3.3       *Interest:* Interest shall accrue on the portion of the
Class 12 Claim that is a Secured Claim and is an Allowed Claim at the Plan
Lien Rate.

5.12.3.3.4       *Payment:*  Beginning on the fifteenth day of the
month first occurring after the earlier of (a) the Effective Date or (b) the date
the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class
12 Claim in equal monthly installments calculated on a five-year amortization.

5.12.3.3.5       *Retention of Lien up to Amount of Allowed Class 12
Claim:*  Except as otherwise provided in this Section 5.12, to the extent that it
has a properly perfected Lien and to the extent it is not avoided, the holder of
an Allowed Secured Class 12 Claim shall retain its Lien upon its Collateral
until its Allowed Secured Claim is paid in full as provided herein. When its
Allowed Secured Claim is paid in full, the holder of the Allowed Class 12
Claim shall be deemed to have released its Lien and security interest in its
Collateral and shall take such steps as are necessary to indicate the release of
its Lien in such Collateral, including without limitation filing a UCC-3
Financing Statement Amendment Form with the State of Utah, indicating that
its Lien has been terminated and released.

5.12.4  <u>Complete Satisfaction of Debt</u>*:*  Notwithstanding anything to the contrary
herein, the treatment afforded to the holder of Claims in this Class shall be in complete
satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported
sales or purchases, interests, or other rights held by or afforded to such holder related to or
arising from its Class 12 <u>Claims</u>. For the avoidance of doubt, the holder of Claims in this Class
shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable,"
or other payment rights from the Debtor's customers, account debtors and/or other third-party
payors.

5.12.5  <u>Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the
Bankruptcy Code Are Preserved</u>.  Except only to the extent waived and/or released under the
Fundbox Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the
Bankruptcy Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that

any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the **Class 12** Claim.

### 5.13   Class 13 – Unique Funding's Claims.

5.13.1   <u>Impairment and Voting</u>.  This Class is impaired under the Plan.  Holders of Allowed Claims in this Class shall be entitled to <u>vote</u> to accept or reject the Plan.

5.13.2   <u>Treatment if Holder Votes in Favor of the Plan</u>.  If the holder of the Claim in this Class either (i) votes in favor of the <u>Plan</u> and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment:

5.13.2.1   *Treatment of Claim in the Event of a Future Stipulation Regarding Plan Treatment.*  To the extent the Debtor and Unique Funding have entered into a stipulation providing for the treatment of the Class 13 Claim (the "<u>Unique Funding Stipulation</u>") then, provided that Unique Funding accepts the Plan and does not object to the Plan, the Class 13 Claim shall be treated consistent with the terms set forth in the Unique Funding Stipulation.

5.13.2.1.1   In such event, subject to the following paragraph, the terms and conditions of the Unique Funding Stipulation (if applicable) are, and shall be, deemed fully incorporated under the Plan by this reference, and to the extent of any inconsistency between this section 5.13 of the Plan and the Unique Funding Stipulation, the terms of the Unique Funding Stipulation shall control. Except to the extent that the Court has already entered a Final Order approving the Unique Funding Stipulation, the Unique Funding Stipulation shall be deemed approved by the entry of the Confirmation Order.

5.13.2.1.2   In the event, however, that Unique Funding votes to reject the Plan or objects to the Plan (for a reason other than that the Plan is not consistent with the express terms of the Unique Funding Stipulation), then the Debtor shall have the rights and remedies specified in the Unique Funding Stipulation together with the right to modify the Plan to provide treatment of the Class 13 Claim consistent with the treatment specified below in section 5.13.3.

5.13.2.2   *Treatment of Claim in the Absence of a Future Stipulation.*  Unless the Debtor and Unique Funding have entered into a Unique Funding Stipulation, the payment and treatment of the Class 13 Claim shall be as follows if the holder of the Claim in this Class either (i) votes in favor of the Plan and does not object to the Plan, or (ii) does not vote on or object to the Plan (and is deemed to have accepted the Plan), then such holder shall receive the following treatment–

5.13.2.2.1   *Allowance of Claim*:  The Claim shall be Allowed in an amount equal to (a) the Unique Funding Net Amount *less* (minus) (b) five

times (5x) the Unreturned 549 Amounts (if any) received, collected or obtained by the holder of the Class 13 Claim (and/or its agents and/or privies).

5.13.2.2.2  *Interest on the Allowed Class 13 Claim*: No interest shall accrue on the Allowed Class 13 Claim for the first year after the Effective Date.  Commencing on the first anniversary of the Effective Date, interest shall accrue on the unpaid balance of the Allowed Class 13 Claim at the Plan Lien Rate.

5.13.2.2.3  *Payment of Allowed Class 13 Claim*:  Beginning on the fifteenth day of the month first occurring one year after the Effective Date, the Debtor shall pay the Allowed Class 13 Claim in thirty-six equal monthly installments.  The Debtor may prepay the Allowed Class 13 Claim at any time.

5.13.2.2.4  *Waiver and Release of Avoidance Actions:*  On the Effective Date, the Debtor shall waive and release any Avoidance Actions it holds or may hold against such holder; provided, however, that the Debtor shall not waive or release any of its claims under sections 362(a), 542, 549 and/or 550 to the extent the Unreturned 549 Amounts exceed the Unique Funding Net Amount.

5.13.2.2.5  *Retention of Lien up to Amount of Allowed Class 13 Claim:*  Except as otherwise provided in this Section 5.13, to the extent that it has a properly perfected Lien, the holder of an Allowed Secured Class 13 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 13 Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.13.2.2.6  *Assignment and Preservation of Unpaid Portion of Claim and Lien for Benefit of the Estate:*  To the extent that the Allowed Class 13 Claim is in an amount less than the filed or scheduled amount of the Class 13 Claim (the "Class 13 Delta"), effective upon payment in full of the Allowed Class 13 Claim, the holder of the Class 13 Claim shall assign to the Debtor for the benefit of the Debtor's bankruptcy estate all of holder's right, title and interest in and to (a) the unpaid balance of the Claim, including the Class 13 Delta, (b) the contract and/or documents governing the Class 13 Claim (the "Contract"), and (c) all rights relating to or arising under the Contract, including any and all rights to collect payment of amounts greater than or in addition to the Allowed Class 13 Claim from the Debtor and any co-borrower(s) and/or guarantor(s), and all rights in collateral (if any) or other property of the Debtor.

5.13.3   <u>Treatment if Holder Votes Against or Objects to the Plan</u>.   If the holder of the Class 13 Claim either (i) votes against the Plan, or (ii) objects to the Plan, then such holder shall receive the following treatment:

5.13.3.1   *Option to Pursue Causes of Actions*: The Debtor may pursue one or more Causes of Action, including but not limited to Avoidance Actions, against the holder of the Class 13 Claims. If the holder of a Class 13 Claim votes against the Plan or objects to the Plan, the Debtor reserves the right to prosecute any and all Causes of Action against such holder, including but not limited to Avoidance Actions.

5.13.3.2   *Claim Not Allowed*:  The Class 13 Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.13.3.3   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 13 Secured Claim shall be treated and paid as provided below, and the balance of the Class 13 Claim that is not Secured shall be treated as a General Unsecured Claim in Class 2:

5.13.3.3.1     *Potential Bifurcation of Claim.*  To the extent the Class 13 Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (taking into account any and all Liens that were senior to the Lien securing the Class 13 Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

5.13.3.3.2     *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties' in interest regarding the claim and amount) shall have the right to object to the Class 13 Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

5.13.3.3.3     *Interest:* Interest shall accrue on the portion of the Class 13 Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

5.13.3.3.4     *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 13 Claim in equal monthly installments calculated on a five-year amortization.

5.13.3.3.5     *Retention of Lien up to Amount of Allowed Class 13 Claim:*  Except as otherwise provided in this Section 5.13, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 13 Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 13 Claim shall be deemed to have released its Lien and security interest in its

Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Utah, indicating that its Lien has been terminated and released.

5.13.4   Complete Satisfaction of Debt: Notwithstanding anything to the contrary herein, the treatment afforded to the holder of Claims in this Class shall be in complete satisfaction of any Secured Claims, General Unsecured Claims, debts, obligations, purported sales or purchases, interests, or other rights held by or afforded to such holder related to or arising from its Class 13 Claims. For the avoidance of doubt, the holder of Claims in this Class shall have no further rights to "Future Receipts", "Future Receivables," "Accounts Receivable," or other payment rights from the Debtor's customers, account debtors and/or other third-party payors.

5.13.5   Debtor's Rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Except only to the extent waived and/or released under the Unique Funding Stipulation, all of the Debtor's rights under sections 362(a), 541, 552(a) and 1186 of the Bankruptcy Code Are Preserved.  Without limitation, the Debtor reserves the right to assert that any and all accounts, accounts receivable, payment intangibles or other rights to payment which first existed on or after the Petition Date are owned and held by the Debtor "free and clear" of any lien or interest of the holder of the Class 13 Claim.

**5.14    Class 14 – Harvest's Claim.**

5.14.1   Impairment and Voting.  Class 14 is unimpaired under the Plan.  Each holder of an Allowed Class 14 Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.14.2   Treatment.  The Allowed Class 14 Claim shall be paid or forgiven in accordance with the terms of the PPP Loan Documents.

**5.15    Class 15 – Equity Interests in the Debtor.**

5.15.1   Impairment and Voting.  Class 15 is impaired under the Plan.  Holders of Equity Interests in this Class shall be entitled to vote to accept or reject the Plan

5.15.2   Treatment of Equity Interests.  The existing Equity Interests in the Debtor will be canceled under the Plan; provided, however, that Troy Hyde shall retain his Equity Interest (and his Equity Interest shall not be cancelled) subject to the conditions precedent and conditions subsequent set forth in section 6.4.2 of this Plan.

5.15.3   Special Voting Interest of Plan Administrator.  The Plan Administrator will be issued and will hold the Special Voting Interest in the Debtor, but all profits and losses will be allocated solely to Troy Hyde until such time, if any, as the interests of Troy Hyde are forfeited under Section 6.4.2 of this Plan.  At the time of any forfeiture, the Plan Administrator in its fiduciary capacity may allocate, assign, sell, or otherwise distribute Troy Hyde's Equity Interests in the best interests of the Debtor and its creditors. The vote or management authority of either the Equity Interest of Troy Hyde or of the Special Voting Interest of the Plan

Administrator shall not be affected by any charging order or the foreclosure of any charging order with respect to any such membership interest of either class, and no such charging order or foreclosure of a charging order will result in the dissociation of either class of membership interest.

### 5.16   Class 16 – Miscellaneous Secured Claims.

5.16.1  Impairment and Voting.  Class 16 is impaired under the Plan.  Each holder of an Allowed Class 16 Claim shall be entitled to vote to accept or reject the Plan.

5.16.2  Payment.  The holders of Allowed Class 16 Claims shall be paid the full amount of their claim as of the Petition Date.

5.16.3  Distributions.  As Collateral which secures a portion of the Class 16 Claim is sold, the Reorganized Debtor will pay in full the portion of the Allowed Secured Claim attributable to such Collateral.  At the discretion of the Reorganized Debtor, the Class 16 Claims may be paid either (a) immediately upon the closing of the sale of the Collateral, or (b) on the next Distribution Date.  Allowed Class 16 Claims shall be paid in full not later than the Final Distribution Date.

5.16.4  Retain Liens.  The holders of Allowed Class 16 Claims shall retain their Liens until their Claims are paid in full.

### 5.17   Class 17 – Subordinated Claims.

5.17.1  Impairment and Voting.  Class 17 is impaired under the Plan.  Each holder of an Allowed Class 17 Claim shall be entitled to vote to accept or reject the Plan.

5.17.2  Payment.  The holders of Allowed Class 17 Claims shall be paid the lesser of (a) the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate, or (b) a pro rata share of the Total Distributions available after payment of Allowed Claims having greater priority in distribution.

5.17.3  Distributions.  Subject to the limitations and priorities described in section 6.6, the holders of Allowed Class 17 Claims shall be paid, pro rata, (a) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available on such dates, and (b) on the Final Distribution Date.  The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution.  Specifically, the holders of Allowed Class 17 Claims will not receive distributions until the holders of claims with higher priority (listed under sections 6.6.1 through 6.6.12 of the Plan) have been paid or reserved in full.

### 5.18   Satisfaction of Claims and Release.  As of the Effective Date, all Claims against the Debtor, the Estate, or the Debtor's or Estate's property shall be released except as provided in the Plan. Without limitation, any accounts, accounts receivable, payment intangibles or other right to payment which first existed on or after the Petition Date shall be owned and held by the Debtor "free and clear" of any lien or interest of the holder of any Claim and any ownership claim by any of the Future Receivables Financiers.

**5.19** **No Assumed Liability.** Except as otherwise expressly set forth in the Plan, the Reorganized Debtor shall not assume or be liable for any Claims.

**5.20** **Disputed Claims**. Notwithstanding any other provision of this Plan, no cash or property shall be distributed under the Plan on account of any Disputed Claim until the Claim is Allowed. The Distribution Agent shall establish a reserve ("Disputed Claims Reserve") with respect to Disputed Claims. Cash and property to be distributed on account of Disputed Claims shall be held by the Distribution Agent until such Claims are Allowed or disallowed by Final Order. At the option of the Distribution Agent, Cash which is held in Disputed Claim Reserve may be held in the Distribution Account, may be deposited into one or more segregated, interest bearing bank accounts that satisfy the requirements of 11 U.S.C. § 345, or may be used to purchase a short term certificate of deposit or another short term investment. Upon the later of the Effective Date or thirty (30) days after a Disputed Claim becomes Allowed, the holder shall receive a distribution from the Disputed Claims Reserve, based upon the Allowed amount of the Claim and, thereafter, shall participate in any further distributions under the Plan as the holder of an Allowed Claim. Any cash or property remaining in the Disputed Claims Reserve after the resolution of all disputes by Final Order shall be distributed in accordance with the Plan.

**5.21** **No Penalties.** Except as expressly stated in the Plan or allowed by the Bankruptcy Court, no late charge, or penalty, including but not limited to prepayment penalties, shall be allowed on any Claim subsequent to the Petition Date.

**5.22** **All Defaults Cured and Waived; All Notes and Obligations Decelerated and Reinstated.** Pursuant to sections 1123(a)(5)(G) and 1124(2) of the Bankruptcy Code, among others, and except as otherwise provided by this Plan, all defaults that existed or that may have existed under any promissory note, loan document, unexpired lease, executory contract or other written agreement of or by the Debtor shall be deemed cured and waived as of the Effective Date. All notes, instruments or obligations that were accelerated pre-petition and/or pre-confirmation shall be decelerated and reinstated as of the Effective Date. All judicial and non-judicial foreclosure actions and proceedings that were instituted pre-petition and/or pre-confirmation shall be canceled, terminated and/or deemed withdrawn and rescinded as of the Effective Date.

**5.23** **Settlement and Compromise.** Pursuant to and consistent with Section 1123(b)(3) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 9019 and other applicable law, this Plan provides for the settlement and adjustment of legal claims and interests belonging to the Debtor and the estate. In exchange for the consideration provided to the Future Receivables Financiers and other holders of Claims and Interests herein, the failure to object to or vote against this Plan shall be deemed an agreement by the Future Receivables Financiers and other holders of Claims or Interests against or in the Debtor to reduce, compromise, and/or modify their Claims and legal interests as provided herein. The Confirmation Order shall, among other provisions, specifically approve this settlement and compromise pursuant to Section 1123(b)(3), Bankruptcy Rule 9019 and other applicable law.

## ARTICLE 6
## MEANS FOR EXECUTION OF THE PLAN

**6.1** **Vesting of Property.** Except as otherwise provided in this Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the assets of the Estate.

**6.2**    **Avoidance Actions and Other Claims.**  Without limiting the foregoing, the Reorganized Debtor and the Plan Administrator shall be vested with all claims and Causes of Action of the Debtor including, without limitation, Avoidance Action and other claims arising under sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code. The Plan Administrator, however, shall have the sole and exclusive right to investigate, file, prosecute and/or settle Avoidance Actions against and materially affecting Troy Hyde, as more particularly described in section 6.7.3.4.  Without limitation, the Debtor's retained Causes of Action include all Avoidance Actions against the Future Receivables Financiers and all Causes of Action it holds or may hold against Troy Hyde or any other "Insider" of the Debtor, except as expressly released, settled, or waived herein.

6.2.1    Waiver of Right to Pursue Certain Chapter 5 Claims

6.2.1.1 *Waiver of Right to Pursue Certain Preference Actions.*  Neither the Plan Administrator nor the Reorganized Debtor shall bring or prosecute Avoidance Actions against any creditor in Classes 1-4, 6-14, and 16-17 that accepts this Plan (either by affirmatively voting to accept the Plan or by not returning a ballot rejecting the Plan) and that does not object to confirmation of the Plan; provided, however, that the Plan Administrator shall have the right to bring and prosecute any Preference Claim or other Avoidance Action that is specifically identified in this Plan or the Disclosure Statement as a Preserved Claim.

6.2.1.2 *Waiver of Right to Pursue Certain Fraudulent Transfer Actions.* Where the Debtor or any of the Consolidated Subsidiary Entities paid an obligation that was not its obligation but was a valid obligation of one of the other entities that are consolidated and identified as part of the Reorganized Debtor under this Plan, such payment or transfer shall not be avoidable (under sections 544, 548, 549, 550 or 553 of the Bankruptcy Code) on the ground that the entity that paid the obligation did not owe the obligation.

6.2.2    Preserved Claims.  Notwithstanding the foregoing section 6.2.1.1, the Reorganized Debtor and the Plan Administrator shall have the right to assert and prosecute (a) any Preference Action or other Avoidance Action against a creditor that votes to reject or objects to confirmation of the Plan, or (b) which is specifically identified in this Plan as a Preserved Claim.

6.2.3    Claims Against Troy Hyde.  All Avoidance Actions and other Causes of Action against Troy Hyde and other Insiders (excepting claims arising from intercompany transfers, all of which are released under section 6.8.1.3) shall be, and hereby are, Preserved Claims.  Unless and until the Debtor completes all payments to creditors contemplated under this Plan, the Plan Administrator shall have the sole and exclusive right to investigate, file, prosecute and/or settle Avoidance Actions and Causes of Action against Troy Hyde and other Insiders, as more particularly described in section 6.7.3.3.

**6.3**    **Bankruptcy Case Administration.**  Except as otherwise provided in this Plan, from and after the Effective Date and continuing through the date on which a final decree closing

the Bankruptcy Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Reorganized Debtor and the Distribution Agent shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Bankruptcy Case.  In addition to the foregoing, for all matters arising under or related to the Bankruptcy Case, the Reorganized Debtor and the Distribution Agent shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of all applications, motions and other papers and pleadings before the Bankruptcy Court.

**6.4**   **Continuation of Business Operations.**   From and after the Effective Date of the Plan, the Reorganized Debtor is authorized to continue its normal business operations and enter into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

6.4.1   Management of the Reorganized Debtor.  The Reorganized Debtor shall be managed by Troy Hyde.

6.4.2   Employment of Troy Hyde.  Troy Hyde shall retain his Equity Interest in the Reorganized Debtor, subject to the following conditions precedent and conditions subsequent:

6.4.2.1   *No Distributions on Account of Equity Interest*.  Unless and until all other Claims and Interests are paid in full as provided for under the Plan, Troy Hyde shall not receive any distributions on account of his Equity Interest in the Debtor; *provided, however*, that the Reorganized Debtor may make cash distributions to Troy Hyde solely to account for and to permit Troy Hyde to pay taxes due and payable for the applicable current tax period on account of his Equity Interest. Troy Hyde may not take any loans from the Debtor until all other Claims and Interests are paid in full as provided for under the Plan.

6.4.2.2   *No Raises or Bonuses for Five Years*.  Troy Hyde shall be paid a salary of $240,000 per year for his services as an officer and employee of the Reorganized Debtor.  He also may be paid commissions due in connection with ERCs paid to the Debtor's customers consistent with commissions paid to other employees of the Debtor. Except as may be approved by the Plan Administrator, Troy Hyde shall not be entitled to receive any raises in his salary, bonuses or additional compensation until all Allowed Claims in Classes 1 through 14 are paid in full or forgiven as provided under the Plan.

6.4.2.3   *Equity Ownership Contingent on Continued Employment.*  Troy Hyde's retention of his Equity Interest is contingent on him continuing to work for the Reorganized Debtor on a full time basis for the entire Plan Period, and not competing with the Reorganized Debtor during the Plan Period.  Until all of the Reorganized Debtor's payment and distribution obligations under this Plan are paid and satisfied in full, the Equity Interest of Troy Hyde shall be, and remain, contingent and non-vested.  The Equity Interest of Troy Hyde will "vest" only if and when

(a) the Reorganized Debtor satisfies in full all of its payment and other obligations under this Plan, (b) Troy Hyde has continued to act as a full time employee and officer of the Reorganized Debtor for the entire Plan Period, and (c) the holder of the Special Voting Interest casts his vote in favor of vesting the Equity Interests of the Debtor in Troy Hyde.

6.4.2.4    *Restriction on Transfer; Subject to Plan Injunction.*  Until the Plan Period is complete and all payment and distributions obligations of the Reorganized Debtor are paid and satisfied in full, the Equity Interest of Troy Hyde may not be transferred or assigned, voluntarily or involuntarily.  Any attempt by Troy Hyde or any other person, prior to expiration of the Plan Period, to transfer, assign, take, seize or interfere with Troy Hyde's Equity Interest shall be void and subject to contempt under the injunctions issued under Article 13 of this Plan.

6.4.2.5    *Voluntary Subordination of Claim.*  Troy Hyde shall voluntarily subordinate any Claim(s) he has against the Debtor, to be treated as a Class 17 Claim.

6.4.3    *Failure to Vest.*  If the Equity Interests of Troy Hyde fail to vest, they shall be forfeited on the failure to meet the conditions or contingencies for vesting, at which event the Plan Administrator as fiduciary for the benefit of the creditors shall allocate, assign, sell, or otherwise distribute the Equity Interests as he determines is in the best interests of creditors and the Debtor's estate. To the extent that the Plan Administrator allocates, assigns, sells, or otherwise distributes the Equity Interests to any new member(s) or transferee(s), such new member(s) or transferee(s) shall be entitled to all profits, losses, and distributions as of the date that Troy Hyde is deemed to have forfeited the Equity Interests. Only the Plan Administrator, as the holder of the Special Voting Interest, shall be entitled to vote on whether the Equity Interests of Troy Hyde vest or fail to vest. On the vesting of the Equity Interest of Troy Hyde, the Special Voting Interest of the Plan Administrator shall terminate. If any party-in-interest objects to the vote of the Plan Administrator regarding the vesting (or non-vesting) of Troy Hyde's Equity Interests, such party-in-interest must seek relief from the Court within fourteen (14) days of such vote, or its objection shall be waived.

6.4.4    *Authority of Plan Administrator if Equity Interests fail to Vest.* Notwithstanding anything in the Plan to the contrary, including section 5.4.1.7 of the Plan, if Troy Hyde's Equity Interests fail to vest on account of Troy Hyde's untimely death or legal incapacity (*i.e.*, if Troy Hyde passes away during the Plan Period), then the Plan Administrator may (a) assign the "unvested" Equity Interests to Troy Hyde's heirs and/or devisees upon such occurrence, or (b) assign the "unvested" Equity Interests to a good faith purchaser that pays new and substantial value to purchase the Equity Interest in such amounts and under such conditions (and subject to such assurances) as the Plan Administrator, in his sole and absolute discretion, might dictate and approve. The Plan Administrator may make the aforementioned assignment(s) only if such assignment(s) are in the best interests of creditors. Any proceeds from such sale or assignment will be distributed in accordance with Section 6.6 of the Plan..

**6.5**    Distributions on Account of Claims and Interests.  The Distribution Agent shall make distributions to Creditors and Interest Holders as more particularly described below.

6.5.1    Distribution Agent.  The Reorganized Debtor shall be, and shall serve as, the "Distribution Agent" under the Plan; *provided, however,* that the Subchapter V Trustee shall be, and serve as, the Distribution Agent if (A) the Bankruptcy Court determines that the provisions of subchapter V of title 11 of the Code, including section 1194(a), mandate that the Subchapter V Trustee fulfill that role and function, or (B) the Bankruptcy Court, for cause, orders that the Subchapter V Trustee shall be, and shall serve as, the Distribution Agent.

6.5.2    Establishment of the Distribution Account.  The Distribution Agent shall establish an account at an FDIC or CUNA insured financial institution into which the Distribution Agent shall, when required pursuant to the terms of this Plan, deposit funds to be paid or distributed pursuant to this Plan (the "Distribution Account").  Any of the Debtor's presently existing accounts may be utilized as the Distribution Account.  It need not be a new account.  To the extent necessary, the Reorganized Debtor shall cooperate in transferring control and signature authority to the Distribution Agent or his, her or its authorized agents.

6.5.3    Funding the Distribution Account.  Beginning no later than the Initial Distribution Date, the Debtor shall deliver to the Distribution Agent and deposit into the Distribution Account its projected Disposable Income, as calculated hereunder, to fund the Distribution Account. The aggregate amount of funds deposited in or credited to the Distribution Account shall be no less than the amount of Total Distributions.

6.5.4    Distributions from the Distribution Account.  On each Distribution Date (and/or on such earlier or more frequent dates as the Distribution Agent may elect, in his, her or its absolute discretion), the Distribution Agent shall pay (or, if applicable, reserve) all cash on deposit in the Distribution Account (less only such amount as the applicable financial institution may require as a minimum balance) according to the priorities described in section 6.6.

6.5.5    Direct Payment of Administrative Claims Allowed. Notwithstanding anything to the contrary in sections 6.5.2, 6.5.3, and 6.5.4 of this Plan, the Distribution Agent may pay Administrative Expense Claims from the Distribution Fund without first depositing funds into the Distribution Account, in accordance with the time required for payment of Administrative Expense Claims set forth in section 3.2 of this Plan. For the avoidance of doubt, any amounts paid towards Administrative Expense Claims  before or after the Effective Date will be counted towards the Total Distributions, even if those amounts are not paid into or through the Distribution Account.

6.5.6    Deposits from Proceeds of Avoidance Actions.  If the Reorganized Debtor (or, if applicable, the Plan Administrator) realizes proceeds from Avoidance Actions or Claims against third-parties, creditors, insiders or employees of the Debtor, such proceeds shall be deposited into the Distribution Account, to be distributed on the Interim Distribution Date immediately following his deposit of the proceeds into the Distribution Account. Such amounts shall be included in—not in addition to—the Total Distributions.

**6.6**   **Priorities in Distribution from the Distribution Account.**  Notwithstanding anything else in this Plan to the contrary, cash deposited in the Distribution Account shall be distributed (or, if applicable, reserved) according to the following priorities in distribution:

6.6.1   <u>Undisputed Taxes and Assessments</u> - first, if applicable, in payment of undisputed property taxes, if any, constituting a Lien upon the Cash as the proceeds of Collateral;

6.6.2   <u>Reserve for Disputed Taxes and Assessments</u> - second, if applicable, set aside in reserve for potential payment of disputed property taxes, if any, constituting a Disputed Lien upon the Cash as the proceeds of Collateral;

6.6.3   <u>Reserve for Anticipated Income Taxes</u> - third, set aside in reserve for potential payment of income taxes that the Reorganized Debtor anticipates or estimates to be due or coming due, including without limitation income taxes arising from a gain on sale, recapture of depreciation or otherwise, if any;

6.6.4   <u>Commissions and Finder's Fees</u> - fourth, in payment of any commissions, finder's fees, auction fees, consignment fees or similar type expenses payable to brokers, finders, <u>auctioneers</u> or other agents involved in a particular sale transaction, in an amount not to exceed six percent in the aggregate of the gross sales proceeds or such greater amount as may be approved by the Court;

6.6.5   <u>Undisputed Liens</u> – fifth, payment of any undisputed Liens or encumbrances against the property or asset that was sold, and constituting a Lien upon the Cash as the proceeds of Collateral;

6.6.6   <u>Reserve for Disputed Liens</u> – sixth, in the event a Lien or encumbrance is disputed either <u>formally</u> or informally by the Reorganized Debtor but the Reorganized Debtor's objection or challenge to the Lien or Claim has not yet been sustained or resolved, set aside in reserve for payment of Disputed Liens upon the Cash as the proceeds of Collateral;

6.6.7   <u>Payment of Administrative Expense Claims [507(a)(2)]</u> – seventh, in payment of Allowed <u>Administrative</u> Expenses, including payment of the Subchapter V Trustee's fees and expenses, and compensation to the attorneys and other Professionals of the Debtor;

6.6.8   <u>Reserve for Anticipated Administrative Expenses [507(a)(2)]</u> – eighth, a reserve for payment of the Reorganized Debtor's and Plan Administrator's administrative expenses (including the post-Effective Date fees and expenses of Professionals of the Reorganized Debtor and Plan Administrator), as determined by the Plan Administrator in its sole and absolute discretion;

6.6.9   <u>Payment of Priority Claims [507(a)(3) through (a)(7)]</u> – ninth, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(3) through (a)(7) of the Bankruptcy Code in order of the priority <u>prescribed</u> in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution,

have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

6.6.10  Priority Tax Claims [507(a)(8)] – tenth, to pay the annual installment payments due to the holders of Priority Tax Claims entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, as described in section 3.3 of this Plan;

6.6.11  Payment of Priority Claims [507(a)(9) through (a)(10)] – eleventh, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(9) through (a)(10) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

6.6.12  Payment of Class 2 General Unsecured Claims – twelfth, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 2 General Unsecured Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

6.6.13  Payment of Class 17 Subordinated Claims – thirteenth, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 17 Subordinated Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full; and

6.6.14  Remainder Distributed to Owners – after the foregoing amounts are paid or reserved in full, any remaining Cash shall be distributed to the holders of Class 15 Equity Interests.

**6.7    Plan Administrator**

6.7.1    Appointment of Plan Administrator.

6.7.1.1 *Initial Plan Administrator.*  John Curtis will be appointed and shall serve as the initial Plan Administrator (the "Initial Plan Administrator").

6.7.1.2 *Successor Plan Administrator.*  If the Initial Plan Administrator voluntarily resigns or is unable to serve as Plan Administrator by reason of death, infirmity or other incapacity, the Successor Plan Administrator shall be David Bateman (presently of Rocky Mountain Advisory), or if David Bateman is unwilling or unable to serve as Plan Administrator, then such person as is nominated jointly by counsel for the Reorganized Debtor and the United States Trustee.

6.7.2    Compensation of the Plan Administrator.  The Plan Administrator shall be compensated at his regular professional hourly rate for services that he or she performs in said capacity.

### 6.7.3 Duties and Powers of the Plan Administrator.

6.7.3.1 *Authority Over Distribution Account and Distribution Funds if Delegated by the Reorganized Debtor.*  The Reorganized Debtor may delegate to the Plan Administrator (on either a temporary or permanent basis) authority to administer the Distribution Account and to administer and distribute the Distribution Funds, subject to the terms of this Plan. If delegated by the Reorganized Debtor, the Plan Administrator shall have the power, right, and obligation to: (i) make distributions from the Distribution Account; (ii) remind and urge the Reorganized Debtor to contribute Distribution Funds into the Distribution Account, as provided for under the Plan; (iii) audit and/or review the Reorganized Debtor's accounting records to ensure that Distribution Funds are sufficient and properly accounted for; and (iv) take any other action authorized under this Plan or applicable law with respect to the Distribution Account and Distribution Funds. Notwithstanding delegated control and authority over the Distribution Account and Distribution Funds, the Debtor shall be considered the "owner" of the Distribution Account, and the Plan Administrator shall not be considered an owner of the Distribution Account or Distribution Funds.

6.7.3.2 *Investigate, Object to, and Settle Claims of Insiders and Employees.* The Plan Administrator shall have sole and absolute authority to investigate any and all claims of Troy Hyde or other insiders and/or employees of the Reorganized Debtor and, if he deems reasonable and appropriate within his sound discretion, to object to or otherwise challenge, settle, compromise, or abandon such claims.

6.7.3.3 *Investigate, Prosecute, and Settle Claims Against Insiders and Employees.*  The Plan Administrator shall have sole and absolute authority to investigate any and all Avoidance Actions, Causes of Action claims or potential claims of the Reorganized Debtor against Troy Hyde, currents and former employees of the Debtor and/or other Insiders including, without limitation, claims (a) arising from or relating to transfers of property of the Debtor to Troy Hyde or for the benefit of Troy Hyde, (b) claims disclosed in the Debtor's Statement of Financial Affairs, and (c) any claims against Insiders discussed in this Plan. The Plan Administrator further shall have authority, if he deems reasonable and appropriate within his sound discretion, to prosecute, settle, compromise, or abandon such claims.

6.7.3.4 *Investigate and Act Upon Certain Avoidance Actions.*  Subject to sections 6.2 and 6.8.1.3 of the Plan, the Plan Administrator shall have concurrent authority (along with the Reorganized Debtor) to investigate any and all Avoidance Actions or potential Avoidance Actions to recovery transfers which were in payment or satisfaction (partial or complete) of obligations of which Troy Hyde is a guarantor or co-obligor. The Plan Administrator shall have concurrent authority (along with the Reorganized Debtor), if he deems reasonable and appropriate within his sound discretion, to prosecute, settle, compromise, or abandon such claims; provided, however, that the Plan Administrator shall consult in good faith with the Reorganized Debtor prior to filing or making demand upon any Avoidance Actions.  To the extent the Reorganized Debtor desires to settle, compromise, or abandon such claims, the

Debtor shall consult in good faith with the Plan Administrator, and shall not abandon or settle without the Plan Administrator's written consent.

6.7.3.5    *Investigate, Object to, and Settle Claims Against the Reorganized Debtor or the Estate if Delegated by the Reorganized Debtor.*  The Reorganized Debtor may delegate to the Plan Administrator (on either a temporary or permanent basis) authority to investigate any and all Claims against the Debtor or the Estate, and, if he deems reasonable and appropriate within his sound discretion, to object to or otherwise challenge, settle, compromise, or abandon such claims. The Plan Administrator's authority under this section 6.7.3.5 is not meant to limit the ability of the Debtor or any other party-in-interest to object to Claims as provided in section 7.2 of the Plan.

6.7.3.6    *Enter into Tolling Agreement(s).*  The Plan Administrator may enter into tolling agreements for any Claims and Causes of Action, including but not limited to Avoidance Actions, with any party or potential defendant.

6.7.4    <u>Lien and Liquidation Preference on Property of the Debtor</u>.  Subject to and effective upon the occurrence of the Effective Date, and for the purpose of securing the Reorganized Debtor's obligation to fund the Distribution Fund Amount and to make the Quarterly Deposits into the Distribution <u>Account</u>, the Debtor hereby grants to the Plan Administrator (for the benefit of persons to entitled to distribution under section 6.6 of the Plan) a security interest and liquidation preference (the "<u>Plan Administrator Lien</u>") upon the following assets of the Debtor, whether currently owned and/or controlled by the Debtor or whether acquired after the Effective Date (collectively, the "<u>Plan Administrator Collateral</u>"): (a) the Distribution Account and all cash on deposit therein; (b) all equipment, vehicles, watercraft (if any), and other non-exempt personal property of Troy Hyde (c) all accounts, payment intangibles, accounts receivable and other amounts owing to the Debtor; (d) all general intangibles; (e) all chattel paper; promissory notes, instruments, leases, security agreement and other documents in favor of the Debtor; (f) all investment property, including any and all stock or membership interests in Subsidiary Entities; and (g) all contracts and contract rights.

6.7.4.1    *Perfection of Plan Administrator Lien.*  The Plan Administrator Lien shall attach and become valid, binding, continuing, enforceable, fully-perfected and non-avoidable by operation of law as of the Effective Date without any further action by the Debtor, the Plan Administrator, or any other person, and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, mortgages, deeds of trust, or other documents. Nonetheless, the Reorganized Debtor and the Plan Administrator may file financing statements in appropriate filing offices (including the State of Utah, Department of Commerce, Division of Corporations and Commercial Code, and may submit to appropriate governmental agencies documents necessary to perfect liens on titled vehicles or property, including the Department of Motor Vehicles) as they deem necessary or appropriate to perfect the Plan Administrator Lien.

6.7.4.2    *Subordinate to Allowed Secured Claims.*  The Plan Administrator Lien is, and shall be, subordinate to (a) all allowed claims that are recognized as

secured claims under this Plan, or (b) which are determined by order of the
Bankruptcy Court entered in the Case to be secured claims pursuant to section 506 of
the Bankruptcy Code that existed and that were properly perfected as of the Effective
Date of the Plan. If the Plan Administrator determines that existence of the Plan
Administrator Lien against particular Collateral violates applicable law or would
undermine the feasibility of the Plan, then the Plan Administrator may act to release
the Plan Administrator Lien as to particular Collateral solely to the extent reasonably
necessary to avoid such violation of law or maintain the feasibility of the Plan.

6.7.4.3    *Obligation to Subordinate to Accommodate Future Indebtedness*.
After the Effective Date, the Plan Administrator shall be obligated to execute such
reasonable subordination agreement(s) as may be necessary to permit the Debtor
(a) to refinance existing secured debt, (b) to obtain an operating line of credit, or
(c) to permit the Debtor to acquire new or replacement equipment necessary for the
Debtor's business needs and ongoing business operations. The Plan Administrator
shall not be obligated, and may refuse, to subordinate the Plan Administrator Lien if
he or she determines, in his or her professional discretion, that the terms of new
proposed loan transaction would impair the feasibility of the Plan or would
unreasonably increase the likelihood that the Debtor may default in its obligation
under the Plan.

6.7.4.4    *Plan Administrator Lien Shall Not Trigger a Default*.
Notwithstanding any provision in this Plan or in any lease, loan agreement or
executory contract of the Debtor to the contrary, neither the granting of the Plan
Administrator Lien, nor the continuation of the Plan Administrator Lien for the
duration of the Plan Period nor any acts by the Debtor or Plan Administrator to
perfect the lien shall constitute, create or trigger a default by the Debtor or an event of
default.

6.7.4.5    *Limitations on Enforcement*.  The Plan Administrator Lien shall be
limited to, and enforceable only in the event of (each a "Plan Administrator Lien
Enforcement Event"): (a) a future bankruptcy case or receivership proceeding by the
Reorganized Debtor; (b) the complete cessation of the Reorganized Debtor's business
operation; (c) a wholesale liquidation of the Reorganized Debtor's assets; or (d) the
failure of the Debtor to make Quarterly deposits into the Distribution Account which
are not cured within forty-five calendar days after written notice to the Debtor.

6.7.4.6    *Enforcement of the Plan Administrator Lien*.  If a Plan
Administrator Lien Enforcement Event shall occur and be continuing, the Plan
Administrator shall have the right to enforce the Plan Administrator Lien pursuant to
article 9a of title 70A of the Utah Code, including the right to foreclose the Plan
Administrator Lien judicially or non-judicially and to liquidate the Plan Administrator
Collateral for an amount sufficient to fund the unfunded portion of the Distribution
Fund Amount, with any excess to be paid to the Reorganized Debtor.

6.7.5    Lien and Liquidation Preference on Property of Troy Hyde.  Subject to
and effective upon the occurrence of the Effective Date, and for the purpose of securing potential

liability of Troy Hyde in connection with Avoidance Actions or Causes of Action, Troy Hyde shall grant to the Plan Administrator (for the benefit of persons to entitled to distribution under section 6.6 of the Plan) a security interest and liquidation preference (the "Plan Administrator Lien") upon the following assets of Troy Hyde, whether currently owned and/or controlled by him or whether acquired after the Effective Date (collectively, the "Plan Administrator Collateral"): (a) all of Troy Hyde's cash and deposit accounts; (b) all of Troy Hyde's interests in real property; (c) all of Troy Hyde's accounts, payment intangibles, accounts receivable, wages receivable and other amounts owing to him; (d) all general intangibles; (e) all chattel paper; promissory notes, instruments, leases, security agreement and other documents in favor of Troy Hyde; and (f) all investment property, including any and all stock or membership interests in the Debtor.

6.7.5.1   *Perfection of Plan Administrator Lien.*  The Plan Administrator Lien shall attach and become valid, binding, continuing, enforceable, fully-perfected and non-avoidable by operation of law as of the Effective Date without any further action by the Debtor, the Plan Administrator, or any other person, and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statements, security agreements, mortgages, deeds of trust, or other documents. Nonetheless, Troy Hyde shall execute in favor of the Plan Administrator deeds of trust, security agreements and pledge agreements reasonably requested by the Plan Administrator, and the Plan Administrator may file or record deeds of trust and financing statements in appropriate recording/filing offices (including the State of Utah, Department of Commerce, Division of Corporations and Commercial Code) as they deem necessary or appropriate to perfect the Plan Administrator Lien.

6.7.6   The Plan Administrator May Employ Professionals.  The Plan Administrator may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtor or the Plan Administrator after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.  Without limitation, in his discretion, the Plan Administrator may retain attorneys, accountants or other professionals that have represented the Debtor in the Bankruptcy Case, including the Debtor's general bankruptcy counsel. The fees and expenses of the Plan Administrator and his Professionals shall be paid as Administrative Expense Claims from the Distribution Fund.

6.7.7   Fiduciary Obligations.  The Plan Administrator shall perform his duties and exercise his powers for the benefit of persons entitled to receive distributions from the Distribution Fund under subsections 6.6.1 through 6.6.12 of the Plan, consistent with the priorities described in section 6.6 of this Plan.

6.7.8   Financial Reporting by the Debtor.  Upon request by the Plan Administrator and/or the Trustee, the Reorganized Debtor shall provide financial information and documents, and shall provide annual financial statements as maintained by the Reorganized Debtor in the ordinary course of business.

6.7.9   <u>Distributions to Offset Tax Liabilities</u>.  If Troy Hyde's Equity Interests fail to vest under the Plan and the Plan Administrator allocates, sells, assigns or otherwise distributes the Equity Interests to a new holder(s), the Debtor shall be entitled to make distributions to such new holder(s) to offset any tax liabilities incurred as a result of being allocated the profits and losses of the Debtor. Notwithstanding anything else to the contrary in the Plan, the Plan Administrator shall not (under any circumstance) be subject to any tax liabilities relating to the profits and losses of the Debtor.

**6.8**   **<u>Consolidation of the Debtor and Subsidiary Entities</u>** .  Except as expressly set forth in this Plan, on the Effective Date, the Debtor and the Subsidiary Entities shall be deemed consolidated pursuant to Bankruptcy Code § 1123(a)(5).

6.8.1   <u>Effect of Consolidation</u>.  The consolidation of the Subsidiary Entities shall include, but shall not be limited to, the following:

6.8.1.1   *Consolidation of Assets and Liabilities*. Except as expressly provided in this Plan (or as otherwise ordered by the Bankruptcy Court), on the Effective Date, all assets (and all proceeds thereof) and all liabilities of the Debtor and the Subsidiary Entities shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other. Creditors are entitled to only one Claim against the Reorganized Debtor and but a single satisfaction of the Claim. Any joint or several liability of the Debtor and the Subsidiary Entities shall be deemed to be one obligation of the Reorganized Debtor. All guaranties of the Debtor or any Subsidiary Entity of the obligations of any other entity comprising the Reorganized Debtor shall be deemed eliminated and extinguished that that any Claim against any of the Reorganized Debtor entities, and any guaranty thereof executed by the any of the Reorganized Debtor entities, shall be deemed to be one obligation of the Reorganized Debtor. If a proof of claim was defective prior to consolidation of the Debtor and the Subsidiary Entities (*i.e.*, the Claim related to an obligation of a Subsidiary Entity, but was filed against the Debtor) such Claim should not be disallowed solely because it was filed against an entity other than the entity that was purportedly liable for the Claim prior to the consolidation provided for in this Plan.

6.8.1.2   *No Increase or Augmentation of Security Interests*. Notwithstanding anything in section 6.8.1.1 of this Plan to the contrary, the consolidation of the Debtor and the Subsidiary Entities shall not act to increase or augment the Collateral for any Secured Claim. For example, if any Claim holder has an "all assets" lien against the Debtor or any Subsidiary Entity, the lien shall not extend to the assets of the other Reorganized Debtor entities, if it would not otherwise extend to those assets under the operative security agreement(s).

6.8.1.3   *Release of Intercompany Claims.*  No distributions shall be made under the Plan on account of intercompany Claims among or between any of the Reorganized Debtor entities, and such intercompany Claims shall be deemed released and discharged on the Effective Date.  This release and discharge includes, without limitation, any Avoidance Actions and any set-off rights.

6.8.1.4    *Administrative Claims Paid from Distribution Fund*. Administrative Claims and operating expenses incurred by either Debtor or by the Reorganized Debtor may be paid from the assets of the consolidated Reorganized Debtor irrespective of whether the Debtor or the Subsidiary Entities may have incurred, or may be liable for, such expense.

6.8.1.5    *Stays, Injunctions, and Releases are Applicable to Subsidiary Entities*.  The provisions of Sections 13.1 – 13.6 of this Plan shall be applicable to the Subsidiary Entities as though the Subsidiary Entities are one and the same as the Debtor and Reorganized Debtor.

6.8.2    <u>Corporate Existence</u>.  Each of the Debtor and the Subsidiary Entities shall continue to exist after the Effective Date as separate corporate entities, limited liability companies, partnerships, or other forms as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, under the applicable law in the jurisdiction in which each applicable entity is incorporated or formed and subject to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, unless amended by the Plan, and to the extent such documents are amended, those documents are deemed to be amended by the Plan and the applicable entity is not required to take any further action or seek any further approval (other than requisite filings required under applicable state law).

6.8.3    <u>Formalizing Consolidation</u>.  Notwithstanding section 6.8.2 of the Plan, the Reorganized Debtor may, but is not required to, formalize the consolidation of the Debtor and the Subsidiary Entities by filing articles of merger, articles of dissolution or other corporate filings with applicable state and federal authorities, as the Reorganized Debtor may determine in its sole and absolute discretion.  The Reorganized Debtor may do so at any time on or after the Effective Date or may elect never to do so.

6.8.4    <u>Use of Any Name</u>.  The Reorganized Debtor may conduct business in the name of the Debtor and the Subsidiary Entities, as the Reorganized Debtor may determine on a case-by-case basis in its sole and absolute discretion.

6.8.5    <u>Tax Filings</u>.  The Reorganized Debtor may file separate returns for the Debtor and the Subsidiary Entities, <u>or</u> may file a consolidated return for the consolidated Reorganized Debtor, as it determines in its sole and absolute discretion and/or as may be suggested by the Reorganized Debtor's tax preparers and/or tax advisors.

**6.9**    **Employment of Professionals.** The Reorganized Debtor may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtor after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.

**6.10**    **Use of the ERC Fund.** The Reorganized Debtor may utilize the ERC Fund in the ordinary course of its business for its ongoing business expenses, payment of debt, capital

expenses, and other business needs, except that, so long as any Allowed Claim has not yet been paid in full, the ERC Fund may not be utilized to pay dividends to equity holders in the Debtor.

## ARTICLE 7
## IMPLEMENTATION OF THE PLAN

### 7.1  Method of Distributions under the Plan.

7.1.1  In General.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Distribution Agent to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Effective Date, unless the Distribution Agent has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Distribution Agent) shall have no obligation to locate holders whose distributions or notices are properly mailed but returned.

7.1.2  Form of Distributions.  Any payment of Cash made by the Distribution Agent pursuant to the Plan shall be made by regular check; *provided, however,* that after the occurrence of the Effective Date, the Distribution Agent is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); *provided, further,* that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to ten dollars ($10) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

7.1.3  Distributions to be on Business Days.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.1.4  Withholding Taxes on Distributions.  The Distribution Agent shall withhold from any Cash or property distributed under the Plan such amounts as the Debtor is obligated under non-bankruptcy law to withhold and transmit to taxing authorities.

7.1.5  Minimum Distributions.  The Distribution Agent shall not be obligated to make any distribution, including a final distribution, unless the payment exceeds fifteen dollars ($15).  To the extent the entire amount distributable to the holder of a claim is not at least $15, the Distribution Agent may retain the funds otherwise distributable to such holder and may use such funds for the benefit of the Reorganized Debtor's other creditors and/or Owners.

### 7.2  Objections to Disputed Claims.  Any objections to Claims against the Estate may be prosecuted by the Debtor, the Reorganized Debtor, the Plan Administrator, or any other party in interest.  Except as otherwise provided by order of the Bankruptcy Court, the Debtor or any other party in interest may file an objection to any Claim until 180 days after the Effective Date.  Upon motion filed within such one hundred eighty (180) days, the Bankruptcy Court may extend the period within which to object to a Claim for a reasonable period of time, not to exceed

an additional one hundred eighty (180) days.  Any Claim to which no timely objection has been filed shall be deemed an Allowed Claim.

>    **7.3**   **Estimation of Claims.**  The Reorganized Debtor, the Plan Administrator, or the Subchapter V Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.

>    **7.4**   **Determination of Tax Liability.**  To the fullest extent permitted under section 505 of the Bankruptcy Code, the Reorganized Debtor, the Plan Administrator, or the Subchapter V Trustee may, at any time, request that the Bankruptcy Court determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax.

>    **7.5**   **No Distributions to the Holders of Disallowed Claims.**  Any and all Claims which are not Allowed, as specified herein, shall be Disallowed.  Claims which are Disallowed (or not Allowed) shall be forever barred as against the Debtor, and shall receive no payments or distribution under this Plan; provided, however, that any Claim which is a Disputed Claim solely by reason of an objection or other legal challenge that is pending and unresolved shall be treated as a Disputed Claim, and may receive payments or distributions to the extent it later becomes Allowed, in whole in part, upon resolution of such objection or challenge.

>    **7.6**   **Late-Filed Claims Forever Barred.**  All Claims arising from proofs of claim filed after the Bar Date automatically shall be disallowed without the need for the Debtor or any other party-in-interest to file an objection, and without any further order of the Court.  No Claim that is late-filed (*i.e.*, filed after the applicable Bar Date) shall be treated or paid as an Allowed Claim under this Plan unless the tardiness is excused and the late-filing of such Claim specifically is permitted pursuant to a Final Order entered prior to the Effective Date.  Rather, any such "late" Claim automatically and without further notice or opportunity for hearing shall be disallowed under this Plan.  Notwithstanding the foregoing, a claim filed after the applicable Bar Date may be treated as an Allowed Claim only if, prior to the Effective Date and after notice and an opportunity for hearing, the Court has entered an order expressly allowing the Claim and/or permitting the holder of the Claim to file a late-filed proof of claim.

>    **7.7**   **Reversion of Unclaimed Checks.**  The amount of any checks issued for distributions under the Plan that remain uncashed for a period of ninety days after the date of such distribution shall revert and be vested in Estate free and clear of any claim or interest of the payee of the uncashed check.

>    **7.8**   **Cash Payments and Time Bar.**  Cash distributions made by the Distribution Agent shall be by checks drawn on a domestic bank, and promptly mailed, postage prepaid.  Any check issued to pay an Allowed Claim will be null and void if such check is not negotiated within ninety (90) days of its issuance.  All Claims that the Distribution Agent attempts to pay with a check that becomes void hereunder will be barred and disallowed, and all rights to such distribution by such Creditor shall be forfeited.  The Distribution Agent will retain the funds resulting from such void checks for the benefit of other Creditors (or, if applicable, Owners) and will distribute such funds to such other Creditors (or, if applicable, Owners) under the Plan.

>    **7.9**   **Retention and Preservation of Claim Objections and Causes of Action.**
Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation

Order, the Debtor and the Reorganized Debtor's rights to object to all Claims and Interests asserted against the Estate and all of the Debtor's or Estate's Causes of Action, including without limitation: (1) the Debtor's Causes of Action asserted in any adversary proceeding, U.S. District Court litigation, state court proceeding, or any other proceeding  which is pending as of the Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; (3) all Claims and Causes of Action described in the Disclosure Statement; (4) any Claims and Causes of Action contained in any contested matter or objection to Claim pending on the Confirmation Date; and (5) any and all other Claims and Causes of Action that the Debtor holds pre-confirmation, including, but not limited to, Claims for unpaid accounts receivable, shall vest in the Estate.  Notwithstanding anything else in the Plan to the contrary, no provision in this Plan is intended or shall be construed to preclude or otherwise bar the Debtor from pursuing any claims arising under chapter 5 of the Bankruptcy Code or under other applicable law.  Among other things, no Person sued pursuant to sections 547, 548, 549, 550, 553 of the Bankruptcy Code or otherwise may argue that confirmation of this Plan precludes such claim on grounds of res judicata, issue preclusion or otherwise.

**7.10    No Release or Waiver.**  Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtor expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court.

## ARTICLE 8
## VOTING ON THE PLAN

**8.1    Voting of Claims.**  Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

**8.2    Nonconsensual Confirmation.**  If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under sections 1191(b) and/or 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan in accordance with section 12.6 hereof to the extent necessary to obtain entry of a Confirmation Order.

## ARTICLE 9
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1** **Assumption of Executory Contracts and Leases.** The following executory contracts or unexpired leases (collectively, the "Assumed Contracts") (if any) are assumed as of the date of the entry of the Confirmation Order pursuant to Section 365 of the Bankruptcy Code in accordance with their terms, unless (a) alternative terms are agreed to by the non-Debtor party or parties to such executory contract or unexpired lease or (b) alternative terms are specified in the Plan:

| Lessor/Counterparty | Description of Lease/Contract | Cure Amount |
|---|---|---|
| All Insurance Companies (including United Wisconsin Insurance Company) | Unexpired Insurance Policies (all)[5] | $0 |
| Clients Identified on Schedule G | Client Contracts for Provision of Staffing Services by Debtor | $0 |
| ERC Contractors | Contracts for Commissions for Sales of ERC Processing Services | $0 |
| Bentlyon Property Management | West Valley Office Lease | $0 |
| RYP Properties | Pennsylvania Office Lease | $0 |
| Shi Investments, LC | Roy Office Lease | $0 |
| Winterton Properties | Provo Office Lease | $0 |

At any time prior to the entry of the Confirmation Order, the Debtor may file a motion and, subject to notice and opportunity for a hearing, obtain entry of an order pursuant to Section 365 of the Bankruptcy Code and/or this Paragraph 9.1 authorizing the Debtor to "assume" any executory contract or unexpired lease that is not, and does not become, a Rejected Contract. For the avoidance of doubt, notwithstanding the "Effective Date" of the Plan, the Assumed Contracts are deemed "assumed" under this Plan as of the date of the entry of the Confirmation Order, consistent with the requirements of Bankruptcy Code § 365(d)(4)(A)(ii).

**9.2** **Rejection of Executory Contracts.** The following executory contracts or unexpired leases (collectively, the "Rejected Contracts") shall be rejected as of the Effective Date pursuant to Section 365 of the Bankruptcy Code, to the extent that they were not already rejected by operation of the Bankruptcy Code or terminated prior to the Petition Date: any and all Executory Contracts and unexpired Leases that have not been either assumed or rejected prior to the Confirmation Date are rejected by the Debtor as of the Confirmation Date, and entry of the

---

[5] The Debtor formerly was insured under a policy(ies) issued by WCF, which expired and/or was terminated. The Debtor's expired/terminated contract(s) with WCF is/are not an Assumed Contract.

Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**9.3**     <u>**Rejection Damages Claims.**</u>   If the rejection of an executory contract or unexpired lease by the Debtor pursuant to Paragraph 9.2 hereof results in a Claim for damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before the Confirmation Date.   To the extent they are Allowed, and unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim timely are filed will be treated as General Unsecured Claims subject to the provisions of the Plan.   The Debtor shall have the right to object to any such rejection damages Claim filed in accordance with this Paragraph.

**9.4**     <u>**Cure Amounts for Assumed Contracts.**</u>   Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default, as well as any nonmonetary defaults, shall be satisfied (either through cure or adequate assurance of a prompt cure in the amounts set forth in Section 9.1 of the Plan, or as otherwise agreed to by the Debtor and the counterparty to the assumed lease or contract), to the extent required under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor, as applicable, upon assumption thereof, subject to the conditions provided in this Plan.

Unless a counterparty to an executory contract or unexpired lease files an objection on or before the date scheduled for the hearing on confirmation of the Plan, and except as otherwise shown on the "Cure Amount" column in the schedule of Assumed Contracts under Section 9.1 of this Plan, the proposed, reasonable and appropriate Cure Amount for each Assumed Contract shall be zero dollars ($0)

**9.5**     <u>**Post-Petition Agreements Unaffected By Plan.**</u>   Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that are otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date.   The Reorganized Debtor shall be deemed to be substituted for the Debtor in such contract or agreement, as applicable, and the Reorganized Debtor shall have all right, title and interest of the Debtor under such contract or agreement as if the Reorganized Debtor had been the original contracting party thereunder.

## ARTICLE 10
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

**10.1**     <u>**Conditions Precedent to Effectiveness.**</u>

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

10.1.1   the Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

10.1.2  all actions, other <u>documents</u> and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

10.1.3  the Court shall have entered orders (or there shall be agreements satisfactory to the Debtor) concerning Claims, any Liens asserted by holders of Claims, and any interests in the <u>Debtor</u> (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtor are required for the feasibility and implementation of the Plan; and

10.1.4  the Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

**10.2**    **<u>Failure of Conditions Precedent.</u>**    Notwithstanding anything in this Plan to the contrary, the conditions set forth in section 10.1 above must be satisfied or waived on or before the date that is 90 days following the Confirmation Date.  In the event that the conditions set forth in section 10.1 above are not satisfied on or before said date, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and section 12.1 of the Plan shall apply.

**10.3**    **<u>Waiver of Conditions.</u>**  The Debtor may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in section 10.1 above, except that the Debtor may not waive the condition that the Estate will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date.

### ARTICLE 11
### RETENTION OF JURISDICTION; CASE CLOSURE;
### RELEASE AND TERMINATION OF SERVICE OF SUBCHAPTER V TRUSTEE

**11.1**    **<u>Retention of Jurisdiction.</u>**  After the Effective Date, the Bankruptcy Court shall have original jurisdiction of all matters arising in, arising under or related to the Bankruptcy Case or Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the following specific matters:

11.1.1 <u>Executory Contracts</u>.  The Court shall retain jurisdiction (a) to hear and determine any and all <u>pending</u> applications for the rejection or assumption of executory contracts and unexpired leases, and (b) to hear and determine any and all Claims resulting from the rejection of any executory contract or unexpired lease, and any objections to such Claims.

11.1.2 <u>Compensation</u>. The <u>Court</u> shall retain jurisdiction to hear and determine all applications by the Subchapter V Trustee, Professionals and others for compensation and reimbursement of expenses.

11.1.3 <u>Distributions</u>. Court <u>shall</u> retain jurisdiction to ensure that the distributions to holders <u>of</u> Claims are accomplished as provided herein.

11.1.4 <u>Litigation</u>.  The Court shall retain jurisdiction to hear and determine any and all <u>adversary</u> proceedings, applications, contested matters and other litigated matters pending on the Confirmation Date or filed thereafter, <u>including</u> any and all claims that might be filed by the Reorganized Debtor or the Subchapter V Trustee under chapter 5 of the Code.

11.1.5 <u>Determine Claims Arising Post-Confirmation</u>.  The Court shall retain jurisdiction to <u>determine</u> any Claim or <u>liability</u> to a Governmental Unit which may be asserted as a result of the transactions contemplated herein.

11.1.6 <u>Determination of Claims Relating to Effective Date Transactions</u>.  The Court shall retain <u>jurisdiction</u> to hear and decide any Claims or Litigation that arise under, arise from or relate to the transactions contemplated and approved under this Plan.  To the extent that any litigation contemplated by this section is filed in any state or federal court other than the Bankruptcy Court, the Debtor and any other party-in-interest (a) may remove the action as permitted by 28 U.S.C. 1452, and (b) may seek to transfer venue of such action to the Bankruptcy Court in the District of Utah.

11.1.7 <u>Tax Claims</u>.  The Court shall retain jurisdiction to hear and determine matters concerning state, local, and federal taxes in accordance <u>with</u> sections 346, 505 and 1146 of the Bankruptcy Code.

11.1.8 <u>Objections to Claims</u>.  The Court shall retain jurisdiction (a) to hear and determine any objections to Claims filed both before and after the Confirmation Date, (b) to allow or disallow any Claim in whole or in part, (c) to decide any controversies as to the classification of any Claims and/or (d) to estimate any Disputed Claim.

11.1.9 <u>Stay or Reversal of Confirmation</u>.  The Court shall retain jurisdiction to enter and <u>implement</u> such orders as may be appropriate in the event Confirmation of the Plan is for any reason stayed, reversed, revoked, modified or vacated.

11.1.10 <u>Plan Modification</u>.  The Court shall retain jurisdiction to hear applications, if any, to modify the Plan in <u>accordance</u> with § 1127 of the Bankruptcy Code.  After Confirmation of the Plan, the Reorganized Debtor may also, so long as it does not adversely affect the <u>interests</u> of Creditors, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Order of Confirmation, in such manner as may be necessary to carry out the purpose and effect of the Plan.

11.1.11 <u>Plan Disputes</u>.  The Court shall retain jurisdiction to hear and determine disputes arising in connection with the Plan or its implementation, including without limitation disputes relating to the <u>execution</u> of agreements, documents or instruments required to be <u>executed</u> pursuant to the terms of the Plan, or arising under or relating to the interpretation of agreements, documents or instruments executed in connection with the Plan.

11.1.12 <u>Plan Implementation</u>  The Court shall retain jurisdiction to construe and to take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan.

11.1.13 <u>Enforce Plan Injunction</u>.  The Court shall retain jurisdiction to enforce the releases, exculpatory provisions and/or injunctions described or provided under this Plan including, without limitation, those <u>described</u> or summarized under Article 12.  Among other things, the <u>Court</u> shall retain jurisdiction to enter temporary restraining orders, preliminary

injunctions, permanent injunctions, contempt sanctions and other appropriate orders and remedies, including to stay and prevent litigation filed or pending before another court or tribunal.

      11.1.14 <u>Plan Corrections</u>  The Court shall retain jurisdiction to correct any defect, cure any omission, or <u>reconcile</u> any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose or intent of the Plan.

      11.1.15 <u>Creditors' Disputes</u>.  The Court shall retain jurisdiction to take any action to resolve any disputes arising <u>out</u> of or relating to any Claim, to hear and determine other issues presented by or arising under the Plan, and to take any action to resolve any disputes of Creditors with respect to their Claims.

      11.1.16 <u>Other Matters</u>.  The Court shall retain jurisdiction to determine such other matters and for such other <u>purposes</u> as may be provided in the Order of Confirmation or that are not inconsistent with chapter 11 of the Bankruptcy Code.

      11.1.17 **Exclusive Jurisdiction.**  The retention of jurisdiction provided for in this Plan shall be exclusive with respect to all matters set forth in section 11.1 hereof so as to preserve for the Reorganized Debtor the <u>benefits</u> of the Plan, subject to the Court's power under section 305 of the Bankruptcy Code or 28 U.S.C. § 1334(c) to abstain as to all or part of any proceeding.

      11.1.18 **Effectuating Orders.**  The Bankruptcy Court shall enter all judgments, partial judgments, and Orders necessary to effectuate or enforce the Plan, any term therein or as reasonably requested <u>by</u> any party intended as a direct beneficiary of a material provision of the Plan.  Such Orders and decrees may include a permanent injunction effectuating all actions, releases, assignments, transfers and waivers required by the Plan.

    **11.2**   <u>Closure of the Case.</u>

      11.2.1 <u>Administratively Closing the Bankruptcy Case</u>.  Pursuant to section 1192 of the Bankruptcy Code, to the extent the Plan is confirmed under section 1191(b) of the Bankruptcy Code, the discharge of the Debtor may not be granted unless and until the Debtor has completed "all payments due within the first 3 years of the plan, or such longer period not to exceed 5 years as the court may fix."  <u>Nevertheless</u>, as soon as the Reorganized Debtor, with the <u>concurrence</u> of the Subchapter V Trustee, determines that there is no need for active administration and oversight of the Case by the Bankruptcy Court, the Case may be administratively closed upon notice to parties-in-interest under applicable Bankruptcy Rules.

      11.2.2 <u>Substantial Consummation</u>.  The Reorganized Debtor shall file a notice of substantial consummation as required under section 1183(c)(2) of the Code upon the substantial consummation of the Plan.  The Subchapter V Trustee is authorized to file notice of substantial consummation in lieu of the Reorganized Debtor if, at any time, he reasonably believes the Plan is substantially consummated.

      11.2.3 <u>Reopening Case</u>.  At any time, the Reorganized Debtor and/or the Subchapter V Trustee (or, only upon a showing of substantial cause, another party-in-interest)

may obtain entry of an order reopening the Bankruptcy Case to obtain any relief or order from the Bankruptcy Court consistent with section 11.1.  After substantially consummated the Plan and/or satisfied the conditions precedent to entry of a discharge, the Debtor may obtain entry of an order reopening the Bankruptcy <u>Case</u> for the purpose of granting and entering the discharge.  Although the Debtor may seek to reopen the Case on an ex parte basis, the Debtor shall give notice of its motion or other request to the Subchapter V Trustee.

        11.2.4 <u>Finally Closing the Bankruptcy Case</u>.  After the Court has entered an order discharging the Subchapter V Trustee and the Debtor determines that there is no further need for administration of <u>the</u> Case by the <u>Bankruptcy</u> Court, the Case shall be closed pursuant to 11 U.S.C. § 350 upon (i) the filing of any final reports required under the Code, (ii) appropriate notice to parties-in-interest, and (iii) the entry of an appropriate final decree and/or order by the Court finally closing the Case.

     **11.3**    **Release of Subchapter V Trustee; Termination of Trustee Service.**  As provided in section 1183(c)(1) of the Code, if the Plan is confirmed under section 1191(a) of the Code,  the service of the Subchapter V Trustee in the Case shall terminate when the Plan has been substantially consummated.  To the extent the Plan is confirmed other than under section 1191(a) of the Code, including confirmation pursuant to section 1191(b) of the Code, the Subchapter V Trustee, the Reorganized Debtor and/or the United States Trustee may request entry of an order terminating the Subchapter V Trustee's service as trustee, and releasing and discharging the Subchapter V Trustee from further obligations as trustee, at such time that (i) the Plan has been substantially consummated, and (ii) continued involvement of, and supervision by, the Subchapter V Trustee is not required by the terms of the Plan or the Code. To the extent that the Compliance Lien is required to be enforced, the Subchapter V Trustee may be reinstated at such time.

**ARTICLE 12**
**MODIFICATION OF THE PLAN**

     **12.1**    **Revocation or Withdrawal of the Plan.**  The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estate or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Estate.

        12.1.1 <u>Amendments Prior to Confirmation</u>.  Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1190, 1122 and applicable provisions of 1123 of the Bankruptcy Code.

        12.1.2 <u>Savings Clause; Reformation; Severability</u>.  Subject to section 12.5 of this Plan, if any provision of this Plan is found to be invalid or unenforceable for any reason, such provision shall be construed and/or reformulated by the Court in such a way as to make it valid and enforceable to the maximum extent permitted by the Bankruptcy Code and other applicable law, and the Plan shall be confirmed as so modified and reformed.  Any provision of this Plan

which the Court determines is prohibited or unenforceable under the Bankruptcy Code, Bankruptcy Rules or other applicable law shall not affect or render invalid or unenforceable any other provisions of Plan.  Specifically, to the extent a particular provision, term or condition of this Plan would prevent confirmation, the Court (with the consent of the Debtor and the Subchapter V Trustee) may strike such provision and may confirm the Plan as modified, with such term, condition or provision omitted, excluded or otherwise modified.

12.1.3 <u>Amendments After Confirmation</u>.  The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that (a) the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code and (b) the Bankruptcy Court approves such modifications after such notice, and under such circumstances, as the Court determines to be fair and equitable.

12.1.4 <u>Effect on Acceptance Requirements</u>.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (a) such Person fails timely to object to the proposed alteration, amendment or modification , or (b) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.  The Debtor may correct any defect or omission in this Plan and any exhibit hereto without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

12.1.5 <u>Effect of Modification</u>.  Every modification of the Plan will supersede all previous versions of the Plan when such modification becomes effective.  Previous superseded versions of the Plan will be deemed to be in the nature of a withdrawn or rejected settlement proposal, and will be of no evidentiary or substantive effect for any purpose whatsoever.

## ARTICLE 13
## STAYS, INJUNCTIONS AND RELEASES

**13.1**    **Continuation of Injunctions or Stays until Effective Date.**  All injunctions or stays provided for in the Bankruptcy Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Further, unless the Plan provides otherwise, any injunctions or stays ordered by the Bankruptcy Court shall continue in effect through and after the Effective Date.

**13.2**    **Injunction Relating to the Plan.**  As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor or its Estate, on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan.  Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Further, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor, or who have held, hold or may hold any debt or interest relating to the Debtor, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by

law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against Reorganized Debtor, or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

**13.3    Broad Injunction.**  The intent of paragraph 13.2 is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtor to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction.  The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against Reorganized Debtor with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation: (i) that the Debtor breached any contract, with, or any duty or obligation to the Creditor; (ii) that the Debtor was the alter ego or instrumentality of another Person; (iii) that the Debtor made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtor is liable for any act or omission.  In addition, to the extent that 11 U.S.C. § 524(e) or other applicable law imposes a limit on the scope of the injunction against any holder of Claims, such holder shall be required to marshal such Claims and to exhaust all of the holder's legal and equitable remedies against all other Persons who are jointly or severally liable on such Claims before attempting to enforce such claims against Reorganized Debtor.

**13.4    Exculpation.**  Neither the Subchapter V Trustee, nor the Reorganized Debtor, nor the Plan Administrator, nor any of their attorneys, accountants or agents shall have or incur any liability to any Creditor for any act or omission in connection with or arising out of their administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and shall be fully protected in acting or in refraining from acting in accordance with such advice.

**13.5    Release of Claims.**  Except as contemplated by the Plan, the rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtor.  Without limiting the foregoing, acceptance of distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor.  Persons deemed to have released claims pursuant to this paragraph shall be forever precluded from asserting against the Debtor or the Reorganized Debtor or their respective assets any Claim, including any Claim of the type released or deemed released herein.

**13.6    Setoffs.**  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff or recoupment that the Estate may have against any Person.

## ARTICLE 14
## DEFAULT AND REMEDIES

**14.1** **Default of Plan; Notice Required.** In the event of any material default of the provisions of this Plan, the Subchapter V Trustee, a creditor or other party in interest aggrieved by such default may provide written notice to the Reorganized Debtor and to the Subchapter V Trustee (a "Default Notice"). The Default Notice must describe with specificity the nature of the default alleged and the steps required of the Debtor (or, if applicable, the Subchapter V Trustee) to cure such default.

**14.2** **Opportunity to Cure.** The Reorganized Debtor (or, if applicable, the Subchapter V Trustee) shall have thirty (30) days after receipt of a written Default Notice to cure such default. The aggrieved Person shall take no further action until at least thirty (30) days have passed and the Debtor (or, if applicable, the Subchapter V Trustee) has not cured or substantially complied with the Default Notice. Even after the thirty (30) day period has expired, the Reorganized Debtor (or, if applicable, the Subchapter V Trustee) may cure a default at any time, even after an application or motion has been filed by an aggrieved party.

**14.3** **Remedies in the Event of Default.**

14.3.1 Application to Compel Compliance. If a material default has occurred and the Reorganized Debtor (or, if applicable, the Plan Administrator) does not cure such default within thirty (30) days after receipt of a Default Notice, the Subchapter V Trustee, the Plan Administrator, or a creditor or party in interest aggrieved by such a material default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan. Such application must be accompanied by an affidavit or sworn declaration specifying the default, the applicant's compliance with the notice requirements, and the Reorganized Debtor's (or, if applicable, the Plan Administrator's) failure to cure the same as required herein.

14.3.2 Service of Application. The application must be served upon (a) the Debtor, (b) Debtor's counsel, (c) the United State Trustee, (d) the Plan Administrator, and (e) the Subchapter V Trustee.

14.3.3 Determination and Relief by Bankruptcy Court. The Bankruptcy Court, after notice and a hearing, shall determine whether a default occurred, whether it was and is material, and if a material default occurred, whether such default has been cured. If the Court determines that a material default has occurred and has not been cured, the Court shall determine an appropriate remedy in light of the applicable default, including an order compelling compliance with the pertinent provisions of the Plan. In determining an appropriate remedy, the Court should consider and impose the least severe remedy that will appropriately compensate the aggrieved party or address the default. Neither this section nor any other provision of this Plan, however, shall be construed to provide a Creditor or other Person with the right to recover attorneys' fees from the Debtor, in the event of a material default or otherwise.

## ARTICLE 15
## MISCELLANEOUS

**15.1** **Severability.** If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy

Court may, upon the request of the Debtor, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

**15.2    Binding Effect.** The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person. Pursuant to 11 U.S.C. § 1141(a), the provisions of this Plan bind the Reorganized Debtor, the Subchapter V Trustee, any Person acquiring property or receiving distributions under the Plan, the counter-parties to any executory contracts or unexpired leases with the Debtor, any and all Creditors or Equity Interest holders of the Debtor, and any and all other Persons referred to or contemplated in this Plan, whether or not the Lien, Claim, Equity Interest or other right of such Person is impaired under the Plan and whether or not such Person has accepted the Plan. To the extent the Bankruptcy Case is converted to chapter 7 or the Reorganized Debtor files a future bankruptcy case, the Claims, Liens, Equity Interests and rights of Creditors and other Persons, as determined and modified by this Plan, shall be final and shall determine the allowed amounts of such claims and interests in the subsequent chapter 7 case or future bankruptcy case.

**15.3    Further Assurances.** Each Person receiving any payment or other benefit under the Plan, including any holder of any Allowed Claim or Equity Interest, shall execute such documents and shall take such other actions (or omit to take actions) as may be necessary or reasonable in order to effectuate the Plan.

**15.4    Notices.** Notices required to be served by the Bankruptcy Code or the Bankruptcy Rules shall be delivered in the manner required by the Code and Rules, to all persons required by be served by the Code and Rules. In addition to the foregoing, all notices, requests and demands to or upon the Debtor or the Subchapter V Trustee shall only be effective if in writing and delivered, via e-mail, to (a) to the Debtor, (b) the Debtor's counsel, and (c) the Subchapter V Trustee, addressed as follows:

If to the Debtor:

> Logistics Giving Resources, LLC
> Attn: Troy Hyde
> E-Mail:  troyhyde@lhghires.com

with a copy to:

> Matthew M. Boley
> Jeffrey Trousdale
> COHNE KINGHORN
> 111 East Broadway, Suite 1100
> Salt Lake City, UT  84111
> E-Mail:  mboley@ck.law
>              jtrousdale@ck.law

<u>If to the Subchapter V Trustee</u>:

        Trustee of Logistics Giving Resources, LLC
        Attn: D. Ray Strong
        Berkley Research Group
        201 South Main Street, Suite 450
        Salt Lake City, UT  84111
        E-Mail:  RStrong@thinkbrg.com

<u>If to the Plan Administrator</u>:

        Plan Administrator of Logistics Giving Resources, LLC
        Attn: John Curtis
        Rocky Mountain Advisory
        15 W. South Temple, Suite 500
        Salt Lake City, UT 84101
        E-Mail:  jcurtis@rockymountainadvisory.com

Notice shall be deemed to have been duly given or made only when actually delivered to, or received by, each and all of (a) the Debtor, (b) the Debtor's attorneys, (c) the Plan Administrator, and (d) the Subchapter V Trustee.

      **15.5**    <u>**Governing Law.**</u>  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, construed and enforced in accordance with, the laws of the State of Utah, without giving effect to the principles of conflicts of law of such jurisdiction.

      **15.6**    <u>**Filing of Additional Documents.**</u>  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

      DATED this 25th day of May, 2022.

                                  **LOGISTICS GIVING RESOURCES, LLC**

                                  By  /s/ Troy Hyde_____
                                    Troy Hyde
                                  Its Manager & Chief Executive Officer

                                  **COHNE KINGHORN, P.C.**

                                  /s/  Matthew M. Boley_____
                                    Matthew M. Boley
                                    Jeffrey Trousdale
                                    *Attorneys for* debtor-in-possession

Exhibit A

**Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)**
**Disposable Income and Cash Flow Projections**
**August 2022 to July 2026**

| | August 2022 | Sep 2022 | Oct 2022 | Nov 2022 | Dec 2022 | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ 1,800,000 | $ 1,568,723 | $ 1,455,762 | $ 1,331,693 | $ 1,239,515 | $ 1,147,228 | $ 1,045,618 | $ 968,269 | $ 947,367 | $ 884,554 | $ 863,464 | $ 842,280 | $ 775,908 | $ 797,385 |
| **Estimated Cash Deposits** | | | | | | | | | | | | | | |
| Customer Deposits | 1,220,919 | 1,223,024 | 1,225,133 | 1,227,246 | 1,229,362 | 1,231,482 | 1,242,763 | 1,244,906 | 1,247,053 | 1,249,203 | 1,251,357 | 1,253,515 | 1,255,677 | 1,257,842 |
| LGR employee retention credits [1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net employee retention credit income [2] | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 |
| LG Hires deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Estimated Cash Deposits** | 1,340,491 | 1,342,596 | 1,344,705 | 1,346,818 | 1,348,934 | 1,351,054 | 1,362,334 | 1,364,477 | 1,366,624 | 1,368,775 | 1,370,929 | 1,373,087 | 1,375,248 | 1,377,414 |
| **Estimated Cash Expenditures** | | | | | | | | | | | | | | |
| Payroll Labor Expense and Payroll Taxes | 1,137,612 | 1,139,733 | 1,141,657 | 1,143,585 | 1,145,515 | 1,147,450 | 1,149,387 | 1,151,328 | 1,153,272 | 1,155,220 | 1,157,170 | 1,159,125 | 1,161,082 | 1,163,043 |
| Healthcare insurance | 40,674 | 40,744 | 40,814 | 40,884 | 40,955 | 41,025 | 41,096 | 41,167 | 41,238 | 41,309 | 41,380 | 41,452 | 41,523 | 41,595 |
| Employee fees | 8,850 | 8,865 | 8,880 | 8,895 | 8,911 | 8,926 | 8,942 | 8,957 | 8,972 | 8,988 | 9,003 | 9,019 | 9,034 | 9,050 |
| Merchant fees | 1,029 | 1,031 | 1,033 | 1,034 | 1,036 | 1,038 | 1,040 | 1,041 | 1,043 | 1,045 | 1,047 | 1,049 | 1,050 | 1,052 |
| Sub-Contractors | 7,676 | 7,689 | 7,703 | 7,716 | 7,729 | 7,742 | 7,756 | 7,769 | 7,783 | 7,796 | 7,809 | 7,823 | 7,836 | 7,850 |
| Rent | 7,076 | 7,089 | 7,101 | 7,113 | 7,125 | 7,138 | 7,150 | 7,162 | 7,175 | 7,187 | 7,199 | 7,212 | 7,224 | 7,237 |
| Utilities | 709 | 710 | 711 | 712 | 714 | 715 | 716 | 717 | 719 | 720 | 721 | 722 | 723 | 725 |
| Repairs and maintenance | 259 | 260 | 260 | 260 | 261 | 261 | 262 | 262 | 262 | 263 | 263 | 264 | 264 | 265 |
| Marketing | 23,202 | 23,242 | 23,282 | 23,322 | 23,363 | 23,403 | 23,443 | 23,484 | 23,524 | 23,565 | 23,605 | 23,646 | 23,687 | 23,728 |
| Automobile expense | 1,000 | 1,002 | 1,003 | 1,005 | 1,007 | 1,009 | 1,010 | 1,012 | 1,014 | 1,016 | 1,017 | 1,019 | 1,021 | 1,023 |
| Bank service charges | 1,268 | 1,270 | 1,272 | 1,274 | 1,276 | 1,279 | 1,281 | 1,283 | 1,285 | 1,287 | 1,290 | 1,292 | 1,294 | 1,296 |
| Cell phone | 1,338 | 1,340 | 1,342 | 1,345 | 1,347 | 1,349 | 1,352 | 1,354 | 1,356 | 1,359 | 1,361 | 1,363 | 1,366 | 1,368 |
| Computer expense | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| Dues & subscriptions | 1,483 | 1,486 | 1,488 | 1,491 | 1,493 | 1,496 | 1,499 | 1,501 | 1,504 | 1,506 | 1,509 | 1,512 | 1,514 | 1,517 |
| Internet | 1,468 | 1,471 | 1,473 | 1,476 | 1,478 | 1,481 | 1,483 | 1,486 | 1,488 | 1,491 | 1,494 | 1,496 | 1,499 | 1,501 |
| Meals and Entertainment | 328 | 328 | 329 | 330 | 330 | 331 | 331 | 332 | 332 | 333 | 334 | 334 | 335 | 335 |
| Office Supplies | 1,523 | 1,525 | 1,528 | 1,531 | 1,533 | 1,536 | 1,539 | 1,541 | 1,544 | 1,547 | 1,549 | 1,552 | 1,555 | 1,557 |
| Professional fees (non-bankruptcy) | 9,760 | 9,777 | 9,794 | 9,811 | 9,827 | 9,844 | 9,861 | 9,878 | 9,895 | 9,913 | 9,930 | 9,947 | 9,964 | 9,981 |
| Software | 1,452 | 1,454 | 1,457 | 1,459 | 1,462 | 1,464 | 1,467 | 1,469 | 1,472 | 1,474 | 1,477 | 1,479 | 1,482 | 1,485 |
| Supplies | 178 | 178 | 179 | 179 | 179 | 180 | 180 | 180 | 181 | 181 | 181 | 181 | 182 | 182 |
| Taxes and Licenses | 10,000 | 10,017 | 10,035 | 10,052 | 10,069 | 10,087 | 10,104 | 10,121 | 10,139 | 10,156 | 10,174 | 10,191 | 10,209 | 10,227 |
| Telephone Expense | 998 | 999 | 1,001 | 1,003 | 1,005 | 1,006 | 1,008 | 1,010 | 1,011 | 1,013 | 1,015 | 1,017 | 1,018 | 1,020 |
| Travel Expense | 2,352 | 2,356 | 2,360 | 2,364 | 2,368 | 2,373 | 2,377 | 2,381 | 2,385 | 2,389 | 2,393 | 2,397 | 2,401 | 2,405 |
| Workman's Comp Insurance | 28,337 | 28,386 | 28,435 | 28,484 | 28,533 | 28,582 | 28,631 | 28,681 | 28,730 | 28,780 | 28,829 | 28,879 | 28,929 | 28,979 |
| Printing | 84 | 84 | 84 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 86 | 86 | 86 |
| Postage | 55 | 55 | 55 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 57 |
| General Liability Insurance | 11,231 | 11,250 | 11,270 | 11,289 | 11,309 | 11,328 | 11,348 | 11,367 | 11,387 | 11,407 | 11,426 | 11,446 | 11,466 | 11,486 |
| Other | 7,500 | 7,513 | 7,526 | 7,539 | 7,552 | 7,565 | 7,578 | 7,591 | 7,604 | 7,617 | 7,630 | 7,643 | 7,657 | 7,670 |
| Payments to Secured Classes 3 through 13 | 67,448 | 67,448 | 67,448 | 67,448 | 67,448 | 67,448 | 67,448 | 10,908 | 10,908 | 10,908 | 10,908 | 10,908 | 19,294 | 19,294 |
| **Total Estimated Cash Expenditures** | $ 1,375,107 | $ 1,377,231 | $ 1,379,539 | $ 1,381,760 | $ 1,383,985 | $ 1,386,214 | $ 1,388,447 | $ 1,334,144 | $ 1,336,385 | $ 1,338,629 | $ 1,340,877 | $ 1,343,130 | $ 1,353,771 | $ 1,356,031 |
| **Net Cash Flow/Disposable Income** | $ (34,617) | $ (34,725) | $ (34,834) | $ (34,942) | $ (35,051) | $ (35,160) | $ (26,113) | $ 30,333 | $ 30,240 | $ 30,146 | $ 30,051 | $ 29,957 | $ 21,477 | $ 21,383 |
| Planned Claim Payments [3] | $ 196,661 | $ 78,236 | $ 89,236 | $ 57,236 | $ 57,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ - | $ - |
| Est. tax distributions for pass-through income | | | | | | 15,215 | - | - | 41,817 | | | 45,094 | - | - |
| **Ending Cash Balance** | $ 1,568,723 | $ 1,455,762 | $ 1,331,693 | $ 1,239,515 | $ 1,147,228 | $ 1,045,618 | $ 968,269 | $ 947,367 | $ 884,554 | $ 863,464 | $ 842,280 | $ 775,908 | $ 797,385 | $ 818,768 |

Footnotes:
[1] In February 2022, the Debtor received Non-Collateral Employee Tax Credits of $1,688,994. The Debtor expects to receive significant additional amounts of Non-Collateral Employee Tax Credits but, notwithstanding the Debtor's best efforts, it is uncertain of the realization or timing of receipt.
[2] The Debtor expects to continue earning commissions from employee retention credits, equal to 4.5% of gross customer employee retention credits. Due to uncertainty surrounding the receipt of the Debtor's own employee retention credits, nothing has been projected.
[3] Administrative claims, Class 2 and Classes 14 - 16. See Exhibit A.1

Exhibit A

**Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)**
Disposable Income and Cash Flow Projections
August 2022 to July 2026

| | Oct 2023 | Nov 2023 | Dec 2023 | Jan 2024 | Feb 2024 | Mar 2024 | Apr 2024 | May 2024 | Jun 2024 | Jul 2024 | Aug 2024 | Sep 2024 | Oct 2024 | Nov 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ 818,768 | $ 792,927 | $ 814,120 | $ 835,218 | $ 808,244 | $ 829,151 | $ 849,962 | $ 828,239 | $ 854,058 | $ 879,781 | $ 858,110 | $ 883,640 | $ 909,073 | $ 887,455 |
| **Estimated Cash Deposits** | | | | | | | | | | | | | | |
| Customer Deposits | 1,260,011 | 1,262,184 | 1,264,361 | 1,266,541 | 1,268,725 | 1,270,913 | 1,273,104 | 1,275,300 | 1,277,499 | 1,279,702 | 1,281,909 | 1,284,119 | 1,286,334 | 1,288,552 |
| LGR employee retention credits [1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net employee retention credit income [2] | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 |
| LG Hires deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | | | | | | | | | | | | | | |
| **Total Estimated Cash Deposits** | 1,379,583 | 1,381,756 | 1,383,932 | 1,386,112 | 1,388,297 | 1,390,484 | 1,392,676 | 1,394,871 | 1,397,071 | 1,399,274 | 1,401,480 | 1,403,691 | 1,405,905 | 1,408,124 |
| **Estimated Cash Expenditures** | | | | | | | | | | | | | | |
| Payroll Labor Expense and Payroll Taxes | 1,165,008 | 1,166,975 | 1,168,947 | 1,170,921 | 1,172,899 | 1,174,880 | 1,176,865 | 1,178,853 | 1,180,845 | 1,182,840 | 1,184,839 | 1,186,841 | 1,188,846 | 1,190,855 |
| Healthcare insurance | 41,667 | 41,738 | 41,810 | 41,883 | 41,955 | 42,027 | 42,100 | 42,172 | 42,245 | 42,318 | 42,391 | 42,464 | 42,537 | 42,610 |
| Employee fees | 9,066 | 9,081 | 9,097 | 9,113 | 9,128 | 9,144 | 9,160 | 9,176 | 9,191 | 9,207 | 9,223 | 9,239 | 9,255 | 9,271 |
| Merchant fees | 1,054 | 1,056 | 1,058 | 1,060 | 1,061 | 1,063 | 1,065 | 1,067 | 1,069 | 1,071 | 1,072 | 1,074 | 1,076 | 1,078 |
| Sub-Contractors | 7,863 | 7,877 | 7,891 | 7,904 | 7,918 | 7,931 | 7,945 | 7,959 | 7,973 | 7,986 | 8,000 | 8,014 | 8,028 | 8,042 |
| Rent | 7,249 | 7,262 | 7,274 | 7,287 | 7,299 | 7,312 | 7,324 | 7,337 | 7,350 | 7,362 | 7,375 | 7,388 | 7,401 | 7,413 |
| Utilities | 726 | 727 | 728 | 730 | 731 | 732 | 734 | 735 | 736 | 737 | 739 | 740 | 741 | 742 |
| Repairs and maintenance | 265 | 266 | 266 | 267 | 267 | 268 | 268 | 269 | 269 | 270 | 270 | 271 | 271 | 271 |
| Marketing | 23,769 | 23,810 | 23,851 | 23,892 | 23,933 | 23,974 | 24,016 | 24,057 | 24,099 | 24,140 | 24,182 | 24,223 | 24,265 | 24,307 |
| Automobile expense | 1,024 | 1,026 | 1,028 | 1,030 | 1,031 | 1,033 | 1,035 | 1,037 | 1,039 | 1,040 | 1,042 | 1,044 | 1,046 | 1,048 |
| Bank service charges | 1,299 | 1,301 | 1,303 | 1,305 | 1,308 | 1,310 | 1,312 | 1,314 | 1,317 | 1,319 | 1,321 | 1,323 | 1,326 | 1,328 |
| Cell phone | 1,370 | 1,373 | 1,375 | 1,378 | 1,380 | 1,382 | 1,385 | 1,387 | 1,389 | 1,392 | 1,394 | 1,397 | 1,399 | 1,401 |
| Computer expense | 18 | 18 | 18 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| Dues & subscriptions | 1,519 | 1,522 | 1,525 | 1,527 | 1,530 | 1,532 | 1,535 | 1,538 | 1,540 | 1,543 | 1,546 | 1,548 | 1,551 | 1,554 |
| Internet | 1,504 | 1,506 | 1,509 | 1,512 | 1,514 | 1,517 | 1,519 | 1,522 | 1,525 | 1,527 | 1,530 | 1,533 | 1,535 | 1,538 |
| Meals and Entertainment | 336 | 337 | 337 | 338 | 338 | 339 | 339 | 340 | 341 | 341 | 342 | 342 | 343 | 344 |
| Office Supplies | 1,560 | 1,563 | 1,565 | 1,568 | 1,571 | 1,574 | 1,576 | 1,579 | 1,582 | 1,584 | 1,587 | 1,590 | 1,593 | 1,595 |
| Professional fees (non-bankruptcy) | 9,998 | 10,016 | 10,033 | 10,050 | 10,067 | 10,085 | 10,102 | 10,120 | 10,137 | 10,155 | 10,172 | 10,190 | 10,207 | 10,225 |
| Software | 1,487 | 1,490 | 1,492 | 1,495 | 1,497 | 1,500 | 1,503 | 1,505 | 1,508 | 1,510 | 1,513 | 1,516 | 1,518 | 1,521 |
| Supplies | 182 | 183 | 183 | 183 | 184 | 184 | 184 | 185 | 185 | 185 | 186 | 186 | 186 | 187 |
| Taxes and Licenses | 10,244 | 10,262 | 10,280 | 10,297 | 10,315 | 10,333 | 10,351 | 10,368 | 10,386 | 10,404 | 10,422 | 10,440 | 10,458 | 10,476 |
| Telephone Expense | 1,022 | 1,024 | 1,026 | 1,027 | 1,029 | 1,031 | 1,033 | 1,034 | 1,036 | 1,038 | 1,040 | 1,042 | 1,043 | 1,045 |
| Travel Expense | 2,410 | 2,414 | 2,418 | 2,422 | 2,426 | 2,430 | 2,435 | 2,439 | 2,443 | 2,447 | 2,452 | 2,456 | 2,460 | 2,464 |
| Workman's Comp Insurance | 29,029 | 29,079 | 29,129 | 29,179 | 29,229 | 29,280 | 29,330 | 29,381 | 29,432 | 29,482 | 29,533 | 29,584 | 29,635 | 29,686 |
| Printing | 86 | 86 | 86 | 87 | 87 | 87 | 87 | 87 | 87 | 88 | 88 | 88 | 88 | 88 |
| Postage | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 58 | 58 | 58 | 58 | 58 |
| General Liability Insurance | 11,505 | 11,525 | 11,545 | 11,565 | 11,585 | 11,605 | 11,625 | 11,645 | 11,665 | 11,685 | 11,705 | 11,725 | 11,746 | 11,766 |
| Other | 7,683 | 7,696 | 7,710 | 7,723 | 7,736 | 7,750 | 7,763 | 7,776 | 7,790 | 7,803 | 7,817 | 7,830 | 7,844 | 7,857 |
| Payments to Secured Classes 3 through 13 | 19,294 | 19,294 | 19,294 | 19,294 | 19,294 | 19,294 | 14,094 | 14,094 | 14,094 | 14,094 | 14,094 | 14,094 | 14,094 | 14,094 |
| **Total Estimated Cash Expenditures** | $ 1,358,295 | $ 1,360,562 | $ 1,362,834 | $ 1,365,110 | $ 1,367,390 | $ 1,369,673 | $ 1,366,761 | $ 1,369,053 | $ 1,371,348 | $ 1,373,647 | $ 1,375,950 | $ 1,378,258 | $ 1,380,569 | $ 1,382,884 |
| **Net Cash Flow/Disposable Income** | $ 21,288 | $ 21,193 | $ 21,098 | $ 21,002 | $ 20,907 | $ 20,811 | $ 25,915 | $ 25,819 | $ 25,723 | $ 25,626 | $ 25,530 | $ 25,433 | $ 25,337 | $ 25,240 |
| Planned Claim Payments [3] | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Est. tax distributions for pass-through income | 47,129 | - | - | 47,977 | - | - | 47,638 | - | - | 47,297 | - | - | 46,955 | - |
| **Ending Cash Balance** | $ 792,927 | $ 814,120 | $ 835,218 | $ 808,244 | $ 829,151 | $ 849,962 | $ 828,239 | $ 854,058 | $ 879,781 | $ 858,110 | $ 883,640 | $ 909,073 | $ 887,455 | $ 912,695 |

Exhibit A

**Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)**
Disposable Income and Cash Flow Projections
August 2022 to July 2026

| | Dec 2024 | Jan 2025 | Feb 2025 | Mar 2025 | Apr 2025 | May 2025 | Jun 2025 | Jul 2025 | Aug 2025 | Sep 2025 | Oct 2025 | Nov 2025 | Dec 2025 | Jan 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ 912,695 | $ 937,837 | $ 916,272 | $ 941,219 | $ 966,069 | $ 946,867 | $ 973,831 | $ 1,004,096 | $ 988,346 | $ 1,022,757 | $ 1,057,242 | $ 1,042,735 | $ 1,077,368 | $ 1,112,075 |
| **Estimated Cash Deposits** | | | | | | | | | | | | | | |
| Customer Deposits | 1,290,774 | 1,293,000 | 1,295,230 | 1,297,463 | 1,299,701 | 1,301,942 | 1,304,187 | 1,306,436 | 1,408,689 | 1,411,118 | 1,413,551 | 1,415,989 | 1,418,431 | 1,420,877 |
| LGR employee retention credits [1] | - | | | | | | | | | | | | | |
| Net employee retention credit income [2] | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | 119,572 | - | - | - | - | - | - |
| LG Hires deposits | - | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| **Total Estimated Cash Deposits** | **1,410,346** | **1,412,571** | **1,414,801** | **1,417,035** | **1,419,272** | **1,421,513** | **1,423,759** | **1,426,008** | **1,408,689** | **1,411,118** | **1,413,551** | **1,415,989** | **1,418,431** | **1,420,877** |
| **Estimated Cash Expenditures** | | | | | | | | | | | | | | |
| Payroll Labor Expense and Payroll Taxes | 1,192,867 | 1,194,883 | 1,196,902 | 1,198,925 | 1,200,951 | 1,202,981 | 1,205,014 | 1,207,051 | 1,185,177 | 1,187,221 | 1,189,268 | 1,191,319 | 1,193,373 | 1,195,431 |
| Healthcare insurance | 42,684 | 42,758 | 42,831 | 42,905 | 42,979 | 43,053 | 43,127 | 43,202 | 43,276 | 43,351 | 43,426 | 43,501 | 43,576 | 43,651 |
| Employee fees | 9,287 | 9,303 | 9,319 | 9,335 | 9,351 | 9,367 | 9,383 | 9,400 | 9,416 | 9,432 | 9,448 | 9,465 | 9,481 | 9,497 |
| Merchant fees | 1,080 | 1,082 | 1,084 | 1,085 | 1,087 | 1,089 | 1,091 | 1,093 | 1,095 | 1,097 | 1,099 | 1,100 | 1,102 | 1,104 |
| Sub-Contractors | 8,055 | 8,069 | 8,083 | 8,097 | 8,111 | 8,125 | 8,139 | 8,153 | 8,167 | 8,181 | 8,195 | 8,210 | 8,224 | 8,238 |
| Rent | 7,426 | 7,439 | 7,452 | 7,465 | 7,477 | 7,490 | 7,503 | 7,516 | 7,529 | 7,542 | 7,555 | 7,568 | 7,581 | 7,594 |
| Utilities | 744 | 745 | 746 | 748 | 749 | 750 | 751 | 753 | 754 | 755 | 757 | 758 | 759 | 761 |
| Repairs and maintenance | 272 | 272 | 273 | 273 | 274 | 274 | 275 | 275 | 276 | 276 | 277 | 277 | 278 | 278 |
| Marketing | 24,349 | 24,391 | 24,433 | 24,475 | 24,517 | 24,560 | 24,602 | 24,644 | 24,687 | 24,729 | 24,772 | 24,815 | 24,858 | 24,900 |
| Automobile expense | 1,049 | 1,051 | 1,053 | 1,055 | 1,057 | 1,059 | 1,060 | 1,062 | 1,064 | 1,066 | 1,068 | 1,070 | 1,071 | 1,073 |
| Bank service charges | 1,330 | 1,333 | 1,335 | 1,337 | 1,339 | 1,342 | 1,344 | 1,346 | 1,349 | 1,351 | 1,353 | 1,356 | 1,358 | 1,360 |
| Cell phone | 1,404 | 1,406 | 1,409 | 1,411 | 1,414 | 1,416 | 1,418 | 1,421 | 1,423 | 1,426 | 1,428 | 1,431 | 1,433 | 1,436 |
| Computer expense | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| Dues & subscriptions | 1,556 | 1,559 | 1,562 | 1,564 | 1,567 | 1,570 | 1,573 | 1,575 | 1,578 | 1,581 | 1,583 | 1,586 | 1,589 | 1,592 |
| Internet | 1,541 | 1,543 | 1,546 | 1,549 | 1,551 | 1,554 | 1,557 | 1,559 | 1,562 | 1,565 | 1,567 | 1,570 | 1,573 | 1,575 |
| Meals and Entertainment | 344 | 345 | 345 | 346 | 347 | 347 | 348 | 348 | 349 | 350 | 350 | 351 | 351 | 352 |
| Office Supplies | 1,598 | 1,601 | 1,604 | 1,606 | 1,609 | 1,612 | 1,615 | 1,617 | 1,620 | 1,623 | 1,626 | 1,629 | 1,631 | 1,634 |
| Professional fees (non-bankruptcy) | 10,242 | 10,260 | 10,278 | 10,295 | 10,313 | 10,331 | 10,349 | 10,367 | 10,385 | 10,402 | 10,420 | 10,438 | 10,456 | 10,474 |
| Software | 1,523 | 1,526 | 1,529 | 1,531 | 1,534 | 1,537 | 1,539 | 1,542 | 1,545 | 1,547 | 1,550 | 1,553 | 1,555 | 1,558 |
| Supplies | 187 | 187 | 187 | 188 | 188 | 188 | 189 | 189 | 189 | 190 | 190 | 190 | 191 | 191 |
| Taxes and Licenses | 10,494 | 10,512 | 10,530 | 10,549 | 10,567 | 10,585 | 10,603 | 10,622 | 10,640 | 10,658 | 10,677 | 10,695 | 10,713 | 10,732 |
| Telephone Expense | 1,047 | 1,049 | 1,051 | 1,052 | 1,054 | 1,056 | 1,058 | 1,060 | 1,061 | 1,063 | 1,065 | 1,067 | 1,069 | 1,071 |
| Travel Expense | 2,468 | 2,473 | 2,477 | 2,481 | 2,486 | 2,490 | 2,494 | 2,498 | 2,503 | 2,507 | 2,511 | 2,516 | 2,520 | 2,524 |
| Workman's Comp Insurance | 29,737 | 29,789 | 29,840 | 29,891 | 29,943 | 29,995 | 30,046 | 30,098 | 30,150 | 30,202 | 30,254 | 30,306 | 30,359 | 30,411 |
| Printing | 88 | 88 | 89 | 89 | 89 | 89 | 89 | 89 | 90 | 90 | 90 | 90 | 90 | 90 |
| Postage | 58 | 58 | 58 | 58 | 58 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 |
| General Liability Insurance | 11,786 | 11,807 | 11,827 | 11,847 | 11,868 | 11,888 | 11,909 | 11,929 | 11,950 | 11,970 | 11,991 | 12,012 | 12,032 | 12,053 |
| Other | 7,871 | 7,884 | 7,898 | 7,911 | 7,925 | 7,939 | 7,952 | 7,966 | 7,980 | 7,994 | 8,007 | 8,021 | 8,035 | 8,049 |
| Payments to Secured Classes 3 through 13 | 14,094 | 14,094 | 14,094 | 14,094 | 11,785 | 11,785 | 8,385 | 8,385 | 8,385 | 8,385 | 8,385 | 8,385 | 8,385 | 8,385 |
| **Total Estimated Cash Expenditures** | **$ 1,385,203** | **$ 1,387,526** | **$ 1,389,853** | **$ 1,392,185** | **$ 1,392,210** | **$ 1,394,549** | **$ 1,393,493** | **$ 1,395,840** | **$ 1,374,277** | **$ 1,376,633** | **$ 1,378,992** | **$ 1,381,356** | **$ 1,383,724** | **$ 1,386,095** |
| **Net Cash Flow/Disposable Income** | **$ 25,142** | **$ 25,045** | **$ 24,948** | **$ 24,850** | **$ 27,062** | **$ 26,964** | **$ 30,265** | **$ 30,167** | **$ 34,411** | **$ 34,485** | **$ 34,559** | **$ 34,633** | **$ 34,707** | **$ 34,782** |
| Planned Claim Payments [3] | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Est. tax distributions for pass-through income | - | 46,611 | - | - | 46,265 | - | - | 45,917 | - | - | 49,067 | - | - | 50,977 |
| **Ending Cash Balance** | **$ 937,837** | **$ 916,272** | **$ 941,219** | **$ 966,069** | **$ 946,867** | **$ 973,831** | **$ 1,004,096** | **$ 988,346** | **$ 1,022,757** | **$ 1,057,242** | **$ 1,042,735** | **$ 1,077,368** | **$ 1,112,075** | **$ 1,095,880** |

Exhibit A

**Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)**
Disposable Income and Cash Flow Projections
August 2022 to July 2026

|  | Feb 2026 | Mar 2026 | Apr 2026 | May 2026 | Jun 2026 | Jul 2026 |
|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ 1,095,880 | $ 1,130,736 | $ 1,165,667 | $ 1,149,431 | $ 1,184,511 | $ 1,219,666 |
| **Estimated Cash Deposits** |  |  |  |  |  |  |
| Customer Deposits | 1,423,327 | 1,425,781 | 1,428,240 | 1,430,703 | 1,433,170 | 1,435,642 |
| LGR employee retention credits [1] | - | - | - | - | - | - |
| Net employee retention credit income [2] |  |  |  |  |  |  |
| LG Hires deposits |  |  |  |  |  |  |
| Other |  |  |  |  |  |  |
| **Total Estimated Cash Deposits** | 1,423,327 | 1,425,781 | 1,428,240 | 1,430,703 | 1,433,170 | 1,435,642 |
| **Estimated Cash Expenditures** |  |  |  |  |  |  |
| Payroll Labor Expense and Payroll Taxes | 1,197,493 | 1,199,558 | 1,201,626 | 1,203,698 | 1,205,774 | 1,207,853 |
| Healthcare insurance | 43,726 | 43,801 | 43,877 | 43,953 | 44,028 | 44,104 |
| Employee fees | 9,514 | 9,530 | 9,547 | 9,563 | 9,580 | 9,596 |
| Merchant fees | 1,106 | 1,108 | 1,110 | 1,112 | 1,114 | 1,116 |
| Sub-Contractors | 8,252 | 8,266 | 8,281 | 8,295 | 8,309 | 8,323 |
| Rent | 7,607 | 7,620 | 7,634 | 7,647 | 7,660 | 7,673 |
| Utilities | 762 | 763 | 764 | 766 | 767 | 768 |
| Repairs and maintenance | 279 | 279 | 280 | 280 | 281 | 281 |
| Marketing | 24,943 | 24,986 | 25,030 | 25,073 | 25,116 | 25,159 |
| Automobile expense | 1,075 | 1,077 | 1,079 | 1,081 | 1,082 | 1,084 |
| Bank service charges | 1,363 | 1,365 | 1,367 | 1,370 | 1,372 | 1,375 |
| Cell phone | 1,438 | 1,441 | 1,443 | 1,446 | 1,448 | 1,451 |
| Computer expense | 19 | 19 | 19 | 19 | 19 | 20 |
| Dues & subscriptions | 1,594 | 1,597 | 1,600 | 1,603 | 1,605 | 1,608 |
| Internet | 1,578 | 1,581 | 1,584 | 1,586 | 1,589 | 1,592 |
| Meals and Entertainment | 353 | 353 | 354 | 354 | 355 | 356 |
| Office Supplies | 1,637 | 1,640 | 1,643 | 1,646 | 1,648 | 1,651 |
| Professional fees (non-bankruptcy) | 10,492 | 10,511 | 10,529 | 10,547 | 10,565 | 10,583 |
| Software | 1,561 | 1,563 | 1,566 | 1,569 | 1,571 | 1,574 |
| Supplies | 191 | 192 | 192 | 192 | 193 | 193 |
| Taxes and Licenses | 10,750 | 10,769 | 10,788 | 10,806 | 10,825 | 10,843 |
| Telephone Expense | 1,073 | 1,074 | 1,076 | 1,078 | 1,080 | 1,082 |
| Travel Expense | 2,529 | 2,533 | 2,537 | 2,542 | 2,546 | 2,551 |
| Workman's Comp Insurance | 30,463 | 30,516 | 30,569 | 30,621 | 30,674 | 30,727 |
| Printing | 90 | 91 | 91 | 91 | 91 | 91 |
| Postage | 59 | 60 | 60 | 60 | 60 | 60 |
| General Liability Insurance | 12,074 | 12,095 | 12,116 | 12,137 | 12,157 | 12,178 |
| Other | 8,063 | 8,077 | 8,091 | 8,105 | 8,119 | 8,133 |
| Payments to Secured Classes 3 through 13 | 8,385 | 8,385 | 8,385 | 8,385 | 8,385 | 8,385 |
| **Total Estimated Cash Expenditures** | $ 1,388,471 | $ 1,390,851 | $ 1,393,235 | $ 1,395,623 | $ 1,398,015 | $ 1,400,412 |
| **Net Cash Flow/Disposable Income** | $ 34,856 | $ 34,931 | $ 35,005 | $ 35,080 | $ 35,155 | $ 35,230 |
| Planned Claim Payments [3] | $ - | $ - | $ - | $ - | $ - | $ - |
| Est. tax distributions for pass-through income | - | - | 51,241 | - | - | 51,507 |
| **Ending Cash Balance** | $ 1,130,736 | $ 1,165,667 | $ 1,149,431 | $ 1,184,511 | $ 1,219,666 | $ 1,203,390 |

Exhibit A.1

**Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)**
**Projected Plan Payments**
**August 2022 to July 2026**

| | August 2022 | Sep 2022 | Oct 2022 | Nov 2022 | Dec 2022 | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Disposable income** | $   - | $   - | $   - | $   - | $   - | $   - | $   - | $ 30,333 | $ 30,240 | $ 30,146 |
| **Administrative claims** | | | | | | | | | | |
| Debtor's counsel [3] | 90,706 | 25,000 | 25,000 | 8,000 | 8,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Debtor's accountants and financial advisors [3] | 37,719 | 5,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Subchapter V Trustee Fees | 15,000 | | 15,000 | | | | | | | |
| **Claims** | | | | | | | | | | |
| 1 - Priority Claims (taxes and wages) | 5,000 | - | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | 48,236 | 48,236 | 48,236 | 48,236 | 48,236 | 48,236 | 48,236 | 48,236 | 48,236 | 48,236 |
| **Secured Classes 3 through 13** | | | | | | | | | | |
| 3 - Breakout Capital's Claims [1] | 56,540 | 56,540 | 56,540 | 56,540 | 56,540 | 56,540 | 56,540 | - | - | - |
| 4 - Everest Business Funding's Claims [1] | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 |
| 5 - Everyday Fundings Claim [2] | - | - | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim [1] | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 |
| 7 - Pinhook Capital's claim [2] | - | - | - | - | - | - | - | - | - | - |
| 8 - Diverse Capital's claim [1] | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 |
| 9 - ROC Funding's claim [2] | - | - | - | - | - | - | - | - | - | - |
| 10 - Brickstone Group's claim [2] | - | - | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim [2] | - | - | - | - | - | - | - | - | - | - |
| 12 - Fundbox's claim [2] | - | - | - | - | - | - | - | - | - | - |
| 13 - Delta Bridge/Unique Funding Solutions' claim [2 | - | - | - | - | - | - | - | - | - | - |
| **Other claims:** | | | | | | | | | | |
| 14 - Harvest Small Business Finance's claim [3] | - | - | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - | - | - |
| **Total Claim Payments** | $ 264,109 | $ 145,684 | $ 156,684 | $ 124,684 | $ 124,684 | $ 118,684 | $ 118,684 | $ 62,144 | $ 62,144 | $ 62,144 |
| **Total Secured Claim Payments** | $ 67,448 | $ 67,448 | $ 67,448 | $ 67,448 | $ 67,448 | $ 67,448 | $ 67,448 | $ 10,908 | $ 10,908 | $ 10,908 |
| **Total Other Claim Payments** | $ 196,661 | $ 78,236 | $ 89,236 | $ 57,236 | $ 57,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ 51,236 | $ 51,236 |
| **Total Claim Payments** | $ 264,109 | $ 145,684 | $ 156,684 | $ 124,684 | $ 124,684 | $ 118,684 | $ 118,684 | $ 62,144 | $ 62,144 | $ 62,144 |

Footnote:
[1] For purposes of the Plan projections, we have used the terms agreed to in the stipulation with each creditor, to be approved by the Court.
[2] Interest accrues at the Plan Lien Rate, which is defined by the Plan Reorganization as the 1 Year Libor Rate as published by the Wall Street Journal.
[3] This represents a PPP loan received by the Debtor.  The Debtor anticipates that it qualifies for forgiveness of this debt and thus no payment has been included.  The Debtor will apply for forgiveness of it.

Exhibit A.1

**Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)**
**Projected Plan Payments**
**August 2022 to July 2026**

| | Jun 2023 | Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Dec 2023 | Jan 2024 | Feb 2024 | Mar 2024 | Apr 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Disposable income** | $ 30,051 | $ 29,957 | $ 21,477 | $ 21,383 | $ 21,288 | $ 21,193 | $ 21,098 | $ 21,002 | $ 20,907 | $ 20,811 | $ 25,915 |
| **Administrative claims** | | | | | | | | | | | |
| Debtor's counsel [3] | 2,000 | 2,000 | | | | | | | | | |
| Debtor's accountants and financial advisors [3] | 1,000 | 1,000 | | | | | | | | | |
| Subchapter V Trustee Fees | | | | | | | | | | | |
| **Claims** | | | | | | | | | | | |
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | 48,236 | 48,236 | - | - | - | - | - | - | - | - | - |
| **Secured Classes 3 through 13** | | | | | | | | | | | |
| 3 - Breakout Capital's Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims [1] | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 |
| 5 - Everyday Fundings Claim [2] | - | - | - | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim [1] | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | 5,199 | - |
| 7 - Pinhook Capital's claim [2] | - | - | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 |
| 8 - Diverse Capital's claim [1] | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 |
| 9 - ROC Funding's claim [2] | - | - | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 |
| 10 - Brickstone Group's claim [2] | - | - | - | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim [2] | - | - | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 |
| 12 - Fundbox's claim [2] | - | - | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 |
| 13 - Delta Bridge/Unique Funding Solutions' claim [2 | - | - | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 |
| **Other claims:** | | | | | | | | | | | |
| 14 - Harvest Small Business Finance's claim [3] | - | - | - | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| **Total Claim Payments** | $ 62,144 | $ 62,144 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 14,094 |
| | | | | | | | | | | | |
| **Total Secured Claim Payments** | $ 10,908 | $ 10,908 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 14,094 |
| **Total Other Claim Payments** | $ 51,236 | $ 51,236 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Claim Payments** | $ 62,144 | $ 62,144 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 19,294 | $ 14,094 |

Footnote:
[1] For purposes of the Plan projections, we have used the
[2] Interest accrues at the Plan Lien Rate, which is defined
[3] This represents a PPP loan received by the Debtor.  Th

**Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)**
**Projected Plan Payments**
**August 2022 to July 2026**

| | | May 2024 | Jun 2024 | Jul 2024 | Aug 2024 | Sep 2024 | Oct 2024 | Nov 2024 | Dec 2024 | Jan 2025 | Feb 2025 | Mar 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Disposable income** | $ | 25,819 | $ 25,723 | $ 25,626 | $ 25,530 | $ 25,433 | $ 25,337 | $ 25,240 | $ 25,142 | $ 25,045 | $ 24,948 | $ 24,850 |
| **Administrative claims** | | | | | | | | | | | | |
| Debtor's counsel [3] | | | | | | | | | | | | |
| Debtor's accountants and financial advisors [3] | | | | | | | | | | | | |
| Subchapter V Trustee Fees | | | | | | | | | | | | |
| **Claims** | | | | | | | | | | | | |
| 1 - Priority Claims (taxes and wages) | | - | - | - | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | | - | - | - | - | - | - | - | - | - | - | - |
| **Secured Classes 3 through 13** | | | | | | | | | | | | |
| 3 - Breakout Capital's Claims [1] | | - | - | - | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims [1] | | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 |
| 5 - Everyday Fundings Claim [2] | | - | - | - | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim [1] | | - | - | - | - | - | - | - | - | - | - | - |
| 7 - Pinhook Capital's claim [2] | | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 |
| 8 - Diverse Capital's claim [1] | | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 |
| 9 - ROC Funding's claim [2] | | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 |
| 10 - Brickstone Group's claim [2] | | - | - | - | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim [2] | | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 |
| 12 - Fundbox's claim [2] | | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 |
| 13 - Delta Bridge/Unique Funding Solutions' claim [2 | | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 |
| **Other claims:** | | | | | | | | | | | | |
| 14 - Harvest Small Business Finance's claim [3] | | - | - | - | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | | - | - | - | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | | - | - | - | - | - | - | - | - | - | - | - |
| **Total Claim Payments** | $ | 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 |
| **Total Secured Claim Payments** | $ | 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | 14,094 |
| **Total Other Claim Payments** | $ | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| **Total Claim Payments** | $ | 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 | $ 14,094 |

Footnote:
[1] For purposes of the Plan projections, we have used the
[2] Interest accrues at the Plan Lien Rate, which is defined
[3] This represents a PPP loan received by the Debtor.  Th

Exhibit A.1

**Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)**
Projected Plan Payments
*August 2022 to July 2026*

| | Apr 2025 | May 2025 | Jun 2025 | Jul 2025 | Aug 2025 | Sep 2025 | Oct 2025 | Nov 2025 | Dec 2025 | Jan 2026 | Feb 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Disposable income** | $  27,062 | $  26,964 | $  30,265 | $  30,167 | $  34,411 | $  34,485 | $  34,559 | $  34,633 | $  34,707 | $  34,782 | $  34,856 |
| **Administrative claims** | | | | | | | | | | | |
| Debtor's counsel [3] | | | | | | | | | | | |
| Debtor's accountants and financial advisors [3] | | | | | | | | | | | |
| Subchapter V Trustee Fees | | | | | | | | | | | |
| **Claims** | | | | | | | | | | | |
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | - | - | - | - | - | - | - | - | - | - | - |
| **Secured Classes 3 through 13** | | | | | | | | | | | |
| 3 - Breakout Capital's Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| 5 - Everyday Fundings Claim [2] | - | - | - | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim [1] | - | - | - | - | - | - | - | - | - | - | - |
| 7 - Pinhook Capital's claim [2] | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 |
| 8 - Diverse Capital's claim [1] | 3,399 | 3,399 | - | - | - | - | - | - | - | - | - |
| 9 - ROC Funding's claim [2] | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 |
| 10 - Brickstone Group's claim [2] | - | - | - | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim [2] | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 |
| 12 - Fundbox's claim [2] | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 |
| 13 - Delta Bridge/Unique Funding Solutions' claim [2 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 |
| **Other claims:** | | | | | | | | | | | |
| 14 - Harvest Small Business Finance's claim [3] | - | - | - | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| **Total Claim Payments** | $  11,785 | $  11,785 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 |
| **Total Secured Claim Payments** | $  11,785 | $  11,785 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | 8,385 |
| **Total Other Claim Payments** | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | - |
| **Total Claim Payments** | $  11,785 | $  11,785 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | $  8,385 | 8,385 |

Footnote:
[1] For purposes of the Plan projections, we have used the
[2] Interest accrues at the Plan Lien Rate, which is defined
[3] This represents a PPP loan received by the Debtor.  Th

Exhibit A.1

**Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)**
**Projected Plan Payments**
**August 2022 to July 2026**

| | Mar 2026 | Apr 2026 | May 2026 | Jun 2026 | Jul 2026 | Total |
|---|---|---|---|---|---|---|
| **Disposable income** | $   34,931 | $   35,005 | $   35,080 | $   35,155 | $   35,230 | |
| | | | | | | |
| **Administrative claims** | | | | | | |
| Debtor's counsel [3] | | | | | | 170,706 |
| Debtor's accountants and financial advisors [3] | | | | | | 52,719 |
| Subchapter V Trustee Fees | | | | | | 30,000 |
| **Claims** | | | | | | |
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | 5,000 |
| 2 - General Unsecured Claims | - | - | - | - | - | 578,826 |
| | | | | | | |
| **Secured Classes 3 through 13** | | | | | | |
| 3 - Breakout Capital's Claims [1] | - | - | - | - | - | 395,780 |
| 4 - Everest Business Funding's Claims [1] | - | - | - | - | - | 73,917 |
| 5 - Everyday Fundings Claim [2] | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim [1] | - | - | - | - | - | 103,984 |
| 7 - Pinhook Capital's claim [2] | 2,055 | 2,055 | 2,055 | 2,055 | 2,055 | 73,983 |
| 8 - Diverse Capital's claim [1] | - | - | - | - | - | 115,576 |
| 9 - ROC Funding's claim [2] | 1,888 | 1,888 | 1,888 | 1,888 | 1,888 | 67,978 |
| 10 - Brickstone Group's claim [2] | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim [2] | 1,849 | 1,849 | 1,849 | 1,849 | 1,849 | 66,566 |
| 12 - Fundbox's claim [2] | 1,008 | 1,008 | 1,008 | 1,008 | 1,008 | 36,272 |
| 13 - Delta Bridge/Unique Funding Solutions' claim [2 | 1,585 | 1,585 | 1,585 | 1,585 | 1,585 | 57,070 |
| | | | | | | |
| **Other claims:** | | | | | | |
| 14 - Harvest Small Business Finance's claim [3] | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - |
| **Total Claim Payments** | $   8,385 | $   8,385 | $   8,385 | $   8,385 | $   8,385 | $  1,828,379 |
| | | | | | | |
| **Total Secured Claim Payments** | $   8,385 | $   8,385 | $   8,385 | $   8,385 | $   8,385 | $   991,127 |
| **Total Other Claim Payments** | $      - | $      - | $      - | $      - | $      - | $   837,252 |
| **Total Claim Payments** | $   8,385 | $   8,385 | $   8,385 | $   8,385 | $   8,385 | $  1,828,379 |

Footnote:
[1] For purposes of the Plan projections, we have used the
[2] Interest accrues at the Plan Lien Rate, which is defined
[3] This represents a PPP loan received by the Debtor.  Th

**Exhibit A.2**

# Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)
**Projected Balances of Claims Outstanding**
**August 2022 to July 2026**

| Claims | 8/31/2022 | 9/30/2022 | 10/31/2022 | 11/30/2022 | 12/31/2022 | 1/31/2023 | 2/28/2023 | 3/31/2023 |
|---|---|---|---|---|---|---|---|---|
| 1 - Priority Claims (taxes and wages) | 5,000 | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | 523,033 | 475,485 | 427,936 | 380,388 | 332,839 | 285,291 | 237,742 | 190,194 |
| 3 - Breakout Capital's Claims | 335,072 | 279,719 | 224,170 | 168,424 | 112,480 | 56,339 | - | - |
| 4 - Everest Business Funding's Claims | 68,820 | 66,682 | 64,539 | 62,391 | 60,237 | 58,077 | 55,913 | 53,742 |
| 5 - Everyday Fundings Claim | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim | 95,176 | 90,333 | 85,473 | 80,594 | 75,697 | 70,782 | 65,848 | 60,896 |
| 7 - Pinhook Capital's claim | 71,036 | 71,036 | 71,036 | 71,036 | 71,036 | 71,036 | 71,036 | 71,036 |
| 8 - Diverse Capital's claim | 106,060 | 103,015 | 99,959 | 96,892 | 93,816 | 90,730 | 87,633 | 84,525 |
| 9 - ROC Funding's claim | 65,270 | 65,270 | 65,270 | 65,270 | 65,270 | 65,270 | 65,270 | 65,270 |
| 10 - Brickstone Group's (Global Funding) claim | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim | 63,915 | 63,915 | 63,915 | 63,915 | 63,915 | 63,915 | 63,915 | 63,915 |
| 12 - Fundbox's claim | 34,827 | 34,827 | 34,827 | 34,827 | 34,827 | 34,827 | 34,827 | 34,827 |
| 13 - Delta Bridge/Unique Funding Solutions' claim | 54,797 | 54,797 | 54,797 | 54,797 | 54,797 | 54,797 | 54,797 | 54,797 |
| 14 - Harvest Small Business Finance's claim | 1,851,500 | 1,851,500 | 1,851,500 | 1,851,500 | 1,851,500 | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - |
| **Total Outstanding Balance:** | $ 3,274,506 | $ 3,156,578 | $ 3,043,421 | $ 2,930,033 | $ 2,816,414 | $ 851,063 | $ 736,980 | $ 679,202 |

# Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)

**Projected Balances of Claims Outstanding**
**August 2022 to July 2026**

| Claims | 4/30/2023 | 5/31/2023 | 6/30/2023 | 7/31/2023 | 8/31/2023 | 9/30/2023 | 10/31/2023 | 11/30/2023 |
|---|---|---|---|---|---|---|---|---|
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | 142,645 | 95,097 | 47,548 | - | - | - | - | - |
| 3 - Breakout Capital's Claims | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims | 51,567 | 49,386 | 47,200 | 45,008 | 42,810 | 40,607 | 38,399 | 36,185 |
| 5 - Everyday Fundings Claim | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim | 55,925 | 50,936 | 45,927 | 40,900 | 35,855 | 30,790 | 25,706 | 20,603 |
| 7 - Pinhook Capital's claim | 71,036 | 71,036 | 71,036 | 71,036 | 69,063 | 67,090 | 65,116 | 63,143 |
| 8 - Diverse Capital's claim | 81,408 | 78,280 | 75,142 | 71,993 | 68,833 | 65,664 | 62,483 | 59,292 |
| 9 - ROC Funding's claim | 65,270 | 65,270 | 65,270 | 65,270 | 63,457 | 61,644 | 59,831 | 58,018 |
| 10 - Brickstone Group's (Global Funding) claim | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim | 63,915 | 63,915 | 63,915 | 63,915 | 62,139 | 60,364 | 58,588 | 56,813 |
| 12 - Fundbox's claim | 34,827 | 34,827 | 34,827 | 34,827 | 33,859 | 32,892 | 31,924 | 30,957 |
| 13 - Delta Bridge/Unique Funding Solutions' claim | 54,797 | 54,797 | 54,797 | 54,797 | 53,275 | 51,753 | 50,231 | 48,708 |
| 14 - Harvest Small Business Finance's claim | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - |
| **Total Outstanding Balance:** | $ 621,390 | $ 563,543 | $ 505,661 | $ 447,745 | $ 429,291 | $ 410,803 | $ 392,279 | $ 373,720 |

Exhibit A.2

# Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)

**Projected Balances of Claims Outstanding**
**August 2022 to July 2026**

| Claims | 12/31/2023 | 1/31/2024 | 2/29/2024 | 3/31/2024 | 4/30/2024 | 5/31/2024 | 6/30/2024 | 7/31/2024 |
|---|---|---|---|---|---|---|---|---|
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | - | - | - | - | - | - | - | - |
| 3 - Breakout Capital's Claims | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims | 33,966 | 31,741 | 29,510 | 27,274 | 25,032 | 22,785 | 20,532 | 18,273 |
| 5 - Everyday Fundings Claim | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim | 15,481 | 10,340 | 5,180 | 0 | - | - | - | - |
| 7 - Pinhook Capital's claim | 61,170 | 59,197 | 57,223 | 55,250 | 53,277 | 51,304 | 49,331 | 47,357 |
| 8 - Diverse Capital's claim | 56,091 | 52,878 | 49,655 | 46,421 | 43,177 | 39,921 | 36,655 | 33,378 |
| 9 - ROC Funding's claim | 56,205 | 54,392 | 52,579 | 50,766 | 48,953 | 47,139 | 45,326 | 43,513 |
| 10 - Brickstone Group's (Global Funding) claim | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim | 55,037 | 53,262 | 51,487 | 49,711 | 47,936 | 46,160 | 44,385 | 42,610 |
| 12 - Fundbox's claim | 29,990 | 29,022 | 28,055 | 27,087 | 26,120 | 25,153 | 24,185 | 23,218 |
| 13 - Delta Bridge/Unique Funding Solutions' claim | 47,186 | 45,664 | 44,142 | 42,620 | 41,098 | 39,576 | 38,053 | 36,531 |
| 14 - Harvest Small Business Finance's claim | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - |
| **Total Outstanding Balance:** | $ 355,126 | $ 336,496 | $ 317,831 | $ 299,130 | $ 285,592 | $ 272,038 | $ 258,468 | $ 244,881 |

Exhibit A.2

# Logistics Giving Resources, LLC   (including LG Drivers LLC and LG Hires LLC)
**Projected Balances of Claims Outstanding**
**August 2022 to July 2026**

| | 8/31/2024 | 9/30/2024 | 10/31/2024 | 11/30/2024 | 12/31/2024 | 1/31/2025 | 2/28/2025 | 3/31/2025 |
|---|---|---|---|---|---|---|---|---|
| **Claims** | | | | | | | | |
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | - | - | - | - | - | - | - | - |
| 3 - Breakout Capital's Claims | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims | 16,009 | 13,739 | 11,464 | 9,182 | 6,895 | 4,603 | 2,304 | - |
| 5 - Everyday Fundings Claim | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim | - | - | - | - | - | - | - | - |
| 7 - Pinhook Capital's claim | 45,384 | 43,411 | 41,438 | 39,464 | 37,491 | 35,518 | 33,545 | 31,572 |
| 8 - Diverse Capital's claim | 30,090 | 26,791 | 23,481 | 20,160 | 16,828 | 13,485 | 10,130 | 6,765 |
| 9 - ROC Funding's claim | 41,700 | 39,887 | 38,074 | 36,261 | 34,448 | 32,635 | 30,822 | 29,009 |
| 10 - Brickstone Group's (Global Funding) claim | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim | 40,834 | 39,059 | 37,283 | 35,508 | 33,733 | 31,957 | 30,182 | 28,406 |
| 12 - Fundbox's claim | 22,250 | 21,283 | 20,316 | 19,348 | 18,381 | 17,413 | 16,446 | 15,479 |
| 13 - Delta Bridge/Unique Funding Solutions' claim | 35,009 | 33,487 | 31,965 | 30,443 | 28,921 | 27,399 | 25,876 | 24,354 |
| 14 - Harvest Small Business Finance's claim | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - |
| **Total Outstanding Balance:** | $ 231,277 | $ 217,657 | $ 204,020 | $ 190,367 | $ 176,697 | $ 163,009 | $ 149,306 | $ 135,584 |

Exhibit A.2

**Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)**
**Projected Balances of Claims Outstanding**
**August 2022 to July 2026**

| Claims | 4/30/2025 | 5/31/2025 | 6/30/2025 | 7/31/2025 | 8/31/2025 | 9/30/2025 | 10/31/2025 | 11/30/2025 |
|---|---|---|---|---|---|---|---|---|
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | - | - | - | - | - | - | - | - |
| 3 - Breakout Capital's Claims | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims | - | - | - | - | - | - | - | - |
| 5 - Everyday Fundings Claim | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim | - | - | - | - | - | - | - | - |
| 7 - Pinhook Capital's claim | 29,598 | 27,625 | 25,652 | 23,679 | 21,705 | 19,732 | 17,759 | 15,786 |
| 8 - Diverse Capital's claim | 3,388 | 0 | - | - | - | - | - | - |
| 9 - ROC Funding's claim | 27,196 | 25,383 | 23,570 | 21,757 | 19,944 | 18,131 | 16,318 | 14,504 |
| 10 - Brickstone Group's (Global Funding) claim | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim | 26,631 | 24,856 | 23,080 | 21,305 | 19,529 | 17,754 | 15,979 | 14,203 |
| 12 - Fundbox's claim | 14,511 | 13,544 | 12,576 | 11,609 | 10,641 | 9,674 | 8,707 | 7,739 |
| 13 - Delta Bridge/Unique Funding Solutions' claim | 22,832 | 21,310 | 19,788 | 18,266 | 16,744 | 15,221 | 13,699 | 12,177 |
| 14 - Harvest Small Business Finance's claim | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - |
| **Total Outstanding Balance:** | $ 124,156 | $ 112,717 | $ 104,666 | $ 96,615 | $ 88,564 | $ 80,512 | $ 72,461 | $ 64,410 |

Exhibit A.2

## Logistics Giving Resources, LLC  (including LG Drivers LLC and LG Hires LLC)
**Projected Balances of Claims Outstanding**
**August 2022 to July 2026**

| | 12/31/2025 | 1/31/2026 | 2/28/2026 | 3/31/2026 | 4/30/2026 | 5/31/2026 | 6/30/2026 | 7/31/2026 |
|---|---|---|---|---|---|---|---|---|
| **Claims** | | | | | | | | |
| 1 - Priority Claims (taxes and wages) | - | - | - | - | - | - | - | - |
| 2 - General Unsecured Claims | - | - | - | - | - | - | - | - |
| 3 - Breakout Capital's Claims | - | - | - | - | - | - | - | - |
| 4 - Everest Business Funding's Claims | - | - | - | - | - | - | - | - |
| 5 - Everyday Fundings Claim | - | - | - | - | - | - | - | - |
| 6 - Blue Bridge Capital's claim | - | - | - | - | - | - | - | - |
| 7 - Pinhook Capital's claim | 13,813 | 11,839 | 9,866 | 7,893 | 5,920 | 3,946 | 1,973 | - |
| 8 - Diverse Capital's claim | - | - | - | - | - | - | - | - |
| 9 - ROC Funding's claim | 12,691 | 10,878 | 9,065 | 7,252 | 5,439 | 3,626 | 1,813 | - |
| 10 - Brickstone Group's (Global Funding) claim | - | - | - | - | - | - | - | - |
| 11 - Lifetime Funding's claim | 12,428 | 10,652 | 8,877 | 7,102 | 5,326 | 3,551 | 1,775 | - |
| 12 - Fundbox's claim | 6,772 | 5,804 | 4,837 | 3,870 | 2,902 | 1,935 | 967 | - |
| 13 - Delta Bridge/Unique Funding Solutions' claim | 10,655 | 9,133 | 7,611 | 6,089 | 4,566 | 3,044 | 1,522 | - |
| 14 - Harvest Small Business Finance's claim | - | - | - | - | - | - | - | - |
| 15 - Equity Interests in the Debtor | - | - | - | - | - | - | - | - |
| 16 - Miscellaneous Secured Claims | - | - | - | - | - | - | - | - |
| **Total Outstanding Balance:** | $ 56,359 | $ 48,307 | $ 40,256 | $ 32,205 | $ 24,154 | $ 16,102 | $ 8,051 | $ - |

Exhibit B

## Logistics Giving Resources, LLC (including LG Drivers LLC and LG Hires LLC)
### Liquidation Analysis
### As of May 24, 2022

| Assets | Book Value | Liquidation Value | Note |
|---|---|---|---|
| Cash | $1,800,000 | $1,800,000 | |
| Accounts Receivable | 2,330,658 | 1,954,298 | |
| Security Deposits | 11,891 | 11,891 | |
| Vehicles and Trailers | 34,237 | 17,119 | |
| Equipment, Furniture, and Fixtures | 11,287 | 5,643 | |
| Potential claims against insider | 474,643 | 474,643 | [1] |
| **Total Assets at Liquidation Value:** | 4,662,715 | 4,263,593 | |
| | | | |
| Less: Future Receivables Financiers Claims | | (1,969,493) | [2] |
| Less: Ch 7 Trustee and professional fees and expenses | | (400,000) | |
| Less: Ch 11 administrative expenses | | (200,000) | |
| **Total Claims:** | | (2,569,493) | |
| | | | |
| **Balance for unsecured claims** | | 1,694,099 | |
| | | | |
| **Total Dollar amount of unsecured claims:** | | 2,422,082 | [3] |
| | | | |
| Percentage of claims which unsecured claims would receive or retain in a Ch 7 liquidation: | | 70% | |
| Percentage of claims which unsecured creditors will receive or retain under the Plan: | | 100% | |

Notes:

[1] See Amended Statement of Financial Affairs 4.1, payments or transfers within 1 year that benefitted an insider.

[2] Claim amounts based on the filed claim amount, stipulated allowed claim amount or scheduled claim amount, less any unauthorized post-petition payments.

[3] Includes Payroll Protection Program loan potentially paid from liquidation as it is unclear whether the loan would be forgiven under a Chapter 7 liquidation.